UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------------------x
                                    :
*In re:*                            :    **Chapter 11**
                                    :
**FURNITURE BRANDS**                :    **Case No. 13-** 12329  (____)
**INTERNATIONAL, INC., et al.,**    :
                                    :
            **Debtors.**[1]         :    **Joint Administration Requested**
                                    :
-------------------------------------------------------------x

DECLARATION OF VANCE JOHNSTON IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

I, Vance Johnston, hereby declare under penalty of perjury:

PERSONAL BACKGROUND

1.      I am the Senior Vice President and Chief Financial Officer of Furniture Brands

International, Inc. ("FBN"), a corporation organized under the laws of the State of Delaware, and

each of its direct and indirect subsidiaries (collectively, "Furniture Brands" or the "Company").

In that capacity, I am familiar with Furniture Brands' day-to-day operations, businesses, and

financial affairs.  FBN and its domestic subsidiaries are the debtors and debtors in possession in

these chapter 11 cases (collectively, the "Debtors").

2.      I have been Senior Vice President and Chief Financial Officer of Furniture Brands

since 2012.  I joined Furniture Brands as Senior Vice President of Growth and Transformation in

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification
number, as applicable, are:  Furniture Brands International, Inc. (7683); Action Transport, Inc. (7587);
Broyhill Furniture Industries, Inc. (3217); Broyhill Home Furnishings, Inc. (8844); Broyhill Retail, Inc.
(8843); Broyhill Transport, Inc. (1721); Furniture Brands Holdings, Inc. (2837); Furniture Brands
Operations, Inc. (4908); Furniture Brands Resource Company, Inc. (1288); HDM Furniture Industries, Inc.
(7484); HDM Retail, Inc. (6125); HDM Transport, Inc. (4378); Lane Furniture Industries, Inc. (5064);
Lane Home Furnishings Retail, Inc. (9085); Laneventure, Inc. (8434); Maitland-Smith Furniture Industries,
Inc. (7486); Thomasville Furniture Industries, Inc. (6574); Thomasville Home Furnishings, Inc. (3139);
Thomasville Retail, Inc. (f/k/a Classic Design Furnishings, Inc.) (6174).  The Debtors' corporate
headquarters is located at 1 N. Brentwood Blvd., St. Louis, Missouri 63105.

2010.  Prior to joining Furniture Brands, I held senior corporate strategy and business

development roles at other companies, including Vice President, Corporate Strategy at Royal

Caribbean International; Vice President Corporate Strategy and Development at OfficeMax; and

Vice President, Operations, Services and Programs at Burger King.  Earlier in my career, I held

senior positions in accounting and consulting with KPMG and Ernst & Young.  I earned a

Bachelor of Science from the University of San Diego in Business Administration, and hold a

Masters of Business Administration from the Booth School of Business at the University of

Chicago.

      3.      I submit this declaration ("Declaration") to assist the Court and other parties in

interest in understanding the circumstances that compelled the commencement of these chapter

11 cases and in support of (i) the Debtors' petitions for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code") filed on the date hereof (the "Commencement

Date") and (ii) the relief, in the form of motions and applications, that the Debtors have

requested of the Court (collectively, the "First Day Pleadings").

      4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge, my discussions with other members of the Debtors' senior management

and advisors, my review of relevant documents, or my opinion based upon experience,

knowledge, and information concerning the Debtors' operations and financial affairs.  If called

upon to testify, I would testify competently to the facts set forth in this Declaration.  I am

authorized to submit this Declaration on behalf of the Debtors.

# I.

## FURNITURE BRANDS' BUSINESS

### Overview

5.      With operations in nine countries and throughout the United States, Furniture

Brands is a world leader in designing, manufacturing, sourcing, and retailing home furnishings.

Furniture Brands' portfolio of home furnishing lines include some of the best known and well-

respected brands in the furniture industry, including Thomasville, Broyhill, Lane, Drexel

Heritage, Henredon, Pearson, Hickory Chair, Lane Venture, Maitland-Smith, La Barge and

Creative Interiors.

6.      Through these brands, the Company offers customers a wide array of home

furnishings, including (i) case goods, consisting of bedroom, dining room, and living room wood

furniture products, (ii) stationary upholstery products, consisting of sofas, loveseats, sectionals,

and chairs, (iii) motion upholstered furniture, consisting of reclining upholstery and sleep sofas,

(iv) occasional furniture, consisting of wood, metal and glass tables, accent pieces, home

entertainment centers, and home office furniture, and (v) decorative accessories and accent

pieces.  The brands are featured in nearly every price and product category in the residential

furniture industry.

