## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
--------------------------------------------------------x
                                    :    Chapter 11
In re:                              :
                                    :    Case No. 13-12329 (CSS)
FURNITURE BRANDS                    :
INTERNATIONAL, INC., et al.,        :    Jointly Administered
                                    :
          Debtors.¹                 :    Docket Ref. No. 21
--------------------------------------------------------x
```

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS, (B) USE CASH COLLATERAL, (C) REPAY THE PREPETITION REVOLVER IN FULL, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING

Upon the motion (the "Motion") [Docket No. 21] dated September 9, 2013 of Furniture

Brands International, Inc., Broyhill Furniture Industries, Inc., HDM Furniture Industries, Inc.,

Lane Furniture Industries, Inc., Maitland-Smith Furniture Industries, Inc., and Thomasville

Furniture Industries, Inc. (each, a "Borrower" and, collectively, the "Borrowers"), and the other

persons designated as a "Credit Party" (each, a "Credit Party" and, collectively, the "Credit

Parties") in the DIP Agreement (as defined below), each as a debtor and debtor-in-possession

(collectively, the "Debtors") in the above-captioned chapter 11 cases, pursuant to sections 105,

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: Furniture Brands International, Inc. (7683); Action Transport, Inc. (7587); Broyhill Furniture Industries, Inc. (3217); Broyhill Home Furnishings, Inc. (8844); Broyhill Retail, Inc. (8843); Broyhill Transport, Inc. (1721); Furniture Brands Holdings, Inc. (2837); Furniture Brands Operations, Inc. (4908); Furniture Brands Resource Company, Inc. (1288); HDM Furniture Industries, Inc. (7484); HDM Retail, Inc. (6125); HDM Transport, Inc. (4378); Lane Furniture Industries, Inc. (5064); Lane Home Furnishings Retail, Inc. (9085); Laneventure, Inc. (8434); Maitland-Smith Furniture Industries, Inc. (7486); Thomasville Furniture Industries, Inc. (6574); Thomasville Home Furnishings, Inc. (3139); Thomasville Retail, Inc. (f/k/a Classic Design Furnishings, Inc.) (6174). The Debtors' corporate headquarters is located at 1 N. Brentwood Blvd., St. Louis, Missouri 63105.

361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of an interim order (this "Interim Order") providing for, among other things:

(i)        authority for the Debtors to obtain senior secured post-petition financing on a super-priority basis pursuant to the terms and conditions of that certain Senior Secured Super-Priority Debtor in Possession Credit Agreement dated September 9, 2013, by and among the Borrowers, Furniture Brands International, Inc., as Borrower Representative, the other Persons party thereto that are designated as Credit Parties, NexBank SSB, as agent for the DIP Lenders (as defined below) (the "DIP Agent"), and the lenders party thereto from time to time (collectively, the "DIP Lenders"), substantially in the form attached hereto as **Exhibit 1** (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Agreement"[2] and the financing made available pursuant to the DIP Agreement and the other DIP Documents (as defined below), the "DIP Facility");

(ii)       authority for the Debtors to (a) execute, deliver, and perform under the DIP Agreement and all other related or ancillary documents and agreements (including

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms as set forth in the DIP Agreement.

the Budget (as defined below)) (collectively with the DIP Agreement, the "DIP Documents") and (b) perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)        authority for the Debtors to (a) use cash collateral on the terms described herein, and (b) access and use the liquidity provided under the DIP Facility on an interim basis, as follows: (1) access and use of the postpetition term loan made available under the DIP Facility in the amount of $90,000,000 (the "Take-Out Term Loan") to (A) permanently repay in full all Revolver Obligations (as defined below) pursuant to that certain payoff letter by the Revolver Agent (collectively with all related or ancillary documents and agreements, including cash collateral agreements, the "Revolver Payoff Letter") attached to the Motion as Exhibit C and, concurrently therewith, terminate the Revolver and fund the indemnification account provided for in the Revolver Payoff Letter (the "Revolver Indemnification Account"), and (B) cash collateralize all outstanding letters of credit and purchase charge cards under the Revolver (as defined below); (2) pay fees and expenses (including original issue discount in respect of the total amount of committed financing under the DIP Facility); and (3) access and use of up to $25 million of the revolving commitment made available under the DIP Facility (the "DIP Revolver" and, together with the Take-Out Term Loan, the "Interim DIP Financing") to (x) refinance prior indebtedness, including any Revolver Obligations, and cash collateralize letters of credit and purchase charge cards outstanding under such prior indebtedness, (y) fund the Debtors' chapter 11 cases and the continued operation of their businesses as Debtors, (z) fund certain fees and expenses associated with the consummation of the transactions contemplated in the DIP Documents, each on the terms

3

set forth herein and the DIP Documents; a grant of an automatically perfected, valid, enforceable, unavoidable, and first-priority security interest first-priority security interest and lien, pursuant to section 364(c)(2) of the Bankruptcy Code, on all DIP Collateral (as defined herein) and assets of the Borrowers and the other Credit Parties of any kind (other than Avoidance Actions (as defined below) and the proceeds therefrom, except as set forth in the Final Order), whether now existing or hereafter acquired, that was not subject to a valid, perfected, and non-avoidable lien in existence on the Petition Date (as defined below), subject only to the Carve-Out (as defined below);

(iv)     a grant of an automatically perfected, valid, enforceable, unavoidable and junior lien, pursuant to section 364(c)(3) of the Bankruptcy Code, on the property of the Borrowers and the other Credit Parties as more fully described herein subject to Permitted Liens (as such term is defined and as set forth in the DIP Agreement) and the Carve-Out;

(v)     a grant of an automatically perfected first priority, valid, enforceable, unavoidable, senior, priming lien, pursuant to section 364(d)(1) of the Bankruptcy Code, on all property of the Borrowers and the other Credit Parties that is subject to a valid and perfected lien securing all obligations owed to the Prepetition Secured Parties (as defined herein);

(vi)     a grant, with respect to the obligations of the Borrowers and the other Credit Parties hereunder and under the other DIP Documents (and subject only to the Carve-Out described in paragraph J.31 hereof), of an allowed super-priority administrative expense claim in each of the Debtors' bankruptcy cases (and against each of the Debtors' estates created pursuant to section 541 of the Bankruptcy Code) pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative

01:14092951.1

4

expenses of the kind specified in or arising under any section of the Bankruptcy Code (including, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) or 726 thereof);

(vii)     authority for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, the reasonable and documented fees and disbursements of the DIP Agent's and the DIP Lenders' attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the DIP Agreement and DIP Documents;

(viii)    authority to use cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code and/or under the DIP Documents, as applicable), subject to the restrictions set forth in the DIP Documents, and providing adequate protection to the Term Loan Parties for any Diminution in Value of their interests in the Prepetition Collateral (each as defined herein);

(ix)      a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as set forth herein;

(x)       approval of the Chapter 11 Case Milestones (Section 7.1(m)) of the DIP Agreement, the "Milestones") in respect of the Bankruptcy Sale and the Lane Sale (each as defined in the DIP Agreement), in accordance with the DIP Agreement through the implementation of the process and procedures set forth in the Bidding Procedures Order (as defined in the DIP Agreement) through an auction whereby the DIP Agent, the DIP Lenders, the Term Loan Agent (as defined below), the Term Loan Lenders (as defined below), and their respective affiliates, shall have the right to credit bid up to the full

amount of the DIP Obligations (as defined below) and the Term Loan Obligations (as defined below), as applicable, and upon execution of the Asset Purchase Agreement (as defined in the DIP Agreement), such credit bid, together with any cash required under the Asset Purchase Agreement, shall be the "stalking horse" bid (with an associated breakup fee and expense reimbursement), with an auction (if necessary) and sale hearing scheduled in accordance with the Milestones; and

(xi) scheduling of a final hearing (the "Final Hearing") to consider entry of an order approving the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing;

and the Court having considered the Motion, the Declaration of Vance Johnston in Support of Debtors' Chapter 11 Petitions and First Day Motions [Docket No. 16], the Declaration of Morgan Suckow in Support of the Motion attached as **Exhibit D** to the Motion, the Declaration of Shawn Hassel in Support of the Motion attached as **Exhibit E** to the Motion, the DIP Documents, the evidence submitted or proffered at the interim hearing to consider the relief requested in the Motion held on September 11, 2013 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d), and 9014; and the Interim Hearing having been held and concluded; and all objections to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and based on all pleadings filed with this Court, and all proceedings held before the Court; and it appearing to the Court that granting the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable

01:14092951.1

6

as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and adequate protection being provided on account of the interests of certain holders of liens on the property of the estates on which liens are to be granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    *Petition Date*. On September 9, 2013 (the "Petition Date"), each of the Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing these chapter 11 cases.

