**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------------x
                                                               :    **Chapter 11**
*In re:*                                                       :
                                                               :    **Case No. 13-12329 (CSS)**
**FURNITURE BRANDS**                                           :
**INTERNATIONAL, INC.,** *et al.*,                             :    **Jointly Administered**
                                                               :
Debtors.[1]                                                    :    **Docket Ref. No. 91**
                                                               :
                                                               :
---------------------------------------------------------------x

**DECLARATION OF BRIAN L. CUMBERLAND, MANAGING DIRECTOR OF ALVAREZ & MARSAL TAXAND, LLC, IN SUPPORT OF DEBTORS' MOTION FOR ORDER APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN, <u>KEY EMPLOYEE RETENTION PLAN</u>**

1.   I, Brian L. Cumberland, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

2.   I am the National Managing Director of the Compensation & Benefits practice at Alvarez & Marsal Taxand, LLC ("<u>A&M Taxand</u>"), the tax consulting practice of Alvarez and Marsal North America, LLC.  My business address is 2100 Ross Avenue, Suite 1400, Dallas, Texas 75201.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are:  Furniture Brands International, Inc. (7683); Action Transport, Inc. (7587); Broyhill Furniture Industries, Inc. (3217); Broyhill Home Furnishings, Inc. (8844); Broyhill Retail, Inc. (8843); Broyhill Transport, Inc. (1721); Furniture Brands Holdings, Inc. (2837); Furniture Brands Operations, Inc. (4908); Furniture Brands Resource Company, Inc. (1288); HDM Furniture Industries, Inc. (7484); HDM Retail, Inc. (6125); HDM Transport, Inc. (4378); Lane Furniture Industries, Inc. (5064); Lane Home Furnishings Retail, Inc. (9085); Laneventure, Inc. (8434); Maitland-Smith Furniture Industries, Inc. (7486); Thomasville Furniture Industries, Inc. (6574); Thomasville Home Furnishings, Inc. (3139); Thomasville Retail, Inc. (f/k/a Classic Design Furnishings, Inc.) (6174). The Debtors' corporate headquarters are located at 1 N. Brentwood Blvd., St. Louis, Missouri 63105.

3.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge and experience, my review of publicly available and proprietary information regarding incentive and retention plans in chapter 11 cases, and information learned from my review of relevant documents and information supplied to me by management and advisors of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I am authorized to submit this declaration in support of the *Debtors' Motion for Order Approving Debtors' Key Employee Incentive Plan and Key Employee Retention Plan* (the "Motion").[2] If called upon to testify, I would testify competently to the facts and opinions set forth herein.

## Overview

4.      I am an expert in executive and management compensation with over 20 years of experience in the field. I have familiarized myself with the Debtors' operations and unique challenges, gathered relevant market data on incentives, retention payments, and severance payments in chapter 11 cases, reviewed data regarding the compensation levels at the Debtors peer companies, assisted the Debtors in developing the Key Employee Incentive Program (the "Original KEIP") and Key Employee Retention Program (the "Original KERP"), and analyzed whether those programs are consistent with typical market practice. Following the filing of the Motion, and as a result of discussions with the official committee of unsecured creditors (the "Committee"), certain economic and non-economic modifications were negotiated with respect to the Original KEIP (as so modified, the "Modified KEIP")

---

[2] Capitalized terms not otherwise defined have the same meanings as used in the Motion.

2

and non-economic modifications were negotiated with respect to the Original KERP (as so modified, the "Modified KERP").

5. Based on my analysis, I have concluded that the Original KEIP and Original KERP were reasonable and consistent with market practices and I have also concluded that the payouts proposed under the Modified KEIP and the Modified KERP, and the allocation thereof, are reasonable and consistent with market practice. This conclusion is based upon a comparison of the design structures and proposed payouts under the Original and Modified KEIP and the Original and Modified KERP with market data regarding incentive and retention payments for other companies going through chapter 11.

## Professional Background and Qualifications

6. I received my bachelor's degree in business administration from the University of Texas, my juris doctor from St. Mary's School of Law and my master of laws in taxation from the University of Denver. Prior to joining A&M Taxand, I led KPMG's Compensation and Benefits Group for the Southwest United States, and I was also a member of KPMG's National Tax Practice in Washington, D.C.