### The Brands

7.      Furniture produced with the Company's brand names has been manufactured and

sold for more than 100 years.  As described below, Furniture Brands has organized its various

brands to target specific customers in relation to style and price point:

- *Thomasville.*  Thomasville was founded in Thomasville, North Carolina, in 1904.
  Thomasville became part of Furniture Brands in 1995.  Thomasville has both
  wood furniture and upholstered products in the mid- to upper-price ranges and
  also offers ready-to-assemble furniture under the Creative Interiors brand name.
  Thomasville also offers case goods for the hospitality and contract markets.

- **Broyhill.** Broyhill began in 1926 as The Lenoir Chair Company. Through the years, Broyhill has grown through acquisitions of local furniture factories and internally generated expansion. Broyhill was acquired by Furniture Brands in 1980. Broyhill offers collections of mid-priced furniture, including both wood furniture and upholstered products, in a wide range of styles and product categories including bedroom, dining room, living room, occasional, home office, and home entertainment.

- **Lane.** Lane was founded by E.H. Lane in 1912 as a cedar chest maker and has grown internally and by acquiring other furniture companies. Lane was acquired by Furniture Brands in 1987. Lane focuses primarily on lower and mid-priced upholstered furniture, including motion and stationary furniture with an emphasis on home entertainment and family rooms.

- **Drexel Heritage.** Drexel Heritage began a rich history of crafting quality furniture in 1903. Drexel Heritage became part of Furniture Brands in 2001 and markets both case goods and upholstered furniture in categories ranging from mid- to premium-priced.

- **Henredon.** Henredon was founded in Morganton, North Carolina in 1945. It became part of Furniture Brands in 2001 and specializes in both wood furniture and upholstered products in the premium-price category.

- **Pearson.** Once known as the Clyde Pearson Company, Pearson was founded in 1941 and has been in continuous operation ever since. Pearson offers finely tailored upholstered furniture in the premium-price category.

- **Hickory Chair.** Hickory Chair has been crafting fine furniture for the past 90 years. Hickory Chair manufactures premium-priced wood and upholstered furniture.

- **Lane Venture.** Lane Venture was founded in 1972 and markets a premium-priced outdoor line of furniture, as well as casual indoor home furnishings.

- **Maitland-Smith.** For 30 years Maitland-Smith has been in the business of designing and manufacturing premium hand crafted, antique-inspired furniture, accessories, and lighting, utilizing a wide range of unique materials. Maitland-Smith became part of Furniture Brands in 2001 and markets its products under both the Maitland-Smith and LaBarge brand names.

### Distribution Channels

8.      Furniture Brands sells its products through specialized interior designers and at retailers ranging from single-brand stores to independent retailers. Retailers carrying the

Company's brands range in size from small, independently-owned furniture stores to national and regional department stores and chains.

9.    The Company's primary avenue of distribution continues to be through a diverse network of independently-owned furniture retailers. Although a number of these retailers have been displaced in recent years, this network remains an important part of Furniture Brands' distribution base. Each of the Company's brands offers services to retailers to support their marketing efforts, including coordinated national advertising, merchandising and display programs, and dealer training.

10.    Furniture Brands also maintains dedicated gallery programs. Gallery retailers display the Company's products in complete and fully accessorized room settings instead of as individual pieces. This presentation format encourages consumers to purchase an entire room of furniture instead of individual pieces from different manufacturers.

11.    Furniture Brands has also developed a dedicated distribution channel of Thomasville Home Furnishings Stores. These stores consist of company or dealer-owned retail locations that feature only Thomasville branded products.

12.    Additionally, Furniture Brands has developed significant relationships and sales accounts with large national department stores and specialty stores.

**Manufacturing and Sourcing**

13.    Furniture Brands employs a diverse manufacturing strategy. As such, Furniture Brands utilizes its own domestic and foreign manufacturing facilities as well offshore vendors for manufacturing and production. Furniture Brands' principal domestic production operations include eight upholstery facilities, two case goods facilities, one component manufacturing facility, and one multi-functional facility. These domestic facilities are located in North Carolina and Mississippi. Furniture Brands also operates its own manufacturing facilities in the

Philippines, Indonesia and Mexico. These international facilities total approximately 5.5 million square feet.

14.    As noted above, a portion of the products used in manufacturing are sourced from offshore manufacturers, primarily in China, the Philippines, Indonesia, and Vietnam. Furniture Brands designs and engineers these products, and then has them manufactured to its specifications by independent offshore manufacturers. Furniture Brands operates its own sourcing group in China; that group has primary responsibility for quality control, sourcing of raw materials and finished goods, and logistics activities in Asia.

15.    Furniture Brands also maintains informal strategic relationships with several of the larger foreign furniture manufacturers. These relationships provide Furniture Brands with the ability to purchase, on a coordinated basis, a significant portion of the foreign manufacturers' capacity, subject to quality control and delivery standards. During 2012, two of these manufacturers represented 13.0% and 10.3% of imported product and four other manufacturers represented in excess of 5% each. Each of these offshore manufacturers represents less than 5% of total product and material costs.