B.    *Debtors-in-Possession*. The Debtors continue to operate their businesses and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

C.    *Jurisdiction and Venue*. This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for these cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    *Committee Formation*. As of the date hereof, the United States Trustee (the "U.S. Trustee" has not yet appointed an official committee of unsecured creditors (the "Committee") in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.

7

E.   *Debtors' Stipulations*.  Subject only to the rights of parties in interest as set forth in paragraph 34 hereof, after consultation with their attorneys and financial advisors, the Debtors (on behalf of, and for themselves) admit, stipulate, acknowledge, and agree to the following:

(i)   *Revolver*.  Furniture Brands International, Inc., as Borrower Representative, the other Borrowers, certain other parties designated as "Credit Parties" thereto, the financial institutions from time to time party thereto (collectively, the "Revolver Lenders"), General Electric Capital Corporation, as agent for the Revolver Lenders (the "Revolver Agent"), General Electric Capital Corporation, Bank of America, N.A., and Wells Fargo Bank, National Association, as co-collateral agents, General Electric Capital Corporation and Bank of America, N.A., as syndication agent, and Wells Fargo Bank, National Association, GE Capital Markets, Inc., and Bank of America, N.A., as lead arrangers and bookrunners are parties to that certain Credit Agreement, dated as of September 25, 2012 (as may be amended, restated, modified, supplemented, or replaced from time to time the "Revolver Credit Agreement").  The Revolver Credit Agreement provides the Debtors with an asset-based credit facility (the "Revolver") with $200 million maximum availability, subject to a borrowing base (and as reduced by reserves), all set forth in the Revolver Credit Agreement.  As of the Petition Date, approximately $91 million was outstanding under the Revolver (together with any other amounts outstanding under the Revolver as provided in the Revolver Credit Agreement, including obligations in respect of letters of credit, cash collateral for letters of credit, purchase charge cards, purchase card services, fees, expenses and indemnity, the "Revolver Obligations").  The Revolver is secured by a first priority lien on all of the Debtors' accounts receivables, inventory, cash deposit and securities accounts and such

other assets related to or arising out of, evidencing or governing any of the foregoing, including, without limitation, all cash, money and cash equivalents and proceeds thereof (subject only to certain liens granted to the Term Loan Agent as described below), and a second priority lien on the Prepetition Term Loan Collateral (as defined herein) (collectively, the "Prepetition Revolver Collateral") pursuant to the "Collateral Documents" (as such term is defined and as set forth in the Revolver Credit Agreement) (the "Revolver Collateral Documents," and, together with the Revolver Credit Agreement, the "Revolver Documents").

(ii)     *Term Loan.* Furniture Brands International, Inc., as Borrower Representative, the other Borrowers, certain other parties designated as "Credit Parties" thereto, the financial institutions party thereto (collectively, the "Term Loan Lenders"), Nexbank SSB as successor agent to Pathlight Capital LLC, as administrative agent and collateral agent (the "Term Loan Agent" and, together with the Term Loan Lender, the "Term Loan Parties"), and Wells Fargo Bank, National Association, as documentation agent, are parties to that certain Term Loan Agreement, dated as of September 25, 2012 (the "Term Loan Agreement"). The Term Loan Agreement provides for a $50 million term loan (the "Term Loan"), of which approximately $49.7 million remains outstanding as of the Petition Date (together with (x) any and all obligations outstanding under the Term Loan, including the Prepayment Premium (as such term is defined in the Term Loan Agreement) and (y) any obligations created pursuant to this Interim Order, including the adequate protection provided in paragraph 12 hereof, the "Term Loan Obligations"). The Term Loan is secured by a first priority lien on substantially all of the Debtors' property other than the Prepetition Revolver Collateral, including without

9

limitation intellectual property, real estate, fixtures, furniture and equipment, and capital stock of the Debtors' subsidiaries, subject to certain exceptions set forth in the Term Loan Agreement, and a second priority lien on the Prepetition Revolver Collateral (collectively, the "Prepetition Term Loan Collateral," and, together with the Prepetition Revolver Collateral, the "Prepetition Collateral"), pursuant to "Collateral Documents" (as such term is defined and as set forth in the Term Loan Agreement) (the "Term Loan Collateral Documents," and together with the Term Loan Agreement, the "Term Loan Documents" and the Term Loan Documents, together with the Revolver Documents and the Intercreditor Agreement, the "Prepetition Loan Documents"). As of the Petition Date, the value of the Prepetition Collateral securing the Revolver Obligations and Term Loan Obligations exceeded the amount of the Revolver Obligations and Term Loan Obligations.

(iii)     *Intercreditor Agreement.*  On September 25, 2012, the Revolver Agent and the Term Loan Agent entered into that certain Intercreditor Agreement that, among other things, assigned relative priorities to certain claims and liens arising under the Revolver and the Term Loan (the "Intercreditor Agreement").

(iv)     *Validity and Priority of Pre-Petition Indebtedness and Liens.*  After consultation with their attorneys and financial advisors, the Debtors, the Revolver Agent, and the Term Loan Agent acknowledge and agree that (a) the liens on the Prepetition Collateral granted pursuant to the Prepetition Loan Documents, respectively, are valid, binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to

10

the Bankruptcy Code or applicable non-bankruptcy law; (b) the liens granted pursuant to the Revolver Collateral Documents are senior to all security interests and liens in the Prepetition Collateral, subject only to the senior liens of the Term Loan Agent in certain Prepetition Collateral in accordance with the Intercreditor Agreement, and to certain other liens otherwise permitted by the Revolver Credit Agreement (to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable, and senior in priority to the liens of the Revolver Agent in the Prepetition Revolver Collateral); (c) the liens granted pursuant to the Term Loan Collateral Documents are senior to all security interests and liens in the Prepetition Collateral, subject only to the senior liens of the Revolver Agent in certain Prepetition Collateral in accordance with the Intercreditor Agreement, and to certain other liens otherwise permitted by the Term Loan Agreement (to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable, and senior in priority to the liens of the Term Loan Agent in the Prepetition Term Loan Collateral); (d) the Revolver Documents are valid and enforceable by the Revolver Agent and Revolver Lenders against each of the Debtors; (e) the Term Loan Documents are valid and enforceable by the Term Loan Agent and the Term Loan Lenders against each of the Debtors; (f) the obligations under the Revolver and the obligations under the Term Loan constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the Revolver Documents and the Term Loan Documents; (g) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the Revolver or to any of the obligations under the Term Loan exist, and no portion of such obligations (including, as applicable, the Revolver Obligations and

the Term Loan Obligations) is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law, except as expressly set forth in the Prepetition Loan Documents; (h) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against the Revolver Agent, the Term Loan Agent, the Revolver Lenders, the Term Loan Lenders (collectively, the "Prepetition Secured Parties"), and/or any of the Prepetition Secured Parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to Sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the Revolver Documents or the Term Loan Documents (or the transactions contemplated thereunder), the obligations under the Revolver and the Term Loan, or the security interests and liens in the Prepetition Collateral; (i) as of the Petition Date, the value of the Prepetition Collateral securing the Revolver Obligations and the Term Loan Obligations exceeded the amount of those obligations, and accordingly, the Revolver Obligations and the Term Loan Obligations constitute allowed, secured claims within the meaning of Sections 506(c) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees, including, attorneys' fees and related expenses, costs, expenses, and other charges of whatever nature owing in respect thereof; (j) the Debtors have waived, discharged, and released any right to challenge any of the obligations under the Revolver and the Term Loan, the priority of

the Debtors' obligations thereunder, and the security for (and the priority of the liens

securing) such obligations, and to assert any offsets, defenses, claims, objections,

challenges, causes of action, and/or choses in action against the Prepetition Secured

Parties, and/or any of their respective officers, directors, or employees; and (k) any

payments made on account of the obligations under the Revolver and the obligations

under the Term Loan (including, as applicable, the Revolver Obligations and the Term

Loan Obligations) to or for the benefit of the Prepetition Secured Parties prior to the

Petition Date were on account of amounts in respect of which the Prepetition Secured

Parties were oversecured, were payments out of the Prepetition Collateral in accordance

with the Intercreditor Agreement, and such payments did not diminish any property

otherwise available for distribution to unsecured creditors.