7. My curriculum vitae, which includes a list of my publications in the previous ten years, is attached hereto as Exhibit A.

8. A&M Taxand is an international professional services firm that offers a wide variety of services to private and public clients, including expert analysis of executive and management compensation. My responsibilities at A&M Taxand primarily have involved consulting to corporate clients, specifically with regard to

executive compensation. I currently lead A&M Taxand's Compensation and Benefits practice. In this capacity, I have worked with numerous *Fortune* 1000 companies and am frequently retained by these companies to advise them on their management compensation strategies, programs and pay levels. I have participated in the development and design of over 100 management incentive plans for companies inside and outside of chapter 11.

### A&M Taxand's Independent Development of the KEIP and KERP Proposals

9.      The Debtors retained A&M Taxand in mid-August 2013 to advise the Debtors on the terms and structure of a key employee incentive plan and a key employee retention plan. A&M Taxand and the Debtor had extensive discussions regarding the types of incentive and retention plans utilized in chapter 11 cases, and also specifically discussed plans utilized by similarly situated companies that were selling significant assets in the bankruptcy process. Based on information supplied by the Debtors and information regarding incentive and retention plans in other chapter 11 cases, A&M Taxand drafted preliminary proposals for the Debtors' Original KEIP and KERP plans on August 21, 2013. On August 23, 2013, A&M Taxand and other advisers discussed with the members of the Debtors' Board of Directors the types of incentive and retention plans utilized in chapter 11 cases and a proposed design for the Debtor. Both the Original KEIP and the KERP were substantially revised following discussions between the Debtors and A&M in August and September of 2013. Several conference calls were conducted to discuss at what level the performance goals would be a "challenge" to be achieved. On September 4, A&M Taxand discussed the

proposed incentive and retention plans with the Debtor's Compensation Committee Chairwoman. On September 5, 2013, I presented my analysis of the fully-revised versions of the Original KEIP and the KERP to the Debtors' Board, which approved the programs on September 8, 2013.

10. My analysis of the Original KEIP and the KERP revealed that the potential level of payout and payout structure under the KEIP are within market norms and are reasonable.

**Debtors' Key Employee Incentive Plan and Key Employee Retention Plan**

11. As set forth in the Motion and as modified through negotiations with the Committee, the Debtors' Modified KEIP provides an opportunity for certain members of the Debtors' executive leadership team who are essential to the continued day-to-day operation of the Debtors' businesses (the "KEIP Participants") to receive incentive pay for outstanding performance. Originally, the program contemplated setting three specific targets (the Threshold, Target, or Stretch Performance Level) with respect to two specific performance metrics: a Sales Incentive Pool and a Liquidity Incentive Pool.

12. The Modified KEIP, however, has been greatly simplified and its magnitude has been curtailed. Under the Modified KEIP, there is no longer a Liquidity Incentive Pool. Rather, the KEIP Participants will share in a pool equal to one percent (1.0%) of the aggregate proceeds of a sale of substantially all of the Furniture Brands' assets, subject to a cap of $3.5 million. The methodology for calculating the amount of sale proceeds has been agreed upon with the Committee. In addition, other non-

economic terms have been incorporated including a requirement that the KEIP Participants waive most of their employment-related claims (such as severance claims under any employment agreement or change in control agreement) in exchange for receiving a KEIP payment.

13. The Modified KERP provides retention payments to 46 non-insider employees (the "KERP Participants") constituting 15, 25, or 30% of the annual base salary of each KERP Participant. An additional $225,000 is allocated to a discretionary bonus pool for employees who may be added to participate in the program; the Debtors have agreed to consult with the Committee prior to the use of such discretionary funds. None of the participants can receive more than $25,000 without the consent of the Unsecured Creditors Committee. It is essential to the Debtors' business interests during the Chapter 11 process that the KERP Participants continue their employment. Without the retention payments, the KERP Participants are likely to terminate their employment with the Debtors and pursue other job opportunities. The loss of these important employees will harm the value of the Debtors' estates and affect the efficiency of the Sales Process. I am informed that six employees who would have been KERP Participants have resigned in the last two months.