16.    The raw materials used in manufacturing Furniture Brands' products include lumber, veneers, plywood, fiberboard, particleboard, steel, paper, hardware, adhesives, finishing materials, glass, mirrored glass, fabrics, leathers, metals, stone, synthetics and upholstered filling material (such as synthetic fibers, foam padding, and polyurethane cushioning). Furniture Brands purchases wood, fabrics, leathers, and other raw materials both domestically and abroad.

### Employees

17.    In order to support its global operations, Furniture Brands employs almost 9,000 people domestically and abroad, including machinists, upholsterers, assembly workers, finishers,

material handlers, inspectors, shippers, sales agents, customer service representatives, support staff and other personnel.

18.    As of the Petition Date, approximately 5,400 Furniture Brands' employees work for one of the Debtors in these chapter 11 cases, and the vast majority of the Debtors' employees work in the United States. The total cost of all wages and benefits payable to these domestic employees amounts to approximately $276 million per year. The Debtors' generally divide their domestic employee base into the following categories and numbers of employees:
(a) approximately 3,900 individuals work as non-exempt manufacturing employees,
(b) approximately 600 individuals work as non-exempt office employees, and (c) approximately 900 individuals work as exempt employees in the United States. The non-exempt employees are paid on an hourly basis, while the exempt employees (other than certain sales agents) are salaried. The Debtors employ approximately 120 sales agents whose compensation entirely consists of sales commissions.

19.    In addition, Furniture Brands employs approximately 3,500 individuals through foreign non-debtor affiliates of the Debtors. Furniture Brands' international employees are distributed as follows:  (a) approximately 490 individuals live and work for Furniture Brands in Mexico; and (b) approximately 3,000 individuals live and work for Furniture Brands in Asia.

20.    None of these employees is covered by a collective bargaining agreement. The Debtors consider their relationships with their employees to be good.

## II.

## ORGANIZATIONAL STRUCTURE

21.    Headquartered in St. Louis, Missouri, FBN is a publicly held corporation whose stock was, until recently, traded on the New York Stock Exchange under the ticker symbol FBN. FBN is the direct or indirect parent of each of the other Debtors and their non-debtor affiliates.

7

FBN is the direct parent of six domestic subsidiaries and one international subsidiary incorporated in Hong Kong.

22.    Furniture Brands' operating subsidiaries are located in the United States, Mexico, Canada, China (Hong Kong), Indonesia, Philippines, Malaysia, and Vanuatu.  The chart below summarizes the organizational structure of the Debtors and their non-debtor affiliates; it also describes the particular home-furnishing brands associated with those entities as applicable.  In addition, Exhibit 1 to this Declaration provides a detailed illustration of the corporate structure for Furniture Brands.



23.    The Company's foreign subsidiaries are not a part of these chapter 11 cases. However, Furniture Brands Canada ULC, a Canadian subsidiary of FBN, petitioned for relief

under the Bankruptcy and Insolvency Act of Canada prior to the commencement of these chapter 11 cases.

## III.

### FURNITURE BRANDS' PREPETITION CAPITAL STRUCTURE

#### General Overview

24.     As of June 29, 2013, Furniture Brands' unaudited and consolidated financial statements reflected assets totaling approximately $547 million and liabilities totaling approximately $550 million.  As of the Petition Date, Furniture Brands had approximately $142.0 million of total funded debt outstanding, including approximately $ 49.7 million owed under a term loan facility and approximately $92.3 million owed under an asset-based revolving facility.  In addition, Furniture Brands currently has unfunded pension obligations of approximately $200 million and approximately $100 million in general trade obligations.

#### Overview of Secured Credit Facilities

25.     On September 25, 2012, FBN and its material domestic subsidiaries entered into the following secured credit facilities:

a.      the Credit Agreement, dated as of September 25, 2012 (as amended, restated, supplemented, or modified from time to time, the "Prepetition ABL Facility") by and among, FBN, a Delaware corporation, as Borrower Representative, Broyhill Furniture Industries, Inc., a North Carolina corporation ("Broyhill Furniture"), HDM Furniture Industries, Inc., a Delaware corporation ("HDM Furniture"), Lane Furniture Industries, Inc., a Mississippi corporation ("Lane Furniture"), Maitland-Smith Furniture Industries, Inc., a Delaware corporation ("Maitland Furniture") and Thomasville Furniture Industries, Inc., a Delaware corporation ("Thomasville Furniture" and, together with FBN, Broyhill Furniture, HDM Furniture, Lane Furniture and Maitland Furniture, collectively the "Borrowers"), as Borrowers,