(v)     *Cash Collateral*. The Debtors acknowledge and stipulate that

substantially all of the Debtors' cash, including the cash in their deposit accounts,

wherever located, whether as original collateral or proceeds of other Prepetition

Collateral, constitutes "cash collateral" (as such term is defined in section 363(a) of the

Bankruptcy Code) of the Prepetition Secured Parties.

(vi)    *Default by the Debtors*. The Debtors acknowledge and stipulate that the

Debtors are in default of their debts and obligations under the Revolver Documents and

the Term Loan Documents. Furthermore, the Debtors acknowledge and stipulate that by

filing petitions for relief under chapter 11 of the Bankruptcy Code and commencing these

chapter 11 cases, all of their debts and obligations under the Revolver Documents and the

Term Loan Documents (including, without limitation, the "Prepayment Premium," as

such term is defined in the Term Loan Agreement), are immediately due and payable.

F.     *Consent to Adequate Protection.*  The Term Loan Agent has provided its consent
to the adequate protection provided in paragraph 12 of this Interim Order.

G.     *Findings Regarding the Postpetition Financing.*

(i)     *Request for Postpetition Financing.*  The Debtors seek authority on an
interim basis to: (a) use cash collateral on the terms described herein, and (b) access and
use the liquidity provided under the Interim DIP Financing to: (1) access and use of the
Take-Out Term Loan (and, to the extent necessary, the DIP Revolver) to (x) permanently
repay in full all Revolver Obligations (and cash collateralize all outstanding letters of
credit and purchase charge cards), except as set forth in the Revolver Payoff Letter, (y)
fund the indemnity account provided for under the Revolver Payoff Letter, and (z) pay
fees and expenses (including original issue discount in respect of the total amount of
committed financing under the DIP Facility); and (2) access and use of up to $25 million
of the DIP Revolver to fund their chapter 11 cases on the terms set forth herein and the
DIP Documents (including, for the avoidance of doubt, the Budget, as defined below);

(ii)     *Priming of Certain Prepetition Liens.*  The priming of the liens of the
Term Loan Agent and the Term Loan Lenders on the Prepetition Collateral, as
contemplated by the DIP Facility and as further described below, will enable the Debtors
to obtain the DIP Facility and to continue to operate their businesses for the benefit of
their estates and creditors. However, the Term Loan Agent and the Term Loan Lenders
are entitled to receive adequate protection as set forth in this Interim Order pursuant to
sections 361, 363, and 364 of the Bankruptcy Code, for and to the extent of any
postpetition diminution in the value of each of their respective interests in the Prepetition
Collateral (including cash collateral) resulting from the Debtors' use, sale, or lease of

14

such collateral, the imposition of the automatic stay, the priming of the prepetition liens granted on the Prepetition Collateral, and the subordination to the Carve-Out described in paragraph J.31 hereof and the DIP Liens (as defined herein) (collectively, the "Diminution in Value"). The Revolver Agent, for the benefit of itself and the Revolver Lenders, is entitled to receive adequate protection. Pursuant to sections 361, 363, and 507(b), as adequate protection, the Debtors shall (1) pay the amounts required under the Revolver Obligations, (2) fund the Revolver Indemnification Account in the amount of $250,000 upon closing of the DIP Facility, and (3) grant the liens in the Revolver Indemnification Account.

(iii)    *Need for Postpetition Financing and Use of Cash Collateral.* The Debtors' need to use cash collateral and to obtain credit pursuant to the DIP Facility as provided for herein is necessary to enable the Debtors to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise to finance their operations requires the availability of working capital from the DIP Facility and the use of cash collateral. Without the ability to access the DIP Facility or cash collateral, the Debtors, their estates, their creditors, and the possibility for a successful reorganization would suffer immediate and irreparable harm. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of cash collateral.

(iv)    *No Credit Available on More Favorable Terms.* Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable

to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (a) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (b) superpriority claims and liens, and (c) the other protections set forth in the Interim Order. The DIP Lenders would be unwilling to provide financing under the DIP Facility absent the requirement that immediately upon entry of this Interim Order, proceeds of the Take-Out Term Loan (and, to the extent necessary, the DIP Revolver) be used to permanently repay the amounts outstanding under the Revolver.

(v)     *Adequacy of the Budget.* As set forth in the DIP Documents, the Debtors have prepared and delivered a budget, a copy of which is annexed to the DIP Agreement attached as **Exhibit B** to the Motion (as may be modified, amended, restated or supplemented with the consent of Oaktree, in its sole discretion on the terms set forth in the DIP Documents and paragraph J.15 hereof, the "Budget"), to the DIP Agent and DIP

Lenders.[3]  The Budget has been thoroughly reviewed by the Debtors, their management, and their advisors.  The Debtors, their management, and their advisors believe the budget and the estimate of administrative expenses due or accruing during the period covered by the DIP Facility were developed using reasonable assumptions.  Assuming the midpoint of the administrative expense estimate and making reasonable assumptions with respect to the proceeds which the sale of the Lane Assets would generate, there should be sufficient available assets to pay all administrative expenses due or accruing during the period covered by the DIP Facility.

H.      *Sections 506(c) and 552(b)*.  In exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and (ii) the Term Loan Agent's, and the Term Loan Lenders' agreement to subordinate their liens and claims to the Carve-Out and the DIP Liens, the DIP Agent, the DIP Lenders, the Term Loan Agent, and the Term Loan Lenders shall, only upon entry of the Final Order, each receive (i) a waiver of any "equities of the case" claims under Section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

I.      *Good Faith of the Agent and the DIP Lenders*.

        (i)      *Willingness to Provide Financing*.  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) the entry by this Court of this Interim Order; (b) approval by this Court of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agent and DIP Lenders are

---

[3]      For the avoidance of doubt, the Agreed Budget is one of the DIP Documents.

extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order, or any other order.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e).* The terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent and sound business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility and the use of cash collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties. The use of cash collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

J.     *Notice.* Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties-in-interest, including, (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the parties included on the Debtors' consolidated list of their thirty (30)

18

largest unsecured creditors; (iv) counsel to the Revolver Agent for itself and for the Revolver

Lenders; (v) Term Loan Agent for itself and for the Term Loan Lenders; (vi) counsel to the DIP

Agent for itself and for the DIP Lenders; and (vii) all parties holding security interests in any of

the Debtors' assets. The parties have made reasonable efforts to afford the best notice possible

under the circumstances and such notice is good and sufficient to permit the relief set forth in

this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the

Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      Interim DIP Financing Approved. The Interim DIP Financing is authorized

and approved, and the use of cash collateral on an interim basis is authorized, subject to the

terms and conditions set forth in this Interim Order and the DIP Documents (including the

Budget).

2.      Objections Overruled. All objections to the Interim DIP Financing and/or

entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled.

**DIP Facility Authorization**

3.      Authorization of the Interim DIP Financing and Entry Into the DIP

Documents. The DIP Facility, the DIP Documents, and the Revolver Payoff Letter are hereby

approved for the Interim DIP Financing. The Debtors are expressly and immediately authorized

and empowered to incur and to perform the DIP Obligations (as defined herein) in accordance

with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all

instruments and documents that may be necessary or required for the performance by the Debtors

under the DIP Facility and the creation and perfection of the DIP Liens (as defined below)

19

provided for by this Interim Order and the DIP Documents. The DIP Documents evidence valid and binding obligations of the Debtors, which shall be enforceable against the Debtors, their estates, and their creditors in accordance with the terms and conditions of the DIP Documents and this Interim Order. The Debtors are hereby authorized to pay, in accordance with this Interim Order, the principal, interest, fees (including original issue discount), expenses, and other amounts described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Documents. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. All of the obligations described in the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with the terms of the DIP Documents. The Debtors are authorized and directed to fund the Revolver Indemnification Account from the proceeds of the DIP Facility. The Debtors are authorized and directed to make payments to the Revolver Agent and the Revolver Lenders as set forth in the Revolver Payoff Letter, including expense reimbursement and indemnification. Such payments to be made five days after receipt of an invoice therefor without any further notice or order of the Court.