14. Attached hereto as Exhibit B is a chart that describes the changes from the Original KEIP and KERP to the Modified KEIP and KERP.

**Assessment of the Modified KEIP and Modified KERP Plans**

15. In assessing the reasonableness of the Modified KEIP and the Modified KERP, A&M Taxand gathered data on court-approved asset sale incentive plans for

6

companies in chapter 11 dating back to October 2005. This data was collected from publicly available information as well as from A&M Taxand's proprietary database.

16. Based on A&M Taxand's comparison of plans similar to the Modified KEIP, I believe that the Modified KEIP's metric based solely on sales proceeds is reasonable and consistent with other asset sale incentive programs approved by bankruptcy courts since the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. First, A&M Taxand identified 15 companies for which the payout under the asset sale incentive program was tied to the level of sales proceeds (the "<u>Comparable Plans</u>").[3] The Modified KEIP payouts are in-line with the aggregate payouts and average per-participant payouts of the Comparable Plans. The Modified KEIP's projected payout (based on the current KPS offer) is below the median and average payout of the Comparable Plans for both the aggregate payout and the average per-participant payout.

17. Second, A&M Taxand reviewed recent bankruptcy cases with potential sales proceeds in the range of $200 million to $350 million to assess the reasonableness of the aggregate Modified KEIP payout as a percentage of total sales proceeds. The Modified KEIP payout of 1.00% of the total sales proceeds is consistent with similar asset sale-based plans adopted by companies in chapter 11. An example of this would be *In re Orchard Supply*, where this Court approved a sales incentive pool of up to $3,125,000 for sales proceeds between $200 million and $300 million (or 1.04% of

---

[3]    Those companies are identified in Exhibit C attached hereto.

proceeds at the top of that range).  *See Orchard Supply Hardware Stores Corp., et al.*, No. 13-11565 (Bankr. D. Del. Aug. 6, 2013).

18. Third, we have reviewed the Frederic W. Cook's Executive Compensation Report ("Cook Report') prepared for the Debtor dated October 2012.  The Cook Report benchmarks market compensation for Debtor's top-level executives.  The KEIP Participants' total direct compensation (base salary plus Modified KEIP payout assuming total sale proceeds equal to the current KPS offer) are on average 39% less than market median target total direct compensation shown in the Cook Report.  With three exceptions, the total direct compensation of the KEIP Participants would fall below the 25th percentile of target market compensation and, on average, is 18% less than the 25th percentile. In addition, the Modified KEIP payout, assuming total sale proceeds equal to the current KPS offer, when combined with fixed compensation (base salary), would produce total direct compensation that is approximately 28% lower than the KEIP Participants' pre-petition total direct compensation.

19. Finally, the Modified KEIP's allocation of payouts between Participants is generally within the range of allocations in similar plans of other chapter 11 companies.

20. A&M Taxand also reviewed KERP plans that have been approved for similar companies in chapter 11 cases.  The retention payments, as percentages of base salary, are consistent with numerous KERP plans that have been authorized by bankruptcy courts for comparable companies going through chapter 11.  The use of a

discretionary pool, for KERP Participants who may be added later, is a common feature of KERP plans utilized by companies in chapter 11 cases.

21. Based on my experience and A&M Taxand's independent analysis, the range of potential payments under the sale proceeds and liquidity metrics of the Modified KEIP are well within the range of market norms. Similarly, the proposed Modified KERP payments are well-within the range of market norms for retention payments paid to key employees during the chapter 11 process.

22. Based on my experience and the work I have done in this case and the independent analysis performed by A&M Taxand, it is my opinion that the Debtors' Modified KEIP and Modified KERP are reasonable, within market norms and tailored to incentivize the KEIP Participants and retain the KERP Participants in order to maximize value for all stakeholders in the Debtors' chapter 11 cases and ensure the efficient management of the Debtors' ongoing business during the chapter 11 process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of October 2013.

By: _____
Name:   Brian Cumberland
Title:   Managing Director,
         Alvarez & Marsal Taxand, LLC