certain other parties designated as "Credit Parties" thereto, the financial institutions from time to time party thereto as lenders (collectively, the "Revolver Lenders"), General Electric Capital Corporation, as agent for the Revolver Lenders (the "Revolver Agent"), General Electric Capital Corporation, Bank of America, N.A. and Wells Fargo Bank, National Association, as co-collateral agents, General Electric Capital Corporation and Bank of America, N.A., as syndication agent, and Wells Fargo Bank, National Association, GE Capital Markets, Inc., and Bank of America, N.A., as lead arrangers and bookrunners; and

        b.    the Term Loan Agreement, dated as of September 25, 2012 (as amended, restated, supplemented, or modified from time to time, the "Prepetition Term Loan" and together with the Prepetition ABL Facility, the "Prepetition Credit Facilities"), by and among FBN, as Borrower Representative, the other Borrowers, certain other parties designated as "Credit Parties" thereto, the financial institutions party thereto (collectively, the "Term Lenders"), and NEXBANK SSB, as successor agent to Pathlight Capital LLC, as administrative agent and collateral agent for the Term Lenders.

26.    On September 25, 2012, the Borrowers borrowed approximately $41.8 million, including $8.5 million in outstanding letters of credit, under the Prepetition ABL Facility and the full amount of the Prepetition Term Loan Facility or $50.0 million was borrowed. Proceeds of borrowings under the Prepetition Credit Facilities on September 25, 2012 were used to pay transaction costs and expenses and to pay in full indebtedness in the amount of $77.0 million that was outstanding under the Borrowers' April 27, 2011 asset-based Amended and Restated Credit Agreement with the financial institutions party thereto as lenders and JPMorgan Chase Bank, N.A., as administrative agent.

27.    Lenders under the Prepetition ABL Facility and the Prepetition Term Loan Facility are also party to an Intercreditor Agreement, dated as of September 25, 2012 (as amended, restated, supplemented, or modified from time to time, the "Prepetition Intercreditor Agreement"), which sets forth the priorities of the two lender groups under the Prepetition ABL Facility and the Prepetition Term Loan Facility, with respect to the Collateral (as hereinafter defined).

### Prepetition ABL Facility

28.    The Prepetition ABL Facility is an asset-based revolving credit facility that permits borrowings in an aggregate amount outstanding not to exceed the lesser of (a) $200 million and (b) a borrowing base of up to 85% of the book value of certain eligible accounts receivable and inventory, in each case, less a $25.0 million block against availability and certain other reserves, including reserves that the Borrowers are required to establish under the terms of the Prepetition Term Loan Facility.  The Prepetition ABL Facility also includes a sub-facility for issuance of letters of credit in an aggregate amount of up to $35.0 million.  In addition, the Prepetition ABL Facility permits protective overadvances in an aggregate amount not to exceed the greater of 5.00% of the borrowing base then in effect or $10.0 million.  Unless terminated sooner, the Prepetition ABL Facility matures on September 25, 2017.

29.    Subject to certain exceptions, all borrowings under the Prepetition ABL Facility are (a) guaranteed by FBN's domestic subsidiaries and (b) are secured by a lien on substantially all of the Borrowers and guarantors assets, as follows:  (i) a first priority security interest in all accounts receivable, inventory, cash deposit and securities accounts, and certain related assets (the "ABL Priority Collateral") and (ii) a second priority security interest in substantially all

other assets (the "Term Priority Collateral" and together with the ABL Priority Collateral, the "Collateral").

30.    All borrowings under the Prepetition ABL Facility accrue interest at a rate *per annum* equal to the base rate (calculated as the greater of the prime rate, Federal Funds Rate plus 0.50%, and LIBOR plus 1.00%) or LIBOR plus the applicable margin. The applicable margin for borrowings under the Prepetition ABL Facility ranges from 1.00% to 2.00% for base rate borrowings and 2.00% to 3.00% for LIBOR borrowings and is calculated quarterly based upon average availability and consolidated EBITDA for the Borrowers' prior fiscal quarter. In addition, the Prepetition ABL Facility is subject to an unused commitment fee of 0.50% if usage is less than or equal to 50.00% and 0.375% if usage is greater than 50.00% of commitments. Amounts repaid under the Prepetition ABL Facility, unless accompanied by a permanent reduction in commitments, may be reborrowed.

31.    As of September 6, 2013, the Borrowers' had outstanding borrowings under the Prepetition ABL Facility of approximately $92.3 million, including $8.6 million in outstanding letters of credit.