4. Authorization to Access the Interim DIP Financing and Apply the Proceeds of the Take-Out Term Loan to Repay the Revolver. During the period that this Interim Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to access the Interim DIP Financing pursuant to the

20

01:14092951.1

terms herein and the terms of the DIP Documents. Additionally, the Debtors are expressly and immediately authorized, and empowered to incur the debt made available under the Take-Out Term Loan and use the proceeds of the Take-Out Term Loan (and, to the extent necessary, the DIP Revolver) to permanently repay in full all outstanding obligations (and cash collateralize all outstanding letters of credit and purchase charge cards) under the Revolver, except as set forth in the Revolver Payoff Letter, and, concurrently therewith, terminate the Revolver.

5.      DIP Obligations.  Upon entry of this Interim Order, the DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' obligations under the DIP Facility, the other DIP Documents, and this Interim Order (the "DIP Obligations"), which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including, any trustee appointed in these cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or to any of the DIP Lenders, under the DIP Documents, or this Interim Order, including all principal, accrued interest, costs, fees, expenses, and other amounts under the DIP Documents.  The DIP Obligations shall be due and payable as provided for herein and in the DIP Documents.

6.      DIP Liens.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected

postpetition priming, first-priority security interests in and liens upon (collectively, the "DIP
Liens") each of Borrowers' and the Credit Parties' right, title, and interest in, to, and under all
personal property and other assets (provided, that with respect to any leased real property of the
Debtors, the DIP Liens will be limited to and shall attach solely to any proceeds of the
disposition of such lease), whether now owned by or owing to, or hereafter acquired by or arising
in favor of the Borrowers and the Credit Parties (including under any trade names, styles, or
derivations thereof), and whether owned or consigned by or to, or leased from or to, such
Borrowers or Credit Parties, and regardless of where located, including the Prepetition Collateral
(collectively, the "DIP Collateral"), as collateral security for the prompt and complete payment
and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the
DIP Obligations. The DIP Collateral shall include (as each such term is defined in the DIP
Documents) all: (a) all accounts (including health-care insurance receivables), all monies, all
cash and cash equivalents, chattel paper (including electronic chattel paper), collateral security,
deposit accounts, securities accounts, futures accounts (and all amounts and assets contained in
such deposit accounts, securities accounts and futures accounts or created thereon), documents
(as defined in the UCC and, including, if applicable, electronic documents), equipment, general
intangibles (including all payment intangibles and Intellectual Property), guarantees, instruments
(including promissory notes), inventory, investment property, securities, insurance claims and
proceeds, tort claims, letter of credit rights (whether or not the letter of credit is evidenced by a
writing), any other contract rights or rights to the payment of money and any supporting
obligations related to any of the foregoing; (b) the Commercial Tort Claims described on
Schedule 1 to the Guaranty and Security Agreement and on any supplement thereto received by
the DIP Agent pursuant to Section 5.8 of the Guaranty and Security Agreement; (c) all books and

22

records pertaining to the collateral; (d) all equipment, goods and fixtures; (e) all securities accounts, deposit accounts, Cash Collateral Accounts and the Collection Account; (f) all Intellectual Property; (g) all property of such Credit Party held by any Secured Party, including all property of every description, in the custody of or in transit to such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Grantor or as to which such Grantor may have any right or power, including but not limited to cash; (h) all Inventory; (i) all Pledged Collateral and Pledged Investment Property; (j) all Letter-of-Credit Rights; (k) subject to entry of the Final Order, the proceeds of any avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions"); (l) all other personal property of such Grantor, whether tangible or intangible and wherever located;  and (m) to the extent not otherwise included, all products and proceeds and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing (in whatever form and including business interruption insurance) including, without limitation, any equity interests or assets constituting indebtedness received or acquired by any Grantor in exchange for, or proceeds from the sale of, assets which constituted DIP Collateral prior to such exchange or sale; provided, however, that "DIP Collateral" shall not include (x)  Avoidance Actions (but will, subject to the entry of the Final Order, include the proceeds thereof), (y) any Excluded Property (as defined in the DIP Agreement), and (z) prior to the occurrence of the Revolver Adequate Protection Termination Date (as defined in paragraph 12(c) hereof), the Revolver Indemnification Account and any cash collateral accounts required pursuant to the Revolver Payoff Letter (it being understood that any residual amounts in such accounts shall constitute DIP Collateral following the Revolver

01:14092951.1

Adequate Protection Termination Date without further action by any party or court order); provided, further, that the DIP Collateral shall, subject to entry of the Final Order, include the proceeds of Avoidance Actions; provided, further, that if and when any property shall cease to be Excluded Property, immediately at and from such time (and without any action by any the Debtors or any other person), the DIP Collateral shall include, and the security interest granted by the Borrowers and each Credit Party shall attach to, such property.

7.      DIP Lien Priority. Subject only to the Carve-Out described in paragraph 31 hereof, the DIP Liens securing the DIP Obligations shall be senior in priority to all other security interests in, liens on, or claims against the DIP Collateral. The DIP Liens shall not otherwise be made subject to or *pari passu* with any lien or security interest and shall be valid and enforceable against any trustee appointed in these chapter 11 cases or any Successor Cases, and/or upon the dismissal of any of these chapter 11 cases or any Successor Cases. Subject to entry of the Final Order the DIP Liens shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code.

8.      DIP Superpriority Claim. Subject only to the Carve-Out described in paragraph 31 hereof, upon entry of this Interim Order, the DIP Agent and the DIP Lenders are hereby granted pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of these chapter 11 cases and any Successor Cases for all of the DIP Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of these chapter 11 cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to

24

the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative (the "DIP Superpriority Claim"); provided, however, that the DIP Superpriority Claim shall not attach to the proceeds of Avoidance Actions, except upon entry of the Final Order.

9.    Extension of Credit. The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required Lenders in their sole discretion.

10.    Use of DIP Facility Proceeds; Repayment of the Revolver Obligations. From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only pursuant to the terms herein and the terms of the DIP Documents. The Debtors are authorized to use the proceeds of the DIP Facility to make the adequate protection payments provided for in paragraph 12 of this Interim Order. Immediately upon entry of this Interim Order, the Debtors shall use proceeds of the Take-Out Term Loan (and, to the extent necessary, the DIP Revolver) to (i) pay fees and expenses (including original issue discount in respect of the total amount of committed financing under the DIP Facility), (ii) permanently repay in full all outstanding obligations (and cash collateralize all outstanding letters of credit and purchase charge cards) under the Revolver and, concurrently therewith, terminate the Revolver in accordance with the Revolver Documents and the Revolver Payoff Letter, and (iii) fund the Revolver Indemnification Account.

**Authorization to Use Cash Collateral and Adequate Protection**

11.     Authorization to Use Cash Collateral. Subject to the terms and conditions

set forth in, and in accordance with, this Interim Order, the DIP Facility, and the DIP

Documents, the Debtors are authorized to use cash collateral. Except as expressly permitted in

this Interim Order (including paragraph 4 hereof), the DIP Facility, and the DIP Documents,

nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their

estates outside the ordinary course of business, or any of the Debtors' use of any cash collateral

or other proceeds resulting therefrom. Upon the occurrence of an Event of Default (as defined

herein and in the DIP Documents), the Debtors' consensual use of cash collateral shall

terminate.