### Prepetition Term Loan

32.    The full amount of the Prepetition Term Loan, or $50 million, was borrowed on September 25, 2012. The Prepetition Term Loan requires that the Borrowers establish reserves under the Prepetition ABL Facility under certain circumstances as follows: (a) a deficiency reserve, which is equal to the excess of the principal balance due under the Prepetition Term Loan over the Prepetition Term Loan borrowing base (which includes eligible accounts and inventory) and (b) a performance reserve of $5.0 million if consolidated EBITDA is less than $10.0 million, $10.0 million if consolidated EBITDA is negative, and $15.0 million if (i)

consolidated EBITDA is less than $5.0 million, and (ii) a key HDM Furniture contract is not renewed. In addition, the Prepetition Term Loan permits protective overadvances in an aggregate amount not to exceed $5.0 million. Unless terminated sooner, the Prepetition Term Loan matures on September 25, 2017.

33.    Subject to certain exceptions, all borrowings under the Prepetition Term Loan are (a) guaranteed by FBN's domestic subsidiaries and (b) are secured by a lien on substantially all of the Borrowers and guarantors assets as follows: (i) a first priority security interest in all Term Priority Collateral and (ii) a second priority security interest in ABL Priority Collateral.

34.    All borrowings under the Prepetition Term Loan accrue interest at a rate *per annum* equal to LIBOR plus applicable margin of 12.00%. Subject to certain exceptions, optional prepayments of the Term Loan Facility are subject to a prepayment premium of 104.00% of the amount prepaid on or prior to the second anniversary of the closing date, 103.00% of the amount prepaid after the second anniversary but on or prior to the third anniversary of the closing date, and 102.00% of the amount prepaid after the third anniversary but on or prior to the fourth anniversary of the closing date. Amounts repaid under the Prepetition Term Loan may not be reborrowed.

35.    As of September 6, 2013, the Borrowers' had outstanding borrowings under the Prepetition Term Loan Facility of approximately $49.7 million.

**IV.**

**EVENTS LEADING TO CHAPTER 11**

**Declining Sales**

36.    As a manufacturer and retailer of home furnishings, Furniture Brands' operations and performance depend significantly on economic conditions, particularly in the United States, and their impact on levels of existing home sales, new home construction, and consumer

discretionary spending. Economic conditions deteriorated significantly in the United States and worldwide in recent years as part of a global financial crisis. Although the general economy has begun to recover, sales of residential furniture remain depressed due to wavering consumer confidence and several, ongoing global economic factors that have negatively impacted consumers' discretionary spending. These ongoing factors include lower home values, prolonged foreclosure activity throughout the country, a weak market for home sales, continued high levels of unemployment, and reduced access to consumer credit. These conditions have resulted in a decline in Furniture Brands' sales, earnings, and liquidity.

37.    Sales have continued to be depressed as a result of a sluggish recovery in the U.S. economy, continuing high unemployment, depressed housing prices, tight consumer lending practices, the reluctance of some households to use available credit for big ticket purchases including furniture, and continuing volatility in the retail market.

38.    Further, some of the Company's larger brands have lost some of their market share primarily due to competition from suppliers who are able to produce similar products at lower costs. The residential furniture industry is highly competitive and fragmented. Furniture Brands competes with many other manufacturers and retailers, some of which offer widely advertised, well-known, branded products, and other competitors are large retail furniture dealers who offer their own store-branded products.

39.    Furniture Brands' sales have decreased during recent earnings periods in comparison with prior year's results. In the second quarter of 2013, sales decreased 4.0% in comparison to the second quarter of 2012, and sales also decreased 7.8% in the six months ended June 29, 2013 compared to the six months ended June 30, 2012. Based on this comparison, sales for the Company's brands that specialize in premium-priced offerings generally outperformed

sales for brands that focus more on low- and mid-priced offerings. In addition, sales for upholstery products generally outperformed sales of case goods.

### Constrained Liquidity

40.      As a result of continued declines in sales, the Furniture Brands' liquidity position has become severely constrained. As of June 29, 2013, the Company's available cash and cash equivalents totaled $8.8 million, compared to $11.9 million as of December 29, 2012. At the same time, net cash used by the Company's operating activities totaled $10.7 million as of June 29, 2013, compared with $3.0 million in the six months ended June 30, 2012.

41.      The Company's most significant sources of liquidity consist of cash generated from working capital and borrowings under the Prepetition ABL Facility. However, following the completion of an inventory appraisal by the Company's prepetition lenders, the amount that the Company was able to borrow under the Prepetition ABL Facility decreased, as the liquidation value of inventory was reduced.

42.      In August, 2013, the Company' borrowing base under its Prepetition Credit Facilities fell below $25.0 million, which triggered weekly borrowing-base reporting requirements under the Prepetition ABL Facility and imposed a reserve requirement of approximately $4.3 million. The imposition of this additional reserve requirement further constricted the Company's already strained liquidity position.