12.     Adequate Protection.

(a)     Subject only to the Carve-Out described in paragraph 31 hereof, as

adequate protection for the use of the DIP Collateral securing the Term Loan before entry

of this Interim Order, the Term Loan Agent and the Term Loan Lenders shall receive

(i) payment in cash on a monthly basis of all interest accruing on the Term Loan at an

interest rate ~~of six (6) percent~~ per annum with any ~~remainder interest~~ fees, and

[handwritten: LIBOR + 12% at the rate set forth in the existing Term Loan (mandatory)]

commissions (including, for the avoidance of doubt, any accrued pre- and post-petition

interest and letter of credit fees and commissions due under the Term Loan Agreement), all

[handwritten insertion: all]

paid as paid-in-kind (PIK) interest at the non-default rate set forth in the Term Loan

Agreement; provided, however, that to the extent a final, non-appealable order of a court

of competent jurisdiction determines that the Term Loan Lenders were undersecured on

the Petition Date, the payments of current interest provided for in this paragraph shall be

reallocated to payment of principal outstanding under the Term Loan; provided, further,

that notwithstanding anything to the contrary contained herein, the Term Loan Agent and the Term Loan Lenders shall be entitled to retain any such adequate protection payments to the extent necessary to compensate them for any Diminution in Value of the Prepetition Collateral; (ii) payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the Term Loan Agent and the Term Loan Lenders (including any accrued pre- and postpetition interest and letter of credit fees and commissions and the reasonable and documented out-of-pocket fees and expenses of their respective professional advisors); (iii) replacement liens to the extent of Diminution in Value of the Prepetition Collateral, including replacement liens on all unencumbered assets of the Debtors (except any Avoidance Actions, but including, subject to entry of the Final Order, the proceeds thereof), which liens will be junior to the liens of the DIP Lenders under the DIP Facility; and (iv) superpriority administrative expense claims with respect to each of the foregoing and to the extent of Diminution in Value of the Prepetition Collateral, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors (except any Avoidance Actions, but including, subject to entry of the Final Order, the proceeds thereof).

(b)     Subject to the terms and conditions set forth in the DIP Documents, upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Term Loan Agent, and the Term Loan Lenders shall each have the right to credit bid, as applicable, the full amount of each of the DIP Obligations and the Term Loan Obligations, in connection with any sale of the Debtors' assets and property, including, any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

27

(c)      As adequate protection, effective immediately upon entry of this Interim
Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy
Code, the Revolver Agent, for the benefit of itself and the Revolver Lenders, is hereby
granted continuing, valid, binding, enforceable, non-avoidable, and automatically and
properly perfected postpetition priming, first-priority security interests in and liens upon
(i) the Revolver Indemnification Account and all funds therein and (ii) all cash collateral
accounts created pursuant to or related to the Revolver Payoff Letter.  The Revolver
Indemnification Account and the liens granted therein shall terminate and all remaining
amounts held in the Revolver Indemnification Account shall be released to the Debtors, if
all Revolver Obligations have been indefeasibly and irrevocably paid in full in cash, upon
the earliest to occur of (such earliest date, the "Revolver Adequate Protection
Termination Date"): (i) ten (10) days following the expiration of the Challenge Period (as
defined herein) if, as of such date, no party has filed a contested matter, an adversary
proceeding, cause of action, objection, claim, defense, or other claim or Challenge as
contemplated in paragraph 34 hereof in respect of any claim, security interest, or any
other rights of the Revolver Agent or the Revolver Lenders; (ii) if, as of the end of the
Challenge Period, any party has filed or commenced any adversary proceeding, cause of
action, objection, claim, defense, or other challenge, as appropriate, as set forth herein, in
respect of any claim, security interest, or any other rights of the Revolver Agent or the
Revolver Lenders, then ten (10) days following entry of a final order (that is not subject
to a stay, or vacatur, appeal or reconsideration) effecting the termination or final
settlement of all such contested matters, adversary proceedings, causes of action,
objections, claims, defenses, and/or other claims or Challenges; and (iii) the effective

01:14092951.1

date of a chapter 11 plan. Following the occurrence of the Revolver Adequate Protection
Termination Date, (x) the liens granted to the Revolver Agent and the Revolver Lenders
in the Revolver Indemnification Account and any cash collateral accounts required
pursuant to the Revolver Payoff Letter shall automatically terminate without any further
action by any party or court order and (y) the Revolver Agent's and the Revolver
Lenders' right to adequate protection from the Debtors or any other party shall forever
terminate without any further action by any party or court order. Notwithstanding
anything to the contrary in this Interim Order to the contrary, the Debtors' residual
interest in the Revolver Indemnification Account shall be subject to the DIP Liens in
accordance with the priorities set forth in this Interim Order and the DIP Documents.

13.     Section 507(b) Reservation. Subject only to the Carve-Out described in
paragraph 31 hereof, nothing contained herein shall impair or modify the application of section
507(b) of the Bankruptcy Code in the event that the adequate protection provided in this Interim
Order is insufficient to compensate for any Diminution in Value of the respective interests of the
Term Loan Agent and the Term Loan Lenders in the Prepetition Collateral during these chapter
11 cases or any Successor Cases.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

14.     Amendment of the DIP Documents. The DIP Documents may, from time
to time, be amended, amended and restated, modified, or supplemented by the parties thereto
without notice or a hearing if the amendment, amendment and restatement, modification, or
supplement is (a) in accordance with the DIP Documents and (b) not prejudicial in any material
respect to the rights of third parties; provided, however, that notwithstanding the foregoing,
except for actions expressly permitted to be taken by the DIP Agent or the DIP Lenders, no

29

amendment, modification, supplement, termination, or waiver of any provision of the DIP
Documents, or any consent to any departure by any of the Borrowers or the Credit Parties
therefrom, shall in any event be effective without the express written consent of the Required
Lenders (it being understood that any necessary signatures may be on a document consenting to
such amendment, modification, termination, or waiver) to the extent required by the DIP
Documents. To the extent reasonably practicable, the Debtors shall provide three days' written
notice to the Committee and the U.S. Trustee prior to entry of any amendment, modification,
supplement, or waiver of any provision of the DIP Documents.

      15.      Budget Compliance. The Borrowers and the Credit Parties shall not, and
shall not permit any subsidiary to directly or indirectly, to use any cash or the proceeds of the
DIP Facility in a manner or for a purpose other than those consistent with the DIP Documents
and this Interim Order. The Budget annexed to the DIP Agreement is hereby approved, and any
modification to, or amendment or update of, the Budget shall be in form and substance
acceptable to and approved by Oaktree as provided in the DIP Documents. The Budget may be
amended or modified in writing only with the written consent of Oaktree, in its sole discretion.

      16.      Modification of Automatic Stay. The automatic stay imposed by
section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtors to grant the
DIP Liens and the DIP Superpriority Claim, and to perform such acts as the DIP Agent may
request in its sole discretion to assure the perfection and priority of the DIP Liens, (b) the
Debtors to take all appropriate action to grant the adequate protection set forth in paragraph 12,
above (the "Replacement Liens"), and to take all appropriate action to ensure that the
Replacement Liens granted thereunder are perfected and maintain the priority set forth herein, (c)
the Debtors to incur all liabilities and obligations to the DIP Agent as contemplated under the

01:14092951.1

30

DIP Documents, (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order, and (e) the implementation of the terms of this Interim Order.

17. Perfection of DIP Liens and Adequate Protection Liens. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein including the DIP Liens and the Replacement Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, real property mortgage or aircraft security agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the Replacement Liens, or to entitle the DIP Agent, the DIP Lenders, the Term Loan Agent, and the Term Loan Lenders to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent, and the Term Loan Agent each are authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Replacement Liens. The Debtors are authorized to execute and promptly deliver to the DIP Agent all such financing statements, mortgages, notices, and other documents as the DIP Agent may reasonably request. The DIP Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of

31

deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

18.     After-Acquired Property. Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including all DIP Collateral pledged or otherwise granted to the DIP Agent, on behalf of the DIP Lenders, pursuant to the DIP Documents and this Interim Order is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date that is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

19.     Proceeds of Subsequent Financing. If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in these chapter 11 cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b), (c), or (d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the indefeasible payment in full of all DIP Obligations, the cancellation, backing, or cash collateralization of the letters of credit provided for under the DIP Agreement, the satisfaction of the DIP Superpriority Claims, and the termination of the DIP Agent's and DIP Lenders' obligations to extend credit under the DIP Facility, then all of the cash proceeds derived from such credit or debt shall (a) immediately be turned over first to the DIP Agent and (ii) thereafter, after the DIP Obligations have been satisfied in full and fully and indefeasibly paid, to the Term Loan Agent, as applicable, to satisfy outstanding prepetition secured indebtedness in accordance with the Prepetition Loan Documents (as defined below).

32

20.     Maintenance of DIP Collateral. Until the indefeasible payment in full of all DIP Obligations, all indebtedness outstanding in accordance with the Prepetition Loan Documents, and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the DIP Facility and the Prepetition Loan Documents, as applicable and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court in accordance with the DIP Documents.