43.      In addition, a majority of Furniture Brands' sales are paid for by customers using credit or debit cards. To facilitate such transactions, Furniture Brands entered into certain agreements with credit card companies and processors, including agreements with American Express. When customers return merchandise to Furniture Brands after a credit card purchase, or dispute the charges with their credit card issuer, Furniture Brands may be obligated to refund to the credit card issuer the purchase price of the returned or disputed merchandise, subject to

certain adjustments (collectively, "Chargebacks"). In the weeks leading up to the Petition Date,

American Express began to establish reserves with funds owed to Furniture Brands for purchases

of the Company's products by customers of American Express. These reserves were intended to

protect American Express from Chargebacks by providing it with a source of funds against

which it could offset amounts owed to its customers on account of Chargebacks. The effect of

these reserves, however, was to further constrain Furniture Brands' liquidity.

44.     Finally, Furniture Brands is facing mounting pension obligations. The Company

operates a qualified defined-benefit pension plan for certain long-term U.S. employees (the

"Pension Plan"). As of December 31, 2012, the Furniture Brands' projected benefit obligation

under the Pension Plan exceeded the fair value of plan assets by approximately $191.8 million.

The projected benefit obligation calculations are dependent on various assumptions, including a

discount rate that is selected based on yields of high quality bonds with cash flows matching the

timing and amount of expected future benefit payments. Because financial markets have

experienced extreme volatility in recent years, the asset values of the Pension Plan and the

discount rate used to measure the benefit obligation have fluctuated significantly.

### Restructuring Initiatives

45.     Against this backdrop, Furniture Brands commenced an analysis of opportunities

for a broader financial restructuring that would provide Furniture Brands with the necessary

flexibility to either continue or to sell its business to maximize creditor recoveries. Furniture

Brands made numerous cost elimination decisions and consolidated domestic operations with the

closing and selling of excess manufacturing, warehouse, and office properties.

46.     Furniture Brands subsequently retained Alvarez & Marsal, LLC ("A&M"), as

restructuring advisors, and Miller Buckfire & Co., LLC ("Miller Buckfire"), as investment

bankers and financial advisors, to assist the Debtors in their efforts to raise additional capital and

implement further cost reduction initiatives, including additional reductions in controllable costs and the sale of non-core assets. These advisors also assisted Furniture Brands with a review of its portfolio of brands and the execution of special initiatives, including a competitive marketing process to raise additional capital through the sale of one or more brands. In addition, Furniture Brands continued to rely on its legal advisor, Paul Hastings LLP, to provide legal counsel during these initiatives.

47.    In the months prior to the Petition Date, the Debtors worked closely with their advisors to consider raising additional liquidity through the capital markets, as well as to explore options with creditors in the Debtors' existing capital structure, in an effort to address their tightening liquidity situation. In 2011, Furniture Brands had engaged Goldman Sachs to investigate the possibility of sale of Furniture Brands' business. Goldman Sachs spent a number of months investigating market receptivity to a potential out-of-court sale, contacting over 15 of the most qualified strategic and financial candidates. However, potential purchasers expressed concern over potential legacy pension liabilities and/or only desired to acquire discrete assets of the Company. It later became clear that an out-of-court solution to the Debtors' liquidity issues would not be available.

48.    After considering all available options, Furniture Brands determined that pressing liquidity constraints resulting from decreased sales, burdensome long-term debt obligations, and legacy pension liabilities, was impeding their ability to implement successful operational improvements and participate in an out-of-court restructuring. Furthermore, prospective buyers of discrete assets were expressing reluctance to engage in financing transactions and asset sale transactions absent the protections available under chapter 11 for such parties. Furniture Brands concluded that seeking chapter 11 relief would be in its best interests, as well as the best interests

of its estates, creditors, and other parties in interest, and, accordingly, commenced these chapter 11 cases.

### Asset Sale Agreement and DIP Financing

49.    The Debtors realized that they would require an immediate infusion of new liquidity to fund operations during the pendency of these chapter 11 cases.  Together, the Debtors and Miller Buckfire contacted over 100 entities, including the lenders under the Prepetition ABL Facility and the Prepetition Term Loan Facility, to solicit interest in providing liquidity either through financing (in-court or out-of-court) or through a sale of some or all of the assets of Furniture Brands.  The universe of parties Miller Buckfire contacted included parties who have historically been active in the debtor-in-possession financing market as well as other financial and strategic parties that Miller Buckfire and the Debtors reasonably expected would have an interest in the process and the wherewithal to consummate the transactions described above.  During these discussions, some parties interested in providing proposals for a debtor-in-possession financing also expressed interest in acting as "stalking horse" bidders to acquire the Debtors' assets, or portions thereof, through sales under section 363 of the Bankruptcy Code.