21.     Insurance Policies. Upon entry of this Interim Order, the DIP Agent and the DIP Lenders are, and are deemed to be, without any further action or notice (including endorsements), named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

22.     Disposition of DIP Collateral. Except as expressly provided for in the DIP Documents, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP Lenders.

23.     Events of Default. The term "Event of Default" shall have the same meaning under this Interim Order as such term has under the DIP Documents and shall include, for the avoidance of doubt, the Milestones.

24.     Rights and Remedies Upon Event of Default. Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 a.m. prevailing Eastern Time on the sixth business day after the date the DIP Agent files a notice of an Event of Default on the docket of the Debtors' chapter 11 cases (such period, the "Default Notice Period"), the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of

this Court to allow the DIP Agent to take any and all actions permitted by law, as if no case were pending under the Bankruptcy Code. Unless otherwise ordered by the Court, the sole basis on which the Debtors can contest the automatic lifting of the automatic stay pursuant to this paragraph is on the grounds that an Event of Default has not occurred, and the Debtors and other parties-in-interest may request an expedited hearing on any motion seeking such a finding, and the DIP Lenders and the Term Loan Parties shall consent to such expedited hearing. In the event the automatic stay is lifted in accordance with this paragraph, any further order of this Court authorizing (a) the use of cash collateral, including accounts receivable, inventory, and the proceeds thereof, of the Debtors in which the DIP Agent or any of the DIP Lenders has an interest, or (b) under section 364 of the Bankruptcy Code, the obtaining of credit or the incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or security interest held by the DIP Agent or which is entitled to priority administrative status which is equal or superior to that granted to the DIP Agent for the benefit of the DIP Lenders or the Term Loan Lenders, as the case may be, shall be prohibited. Upon the DIP Agent having delivered a notice of an Event of Default in accordance with the DIP Documents and this Interim Order, at any hearing with respect to whether an Event of Default has occurred, there shall be a presumption in favor the DIP Lenders and the DIP Agent that an Event of Default has occurred, which presumption may be rebutted by the Debtors and/or the Committee. In accordance with Section 7.2(a) of the DIP Agreement, and subject to any applicable grace periods (including, without limitation, under Section 7.1(l)(vii), (viii) and (ix) and Section 7.1(o)(ii)), upon the occurrence of any Event of Default, the DIP Agent may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lenders' obligations to make additional loans under the DIP Facility. Upon the occurrence of an Event of Default, all loans under the DIP

34

Facility shall become due and payable in accordance with Section 7.2(b) of the DIP Agreement.

Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and

remedies provided for in Section 7.2 of the DIP Agreement.

25.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification

or Stay of this Order. Each of the DIP Agent, the DIP Lenders, the Term Loan Agent, and the

Term Loan Lenders have acted in good faith in connection with this Interim Order, and their

reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim

Order and the record made during the Interim Hearing, and in accordance with section 364(e) of

the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter

modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP

Agent, the DIP Lenders, the Term Loan Agent, and the Term Loan Lenders are entitled to fullest

extent to the protections provided in section 364(e) of the Bankruptcy Code. Any such

modification, amendment, or vacatur shall not affect the validity and enforceability of any

advances previously made or made hereunder, or lien, claim or priority authorized or created

hereby. Any liens or claims granted to the Agent, the DIP Lenders, the Term Loan Agent, and/or

the Term Loan Lenders arising prior to the effective date of any such modification, amendment,

or vacatur of this Interim Order shall be governed in all respects by the original provisions of this

Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted

herein.

26.     DIP and Other Expenses. The Debtors are authorized to pay all reasonable

out-of-pocket expenses of the DIP Agent, the DIP Lenders, and Oaktree (as defined in the DIP

Agreement) in connection with the DIP Facility, to the extent provided in the DIP Documents

(including, without limitation, Section 9.5 of the DIP Agreement) (including, without limitation,

whether the DIP Documents are terminated by the DIP Agent or the DIP Lenders in accordance with the terms of the applicable DIP Documents), including, without limitation, legal, accounting, collateral examination and monitoring fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses. For the avoidance of doubt, the fees and expenses described in the foregoing sentence shall include, to the extent set forth in Section 9.5 of the DIP Agreement, all reasonable and documented out-of-pocket costs, fees, and expenses incurred in connection with the preparation, negotiation, execution, interpretation or administration of, any modification of any term of or termination of, any of the DIP Documents, any commitment or proposal letter therefor, any other document prepared in connection therewith (including, without limitation, the Asset Purchase Agreement (as defined in the DIP Agreement)) or the consummation and administration of any transaction contemplated therein, (including, without limitation, the sale contemplated by the Asset Purchase Agreement (as defined in the DIP Agreement)). Payment of all such fees and expenses shall not be subject to allowance by this Court, and parties entitled under the DIP Documents to receive such payment of fees and expenses shall not be required to comply with the U.S. Trustee fee guidelines; provided, however, that any time that such professionals seek payment of fees and expenses that are incurred from and after the Petition Date from the Debtors, each professional shall provide copies of its fee and expense statements (redacted to remove confidential or attorney-client privileged information) to the U.S. Trustee and counsel for the Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors. To the extent that the U.S. Trustee or the Committee (if appointed) has an objection to the fees and expenses of any such professional, they shall be afforded 10 days after receipt of such fee and expense statement to raise a specific written objection, including quantification of

36

the disputed amount, with the applicable professional (it being understood that the Debtors shall

be authorized to pay all amounts that are not disputed in a timely received written objection), and

such professional shall only be required to disgorge any amounts paid to such professional

pursuant to such fee and expense statement upon being "so ordered" to do so pursuant to a final

order of this Court.

27.     Indemnification. The Debtors shall indemnify and hold harmless the DIP

Agent, the DIP Lenders, and each of their respective shareholders, controlling persons, directors,

agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals,

officers, employees, agents, investor funds, advisors, attorneys, professionals, representatives,

investment bankers, and consultants, each in their respective capacities as such, from and against

any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or

causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred,

suffered, sustained, or required to be paid by an indemnified party of every nature and character

arising out of or related to the DIP Documents or the transactions contemplated thereby and by

this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant

to the terms of the DIP Documents and as further described therein and herein, except to the

extent resulting from such indemnified party's gross negligence or willful misconduct as finally

determined by a final non-appealable order of a court of competent jurisdiction. The indemnity

includes indemnification for the DIP Agent's and any of the DIP Lenders' exercise of

discretionary rights granted under the DIP Facility. In all such litigation, or the preparation

therefor, the DIP Agent and the DIP Lenders shall be entitled to select their own counsel and, in

addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and

expenses of such counsel.

28.    Released Parties. Without limiting the rights of the parties in interest as set forth in paragraph 34 hereof, the Debtors hereby waive any and all actions related to, and hereby release, each of (a) the DIP Lenders, (b) the Prepetition Secured Parties, and (c) each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such (each such person or entity identified in sub-clauses (a) through (c) of this paragraph 28, a "Released Party" and, collectively, the "Released Parties") from any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, or any Challenge (as defined herein), whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising prior to the Petition Date and to the extent related to the Prepetition Loan Documents, the DIP Agreement, or this Interim Order, any documents related to the Prepetition Loan Documents, the DIP Agreement, or this Interim Order, any aspect of the prepetition relationship with the Released Parties, any Debtor, or any other acts or omissions by the Released Parties in connection with the Prepetition Loan Documents, the DIP Agreement, or this Interim Order, any documents related to the Prepetition Loan Documents, the DIP Agreement, or this Interim Order, or any aspect of their prepetition relationship with any Debtor.

29.    Proofs of Claim. The DIP Agent, the DIP Lenders, and the Term Loan Parties shall not be required to file proofs of claim in any of these chapter 11 cases or Successor Cases for any claim allowed herein. Any proof of claim filed by the DIP Agent and the Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that

38

01:14092951.1

may be filed by any of the Term Loan Parties. Any order entered by this Court in relation to the establishment of a bar date in any of these cases or Successor Cases shall not apply to the DIP Agent, the DIP Lenders, and the Term Loan Parties.

30.    Access to Collateral/No Landlord's Liens. Subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents and this Interim Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Documents, the DIP Agent may, subject to any separate agreement by and between such landlord and the DIP Agent (a "Separate Agreement"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and, subject to any Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, however, that, subject to any such Separate Agreement, the DIP Agent shall only pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the Agent, calculated on a per diem basis. Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the Agent in this paragraph.