50.    By August 2013, the Debtors and their advisors had received the following three debtor-in-possession financing proposals: (i) one led by a group comprised of the lenders under the Prepetition ABL Facility along with a new potential term loan provider; (ii) one from Oaktree Capital Management, L.P., the lender under the Debtors' Prepetition Term Loan, and certain of its affiliates ("Oaktree"); and (iii) one from a third party, each of which submitted draft commitment letters alongside their term sheets.  Both Oaktree and the third-party also proposed stalking horse bids for all or a substantial portion of the Debtors' assets.  The Debtors, with the assistance of their advisors, engaged in extensive and intense negotiations in an attempt to improve the proposals submitted by these three parties.

51.     After extensive arm's-length negotiations with all three proponents of debtor-in-possession financing, the Debtors, in consultation with their advisors, determined that the proposal by Oaktree (including the DIP Financing and the stalking horse bid) provided the best overall outcome to the Debtors.  Specifically, relative to the other two proposals received, the Oaktree proposal provided the Debtors with more liquidity and more time and flexibility to conduct a competitive auction for the sale the Debtors' assets under section 363 of the Bankruptcy Code, in order to maximize value for the estates.  In addition, Oaktree's proposal contemplated a lower amount of new financing than the other proposals, as it did not involve a refinancing of the Prepetition Term Loan Facility.  The DIP Financing thus provides the Debtors not only with much-needed liquidity, but also provides the Debtors with a stalking horse bidder for the contemplated 363 sale, and thus clears the path for the emergence of the Debtors' businesses as a going concern.

52.     With respect to DIP financing, Oaktree committed to enter into a $140 million senior secured priming debtor-in-possession credit facility (the "DIP Facility") that will consist of: (i) a $90 million term loan commitment that will be used to refinance with a single term loan advance all outstanding obligations under the Prepetition ABL Facility (including cash collateralizing all issued and outstanding letters of credit) and concurrently therewith the Prepetition ABL Facility shall be terminated; and (ii) a $50 million revolving commitment, with $25 million of this revolving commitment available immediately upon entry an order of the Bankruptcy Court approving the DIP Facility on an interim basis. The DIP Facility is not subject to a borrowing base.

53.     Moreover, as previously noted, Oaktree committed to act as the stalking horse bidder for certain of the Debtors' assets.  Subject to higher and otherwise better offers, Oaktree

will purchase substantially all assets of the Debtors (and possibly assets of their non-debtor

foreign affiliates), except that Oaktree will not acquire the assets of the Debtors' Lane business

(the "Bankruptcy Sale"). In exchange for the assets it seeks to acquire, Oaktree will pay $166

million (the "Purchase Price"). The Debtors will also continue conducting a competitive

marketing process to sell their Lane business. The Purchase Price may be satisfied, in whole or

in part, by: (a) a "credit bid" (as such term is defined within the meaning of section 363(k) of the

Bankruptcy Code) of the accrued and then outstanding amount of Oaktree's portion of the

Debtors' secured indebtedness, including, without limitation, each of (i) the DIP Facility and (ii)

the Prepetition Term Loan (including any Prepayment Premium (as such term is defined in the

Prepetition Term Loan Agreement)) (collectively, the "Credit Bid"); and (b) cash in an amount

equal to the difference between the Purchase Price and the Credit Bid.

54.    Furniture Brands' paramount goal is to maximize the recovery of all creditor

constituencies and Furniture Brands' other stakeholders given its challenging financial position.

Following careful consideration of all alternatives, the Debtors have determined that

implementation of their chapter 11 restructuring pursuant to the terms set forth in the DIP

Financing and the asset purchase agreement with Oaktree represent the best way to maximize the

value of the Debtors' businesses. The Debtors anticipate that they will complete an auction and

sell their Lane business within the next 30 days, and will close the Bankruptcy Sale of

substantially all other assets to Oaktree, or an otherwise higher and better bidder, within the next

140 days. Implementing such a restructuring is a significant step in effectuating the Debtors'

turnaround and will enable the Debtors' businesses to emerge from chapter 11 as a healthy,

viable enterprise.

## VI.

### Support for Relief Requested in First Day Pleadings

55.     Concurrently with the filing of its chapter 11 petitions, or as soon as practicable

thereafter, Furniture Brands has filed (or will file) a number of First Day Pleadings seeking relief

that Furniture Brands believes is necessary to enable it to operate with minimal disruption and

loss of productivity.  The facts set forth in the First Day Pleadings are incorporated herein in

their entirety.  Furniture Brands requests that the relief requested in each of the First Day

Pleadings be granted as critical elements in ensuring a smooth transition into chapter 11.

56.     I have reviewed each of the First Day Pleadings, and the facts stated therein are

true and correct to the best of my belief with appropriate reliance on corporate officers and

advisors.  The relief sought in each of the First Day Pleadings is necessary to enable to Furniture

Brands to continue operations with minimal disruption and constitutes a critical element in the

successful implementation of Furniture Brands' effort to maximize the recovery of its creditors.