31.    Carve-Out.

(a)    For the purposes of this Interim Order, the term "Carve-Out" means, collectively: (i) all unpaid fees required to be paid by the debtors to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable and documented fees and expenses

39

incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed at any time, all accrued and unpaid reasonable and documented fees, disbursements, costs, and expenses incurred at any time before or on the first business day following delivery by the DIP Agent or the Required Lenders of a Carve Out Trigger Notice (as defined below) by any professionals or professional firms retained by the Borrowers or the Committee, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) after the first business day following delivery by the DIP Agent or the Required Lenders of the Carve Out Trigger Notice, to the extent allowed at any time, all reasonable and documented unpaid fees, disbursements, costs, and expenses incurred by professionals or professional firms retained by the Borrowers or any Committee in an aggregate amount not to exceed $1,000,000 (the amount set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Agent or the Required Lenders (which delivery may be made via electronic mail) to the Borrowers and their counsel, the U.S. Trustee, and lead counsel to any Committee, which notice may be delivered following the occurrence and continuance of an Event of Default, and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     The Carve-Out shall be senior to all liens and claims (including administrative and superpriority claims and any such claims held by the Stalking Horse Purchaser) securing the DIP Obligations, the Debtors' prepetition obligations, the Replacement Liens, and all other liens or claims (including administrative and superpriority claims), including all other forms of adequate protection, liens or claims

40

(including administrative and superpriority claims) securing the DIP Obligations and prepetition obligations granted or recognized as valid, including the liens, security interests, and claims (including administrative and superpriority claims) granted herein or pursuant to the DIP Documents to the DIP Lenders.

32.    Limitation on Investigation.

(a)    No DIP Collateral, cash collateral, proceeds of the DIP Facility, portion of the Carve-Out, the Revolver Indemnification Account, or any other amounts may be used directly or indirectly by any of the Borrowers or any other Credit Party, the Committee, if any, or any trustee or other estate representative appointed in these chapter 11 cases or any Successor Cases or any other person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) for any of the following actions or activities (the "Proscribed Actions"):

(i)    to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the liens granted under the DIP Documents, this Interim Order, or the Final Order (including, the DIP Superpriority Claims); or

(ii)    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, and each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals,

41

officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any Avoidance Actions, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens granted under the DIP Documents, or the claims liens granted under the Prepetition Loan Documents, (D) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the Revolver Obligations, or the Term Loan Obligations (including. for the avoidance of doubt, the "Prepayment Premium" as defined in the Term Loan Agreement); (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (1) the DIP Agent or the DIP Lenders under this Interim Order or under any of the DIP Documents or (2) the Prepetition Secured Parties (in each case, as applicable, including, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the DIP Documents, this Interim Order, and the Final Order); or (F) objecting to, contesting, or interfering with, in any way, DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred (as set forth in the DIP Documents).

01:14092951.1

(b)     Notwithstanding anything to the contrary herein, the Committee may use
up to $50,000.00 in the aggregate amount of the Carve-Out, any cash-collateral, or
proceeds of the Loan to investigate the Prepetition Secured Parties (the "Committee
Investigation Budget"). Any and all claims incurred by the Committee related to or in
connection with any Proscribed Activities other than up to the Committee Investigation
Budget shall not constitute an allowed administrative expense claims (including, without
limitation, Section 1129(a)(9)(A) of the Bankruptcy Code) and shall not be satisfied by
the Carve-Out, any cash collateral or proceeds of the Loan, and shall be satisfied solely
from the unencumbered assets of the Credit Parties (if any) (the "Unencumbered
Assets"), thereby reducing recoveries to the holders of unsecured claims (other than any
deficiency claim held by the Prepetition Secured Parties); provided, however, that to the
extent there are no Unencumbered Assets available to satisfy such claims, then such
claims shall be automatically disallowed without further action by any party or Court
order and shall not receive a recovery in the chapter 11 cases and any Successor Cases.

33.     Payment of Compensation. So long as an unwaived Event of Default has
not occurred, and to the extent permitted under the DIP Documents (including, for the avoidance
of doubt, the Budget), the Debtors shall be permitted to pay fees and expenses allowed and
payable, as applicable, by any interim, procedural, or final order of this Court (that has not been
vacated or stayed, unless the stay has been vacated) under sections 330 and 331 of the
Bankruptcy Code, as the same may be due and payable.

34.     Challenge Period.

(a)     Subject only to the terms of this paragraph 34, the grant of adequate
protection to the Term Loan Agent, the Term Loan Lenders, the Revolver Agent, and

01:14092951.1

Revolver Lenders, and the repayment of the Revolver pursuant to this Interim Order and the various stipulations and waivers contained in paragraph E hereof shall be without prejudice to the rights of the Committee to seek to disallow the Prepetition Secured Parties' claims in respect of the Prepetition Loan Documents (including. for the avoidance of doubt, the "Prepayment Premium" as defined in the Term Loan Agreement), pursue any claims or seek appropriate remedies against Prepetition Secured Parties in connection with the Prepetition Loan Documents or avoid all or substantially all of the security interests or liens in the Prepetition Collateral or in any other asset or property of Debtors in which Prepetition Secured Parties claim an interest, including any claim, action, or proceeding brought against the Prepetition Secured Parties in accordance with this paragraph 34 that requires Prepetition Secured Parties to give up adequate protection liens and super-priority claims, to disgorge adequate protection interest payments received or accruals credited, or to disgorge as repaid pursuant to this Interim Order any amounts repaid on account of the Revolver as a result of any of the Prepetition Secured Parties' claims against Debtors or liens upon and security interests in the assets and properties of Debtors (including the Prepetition Collateral) being invalidated, avoided, subordinated, impaired or compromised in any way, either by an order of this Court (or other court of competent jurisdiction) or by settlement. Any party (other than the Debtors, which have waived all such rights), including the Committee, must commence, as appropriate, a contested matter or adversary proceeding raising any objection, claim, defense, suit or other challenge (a "Challenge") with respect to any claim, security interest, or any other rights of the Prepetition Secured Parties under the Revolver Documents or the Term Loan Documents, as applicable, including in the nature

44

of a setoff, counterclaim, or defense on or before the earlier of the first to occur of (i)
sixty (60) calendar days from the date the U.S. Trustee appoints the Committee and (ii)
seventy-five (75) calendar days following the date of entry of the Final Order (the
"Challenge Period"). The Challenge Period may only be extended (x) as to the Revolver
Agent and/or the Revolver Lenders, with the prior written consent of both of the
Revolver Agent and the Term Loan Lenders, (y) as to the Term Loan Agent and the Term
Loan Lenders, with the prior written consent of the Term Loan Lenders, or (z) by consent
of the Court for good cause shown. In the event of a timely and successful Challenge to
the repayment of the Revolver Obligations, this Court shall fashion the appropriate
remedy with respect to the Revolver Lenders after hearing from all parties in interest.

(b)     Upon the expiration of the Challenge Period, to the extent not specifically
included in a timely and properly filed pleading asserting a Challenge: (i) any other
possible Challenge, whether such Challenge is separately filed or otherwise asserted
through an amendment of any timely and properly filed pleading asserting a Challenge,
shall be deemed to be forever waived and barred; (ii) all of the Debtors' agreements,
acknowledgments, stipulations, waivers, releases, and affirmations as to the priority,
extent, and validity of the Prepetition Secured Parties' claims, liens, and interests, of any
nature, under the Prepetition Loan Documents, or otherwise incorporated or set forth in
this Interim Order, shall be of full force and effect and forever binding upon the Debtors,
the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-
interest in these chapter 11 cases and any Successor Cases without further action by any
party or this Court, and any Committee and any other party in interest, and any and all
successors-in-interest as to any of the foregoing, shall thereafter be forever barred from

bringing any Challenge with respect thereto; (iii) the liens granted pursuant to the
Prepetition Loan Documents shall (to the extent not otherwise satisfied in full) be deemed
to constitute valid, binding, enforceable, and perfected liens and security interests not
subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable
bankruptcy law; and (iv) without further order of the Court, the obligations under the
Prepetition Loan Documents shall (to the extent not otherwise satisfied in full) be
allowed as fully secured claims within the meaning of section 506 of the Bankruptcy
Code for all purposes in connection with these cases and any Successor Cases and shall
not be subject to challenge by any party in interest as to validity, priority, or otherwise.