To this end, Furniture Brands has filed the following First Day Pleadings:

(i)     Debtors' Motion for Entry of Order, Pursuant to Bankruptcy Rule 1015, Directing Joint Administration of Related Chapter 11 Cases;

(ii)     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Post-Petition Financing on a Super-Priority, Senior Secured Basis Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364, (B) Use Cash Collateral Pursuant to Bankruptcy Code Section 363, (C) Repay Prepetition Revolver in Full Pursuant to Bankruptcy Code Section 363, (II) Granting Adequate Protection to Certain Prepetition Lenders Pursuant to Sections 361, 362, 363, and 364, (III) Modifying the Automatic Stay and (IV) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001;

(iii)     Debtors' Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 345(b), 363(c)(1), 364(a), 364(b), and 503(b)(1), Bankruptcy Rules 6003 and 6004 and Local Rule 2015-2 (A), Authorizing Debtors to Use Existing Cash Management System, (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers, (C) Authorizing Continued Use of

Intercompany Transactions, (D) Waiving Requirements of Section 345(b) of Bankruptcy Code and (E) Authorizing Debtors to Use Existing Bank Accounts and Existing Business Forms;

(iv)     Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Bankruptcy Code Sections 105(a), 363(b), 503(b), 507(a)(4), and 507(a)(8), and Bankruptcy Rules 6003 and 6004, (A) Authorizing Debtors to (I) Pay Certain Employee Compensation and Benefits and (II) Maintain and Continue Such Benefits and Other Employee-Related Programs and (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;

(v)      Debtors' Motion for Entry of Order, Pursuant to Bankruptcy Code Sections 105(a), 362(d), 363(b)(1), and 503(b) and Bankruptcy Rules 6003 and 6004, (A) Authorizing Debtors to (I) Continue Workers' Compensation Program and Liability, Product, Property, and Other Insurance Programs, (II) Pay All Obligations in Respect Thereof, and (III) Continue to Honor Insurance Premium Financing Obligations, and (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;

(vi)     Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (A) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (B) Approving Debtors' Proposed Form of Adequate Assurance, and (C) Determining Adequate Assurance of Payment for Future Utility Services;

(vii)    Debtors' Motion for Entry of Order, Pursuant to Bankruptcy Code Sections 105(a), 363(b), 541, and 507(a)(8) and Bankruptcy Rules 6003 and 6004, (A) Authorizing Debtors to Pay Prepetition Taxes and Fees and (B) Authorizing And Directing Banks and Financial Institutions to Honor And Process Checks and Transfers Related to Such Obligations;

(viii)   Debtors' Motion for Entry of Order, Pursuant to Bankruptcy Code Sections 105(a) and 363(b) and Bankruptcy Rules 6003 and 6004, (A) Authorizing Debtors' Payment of (I) Certain Prepetition Shipping and Delivery Charges and (II) Mechanic's Lien Charges, and (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;

(ix)     Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Bankruptcy Code Sections 363(b), 503(b)(9), and 105(a) and Bankruptcy Rules 6003 and 6004, Authorizing (A) Debtors to Pay the Prepetition Claims of Certain Critical Domestic and Foreign Vendors and Administrative Claimholders, and (B) Financial Institutions to Honor And Process Prepetition Checks and Transfers to Certain Critical Vendors;

(x)     Debtors' Motion For Entry of Order, Pursuant to Bankruptcy Code Sections 105(a), 362, 363(b), 503(b)(1), 1107(a), and 1108 and Bankruptcy Rules 6003 and 6004, (A) Authorizing Debtors to Continue (I) Customer Programs and Practices and (II) Certain Prepetition Credit Card Obligations in the Ordinary Course of Business and (B) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;

(xi)    Debtors' Motion for Entry of Order, Pursuant to Bankruptcy Code Sections 105(a) and 521, Bankruptcy Rule 1007 and Local Rule 1007-1, for Extension of Time to File Schedules and Statements of Financial Affairs;

(xii)   Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Bankruptcy Code Sections 105(a), 362 and 541, Establishing Notification and Hearing Procedures for Transfers of Common Stock;

(xiii)  Debtors' Application for Entry of an Order Appointing Epiq Bankruptcy Solutions, LLC as Claims And Noticing Agent Pursuant To 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), And Local Rule 2002-1(f); and

(xiv)   Debtors' Motion for Entry of Order Enforcing Sections 362 and 525 of the Bankruptcy Code.

## Conclusion

57.     I believe approval of the relief requested in the First Day Pleadings is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Pleadings and such other further relief as may be just.

*[remainder of page intentionally left blank]*

23

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: September 9, 2013
       St. Louis, Missouri

On behalf of the Debtors

By: _____
Name:   Vance Johnston
Title:    Chief Financial Officer

## EXHIBIT 1

### CAPITAL STRUCTURE CHART



Furniture Brands International, Inc. – Legal Entity Ownership Structure