(c)     Nothing in this Interim Order vests or confers on any person, including the
Committee or any other statutory committee that may be appointed in these chapter 11
cases, standing or authority to pursue any cause of action, claim, defense, or other right
belonging to the Debtors or their estates. For the avoidance of doubt, entry of this
Interim Order shall not grant standing or authority to the Committee to pursue any cause
of action, claim, defense, or other right on behalf of the Debtors or their estates.

35.     No Third Party Rights. Except as explicitly provided for herein, this
Interim Order does not create any rights for the benefit of any third party, creditor, equity holder,
or any direct, indirect, or incidental beneficiary.

36.     Section 506(c) Claims. Upon entry of the Final Order, no costs or expenses
of administration which have been or may be incurred in these cases at any time shall be charged
against the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or any of their respective
claims, the DIP Collateral, the Revolver Indemnification Account, or the Prepetition Collateral
pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior

written consent, as applicable, of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders; provided, however, that the foregoing shall automatically terminate as to the Revolver Agent and the Revolver Lenders upon the occurrence of the Revolver Adequate Protection Termination Date.

37.    Section 552(b).  Upon entry of the Final Order, the Revolver Agent and the Term Loan Agent shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) shall not apply to the Revolver Agent (on behalf of itself and the Revolver Lenders) or to the Term Loan Agent (on behalf of itself and the Term Loan Lenders), with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral; provided, however, that the foregoing shall automatically terminate as to the Revolver Agent and the Revolver Lenders upon the occurrence of the Revolver Adequate Protection Termination Date.

38.    No Marshaling/Application of Proceeds.  Upon entry of the Final Order, the DIP Agent, the DIP Lenders, and the Term Loan Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and all proceeds shall be received and applied in accordance with the DIP Documents.

39.    Joint and Several Liability.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

47

40.    Discharge Waiver. The DIP Obligations and the Term Loan Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in these cases, notwithstanding the provisions of Section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash (or, with respect to any letters of credit, such letters of credit have been treated in a manner satisfactory to the DIP Agent) on or before the effective date of such confirmed plan of reorganization. None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash (or, with respect to any letters of credit, such letters of credit have been treated in a manner satisfactory to the DIP Agent) on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.

41.    Rights Preserved. Except as expressly set forth in paragraph 12(c) of this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Agent's, the DIP Lenders', and/or the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors, including, without limitation, the right of the Revolver Agent and the Revolver Lenders to seek an increase in the funds in the Revolver Indemnification Account; (b) any of the rights of any of the DIP Agent, the DIP Lenders, and/or the Prepetition Secured Parties under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (d) any other rights, claims, or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, DIP Lenders, and/or the Prepetition Secured Parties.

42. <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Agent, the DIP Lenders, and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order the DIP Documents, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, and/or the Prepetition Secured Parties.

43. <u>Binding Effect of Interim Order</u>. Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, all other creditors of the Debtors, the Committee, any other statutory committee that may be appointed in these chapter 11 cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these cases, any Successor Cases, or upon dismissal of any of these cases or Successor Cases.

44. <u>Effect on Certain Pre-Petition Agreements</u>. Except as expressly set forth in this Interim Order the terms and conditions, validity, and enforceability of the Prepetition Loan Documents shall not be affected by this Interim Order.

45. <u>Leases</u>. Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, upon an Event of Default, the rights of the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders to enter onto the Debtors' leased premises shall be limited to (i) any such rights agreed to in writing by the applicable landlord prior to entry onto the leased premises, (ii) any rights that the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders have under applicable non-bankruptcy law, if any, and (iii) such rights as may be granted by the

Court on a separate motion with notice to the applicable landlords of the leased premises and an opportunity for such landlords to respond and be heard.

46.      Notwithstanding anything to the contrary contained in this Interim Order, the DIP Agreement, the other DIP Documents, the Revolver Payoff Letter or otherwise, all liens, security interests, superpriority administrative expense claims, rights and remedies of DIP Agent and DIP Lenders authorized under this Interim Order shall be expressly subject to the rights, liens, security interests and claims of Wells Fargo Bank, National Association and the Debtors' other depository and disbursement banks as provided for under the Interim Order, Pursuant To Bankruptcy Code Sections 105(A), 345(B), 363(C)(1), 364(A), 364(B), And 503(B)(1), Bankruptcy Rules 6003 And 6004 And Local Rule 2015-2 (A) Authorizing Debtors To Use Existing Cash Management System, (B) Authorizing And Directing Banks And Financial Institutions To Honor And Process Checks And Transfers, (C) Authorizing Continued Use Of Intercompany Transactions, (D) Waiving Requirements Of Section 345(B) Of Bankruptcy Code And (E) Authorizing Debtors To Use Existing Bank Accounts And Existing Business Forms.

47.      Interim Order Controls.  In the event of any inconsistency between the terms and conditions of the DIP Documents or the Revolver Payoff Letter and this Interim Order, the provisions of this Interim Order shall govern and control.

48.      No Right to Seek Modification.  Unless requested by the DIP Agent, the Debtors irrevocably waive any right to seek any modification or extension of this Interim Order (in whole or in part) without the prior consent of the Required Lenders, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent or the Required Lenders.

49.    Survival.

(a)    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in any of these chapter 11 cases, (ii) converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of these chapter 11 cases or any Successor Cases, or (iv) pursuant to which this Court abstains from hearing any of these chapter 11 cases or Successor Cases.

(b)    The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent, the DIP Lenders, the Term Loan Agent, and the Term Loan Lenders, pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in these cases, in any Successor Cases, or following dismissal of these cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full and all commitments to extend credit under the DIP Facility are terminated, and (ii) in respect of the Term Loan, all of the Term Loan Obligations have been indefeasibly paid in full. The terms and provisions concerning the indemnification of the DIP Agent and the DIP Lenders shall continue in these chapter 11 cases, in any Successor Cases, following dismissal of these chapter 11 cases or any Successor Cases, termination of the DIP Documents, and/or the indefeasible repayment of the DIP Obligations.

50.    Waiver of Applicable Stay.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

51.    Final Hearing.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for 10/2, 2013 at 11:00 A.m. before the Honorable Christopher Sontli, United States Bankruptcy Judge, in Courtroom 5 at the United States Bankruptcy Court for District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801. On or before 9/16/2013, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on (a) the parties having been given notice of the Interim Hearing, (b) any party which has filed prior to such date a request for notices with this Court, and (c) counsel for the Committee (once appointed). The Final Hearing Notice shall state that any party-in-interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on 9/25, 2013 at 4:00 p.m. (prevailing Eastern time), which objections shall be served so as to be **actually** **received** on or before such date on: (a) the Debtors, [●], Attn: [●]; (b) counsel for 1 North Brentwood Blvd, St Louis the Debtors, (i) Paul Hastings LLP, 75 East 55th Street, New York, New York 10022, Attn: Luc Meredith Graham Esq MO 63105 A. Despins, Leslie A. Plaskon, and James T. Grogan and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary; [(c) counsel for the Committee, [●], Attn: [●];] (d) counsel for the DIP Lenders, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick J. Nash, Jr., P.C., Ross M. Kwasteniet, and Christopher J. Greeno, P.C. and 601 Lexington Avenue, New York, New York 10022, Attn: Brian E. Schartz; (e) counsel for the Term Agent and the DIP Agent, King &

Spalding LLP, 1180 Peachtree Street, N.E., Atlanta, Georgia 30309, Attn: Jesse H. Austin, III; (f) counsel for the Revolver Agent, (i) Morgan, Lewis & Brockius LLP, 225 Franklin Street, 16th Floor, Boston, MA 02110-4104, Attn: Matthew Furlong and 101 Park Avenue, New York, New York 10178, Attn: Wendy S. Walker and (ii) Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, DE 19801, Attn: Kurt F. Gwynne; and (g) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Jane Leamy.

52.     _Nunc Pro Tunc_ Effect of this Final Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable _nunc pro tunc_ to the Petition Date immediately upon entry hereof.

53.     Retention of Jurisdiction. The Court has retained and will retain jurisdiction to implement, interpret, and enforce this Interim Order according to its terms.

SO ORDERED by the Court this _11_ day of September, 2013.

_____
CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE