# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FBI WIND DOWN, INC. (F/K/A FURNITURE | ) | Case No. 13-12329 (CSS) |
| BRANDS INT'L, INC.), *et al.* | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| ―――――――――――――――――――― | ) | |
| FBI WIND DOWN INC. LIQUIDATING TRUST, | ) | |
| BY AND THROUGH ALAN D. HALPERIN, | ) | |
| AS LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 15-51095 (CSS) |
| | ) | |
| ALL AMERICAN POLY CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| ―――――――――――――――――――― | ) | |

### OPINION

**BLANK ROME LLP**
Victoria A Guilfoyle
1201 Market Street
Suite 800
Wilmington, DE 19801
-and-
HAHN & HESSEN LLP
Edward L. Schnitzer
Jeffrey Zawadzki
488 Madison Avenue
New York, NY 10022
Co –Counsel for Plaintiff

**THE LAW OFFICES OF
JAMES TOBIA, LLC**
James Tobia
1716 Wawaset Street
Wilmington, DE 19801
-and-
JONES & ASSOCIATES
Roland Gary Jones
1745 Broadway
17th Floor
New York, NY 10019
Co-Counsel for Defendant

Dated: February 16, 2018

Sontchi, J.

## INTRODUCTION[1]

Before the Court are cross-motions for summary judgment.  Plaintiff's Motion[2] seeks, among other things, a determination whether eighteen transfers (collectively, the "Transfers") qualify as avoidable preferences outside any 11 U.S.C. § 547(c) defenses,[3] and whether such Transfers can be recovered and disallowed under § 502 and the terms of the Plan.  Defendant has filed a Cross-Motion for summary judgment contending that the Transfers are not preferential, otherwise qualify for § 547(c) ordinary course of business and subsequent new value defenses, and are not fraudulent transfers.

For the reasons set forth below, the Court will grant, in part, and deny, in part, both the Plaintiff's Motion and the Cross-Motion.  Specifically, the Court holds the following on the Plaintiff's Motion:

1.    Summary judgment is granted for all the § 547(b) preference elements, with the exception that there is a dispute of material fact regarding whether the Transfers are an interest of the Lane and Broyhill Debtors in property, and consequently preferential.

---

[1] The Court hereby makes the following findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are also adopted as such.

[2] Capitalized terms herein shall have the meaning ascribed to them *infra*.

[3] The initial Plaintiff's Motion asks for a judgment of "$554,149.36, [the total of the Transfers,] plus costs and interest."  However, the Plaintiff's subsequent reply brief and their answer to the Cross-Motion request judgment "in an amount no less than $313, 410.27," which is the total of the Lane and Broyhill Pressure Payments alone.  While Plaintiff provides no specific explanation for this reduction in ask, given the above, it appears Plaintiff has withdrawn their request for summary judgment as to those remaining non-pressured Transfers and is only contesting up to the reduced amount of $313,410.27.  Regardless, this reduction in ask requires no further analysis from the Court since, as described further below, the Defendant's request for summary judgment on the ordinary course of business defense as to all Transfers outside the Lane Pressure Payments is granted. *See, infra,* n. 134.

2.     Summary judgment is denied as to the inapplicability of any § 547(c) defenses, given the successful counterclaims of the Cross-Motion.

3.     Summary judgment is denied on the determination of disallowance, objection, or setoff, since relief is inappropriate when the preferential nature of the Transfers are still in dispute.

4.     Plaintiff's fraudulent transfer claim may not be reviewed in summary judgment as the Plaintiff failed to properly brief the issue.

The Court also holds the following as to the Defendant's Cross-Motion:

1.     Summary judgment is denied regarding Defendant's argument that the Transfers are not an interest of the Lane and Broyhill Debtors in property and consequently not preferential, as a dispute of material fact remains on that specific element of § 547(b).

2.     Summary judgment is granted, in part, regarding the ordinary course of business defense for all Transfers, excluding the Lane Pressure Payments for which a dispute of material fact remains and summary judgment is denied.

3.     Summary judgment is granted, in part, regarding subsequent new value up to $16,692.00, but is denied as to the remaining contested amount.

4.     Summary judgment is denied as to the lack of fraudulent transfers since a dispute of material fact exists whether the Transfers were § 548 fraudulent transfers given for less than reasonably equivalent value.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A) and (O). Venue is proper before the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. §§ 1408 and 1409. The Court has the judicial authority to enter a final order.

## STATEMENT OF FACT

### A.    Procedural Background

On September 9, 2013 (the "Petition Date"), FBI Wind Down, Inc. (f/k/a Furniture Brands International, Inc.) and eighteen affiliated companies, (together, the "Debtors") filed a voluntary petition for Chapter 11 relief.[4]  As part of said petition, Debtors also filed a motion authorizing use of their existing cash management system, which this Court granted.[5]  On October 21, 2013, All American Poly filed a proof of claim against Debtor-subsidiary Lane for $35,455.88 (the "Claim").[6]  On July 14, 2014, the Court confirmed the Second Amended Joint Plan of Liquidation of FBI Wind Down, Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code (the "Plan").  The Plan partially consolidated the Debtors into groups based on prepetition business and operations.[7]  The substantively

---

[4] Del. Bankr. 13-12329, D.I. 1.

[5] D.I. 7.

[6] Adv. Pro. No. 15-51095, D.I. 66, A000181 (*Lane Proof of Claim*).  The remaining docket items *infra* cite to this adversary proceeding.

[7] D.I. 66, A000220-21.

consolidated groups at issue in the Motions are the brand groups Broyhill Debtors and Lane Debtors, and the corporate group FBI Debtors.[8]

Under Section 7.3 of the Plan, the Liquidating Trustee has rights to pursue any existing or potential Causes of Action (as defined in the Plan) including those under 11 U.S.C. §§ 547, 548, and 550.[9] Alan D. Halperin was appointed as Liquidating Trustee ("Liquidating Trustee" or "Plaintiff") for FBI Wind Down, Inc. Liquidating Trust and continues to serve in that capacity.[10] On August 19, 2015, the Liquidating Trustee brought this present action against All American Poly Corp. ("All American Poly" or "Defendant") seeking, among other things, avoidance and recovery of certain transfers totaling $554,149.36 under §§ 547 and 548 of the Bankruptcy Code, and the disallowance of All American Poly's Claim under the Plan.[11] Defendant answered with nineteen affirmative defenses, including ordinary course of business, subsequent new value, and reasonably equivalent value defenses.[12] Following the Court's procedures, both parties participated in mediation but were unsuccessful in reaching an accord.[13] Written

---

[8] "Broyhill Debtors" collectively consists of BFI Wind Down, Inc.; BFH Wind Down, Inc.; FBO Wind Down, Inc.; and FBRC Wind Down, Inc. "Lane Debtors" collectively consists of LFI Wind Down, Inc.; LHFR Wind Down, Inc.; and LV Wind Down, Inc. "FBI Debtors" collectively consists of FBI Wind Down, Inc., FBH Wind Down Inc., FBO Wind Down, Inc., and FBRC Wind Down, Inc. D.I. 1, ¶ 9. Debtors' "corporate" group is synonymous with FBI Debtors for the purposes of this action. *See* D.I. 67, A000487 (*Graham Tr.*, 33:18-21).

[9] D.I. 1, ¶ 8.

[10] *Id.* at p. 1.

[11] *Id.*

[12] D.I. 7.

[13] D.I. 65.

discovery and depositions were subsequently conducted according to an amended scheduling order.[14]

On July 31, 2017, both the Plaintiff and Defendant filed cross-motions for summary judgment.  Plaintiff's motion seeks summary judgment on the Liquidating Trustee's § 547 claims to avoid certain alleged preferential transfers (the "Plaintiff's Motion").[15] Defendant's motion for summary judgment argues affirmative defenses to Plaintiff's §§ 547 and 548 claims (the "Cross-Motion", together with Plaintiff's Motion the "Motions").[16]  The Motions have been fully briefed and are ripe for consideration.

## B.  Factual Background

### 1. Background and History Between the Parties

All American Poly is a producer of custom plastic products such as sheeting, stretch wrap, liners, and bags.  Prior to the Petition Date, All American Poly provided goods to two of the Debtors' brands, Lane and Broyhill, for use in their businesses.[17]

Lane Debtors conducted business as a subsidiary in Mississippi, and Broyhill conducted its business as a subsidiary in North Carolina.  Both brands had separate employees and accounts payable groups.[18]

---

[14] D.I. 24, 36, 47.

[15] D.I. 64.

[16] D.I. 62.

[17] D.I. 70, App. A (*Aff. of Jed Sussman*, ¶ 5).

[18] D.I. 68, A000532-33 (*Meredith Graham Tr.*, 78:6-79:19).

All American Poly began its business relationship with Lane in November 2010, and later began a business relationship with Broyhill in August 2012.[19]  Both brands had a historic practice of weekly or biweekly payments to All American Poly.[20]  As a vendor, All American Poly communicated directly with the subsidiaries with which it conducted business.[21]  In this case, Lane, Broyhill, and All American Poly regularly communicated via e-mail and telephone, with All American Poly inquiring several times over the timing of future payments from Lane.[22]

Lane and Broyhill further had separate payment procedures and lines of credit with All American Poly.[23]  Before the ninety days preceding the Petition Date (the "Preference Period"), Lane made payments to All American Poly via automatically printed checks that were mailed through the U.S. Postal Service, except for one payment made by wire.[24]  Lane also made several "open" payments to All American Poly before the Preference Period that were keyed off against unpaid invoices.[25]  Broyhill, by contrast, made all its payments via ACH.[26]

---

[19] The relationship start dates herein correspond to the months of the first invoices for both parties in the record of historical payments.  D.I. 67, A000298-307 (*Defendant's Responses to Interrogatories, Annex 1-2*).

[20] *Id.* at A000418-22 (*Sussman Tr.*, 107:18-111:17).

[21] *Id.* at A000520 (*Graham Tr.*, 66:1-13).

[22] D.I. 70, Exh. A (*Sussman Aff.*, ¶¶ 9, 13); *see* D.I. 72, App. B-E (*E-mails from Jed Sussman to Lane*).

[23] D.I. 68, A000533 (*Graham Tr.*, 79:3-5); D.I. 67, A000357-59 (*Sussman Tr.*, 46:5-12, 48:23-25).

[24] D.I. 68, A000534-35, 537 (*Graham Tr.*, 80:13-81:14, 83:15-18).

[25] D.I. 67, A000305 (*Lane "Open Account" Payments During the Historical Period*).

[26] D.I. 68, A000739-40 (*Exh. B (Broyhill); E-mail from Rick Isaak to Teresa North (July 5, 2013)*).

As the Debtors began facing cash flow problems in 2013, FBI Debtors' corporate group began delaying payments to vendors, including All American Poly.[27]  When Master Account funds were insufficient to cover all payments, priority was placed on payments that would keep plants open and shipment of goods continuous.[28]

*2. Debtors' Cash Management System*

In September 2012, Debtors entered into an asset-based lending facility which required implementing a new centralized cash management system to streamline the collection and distribution of proceeds.[29]  The cash management system swept funds from brand-specific depository accounts into sub-concentration accounts and then into a master account with Wells Fargo (the "Master Account") owned by an FBI Debtor, Furniture Brands International, Inc.[30]  Funds from the Master Account were then distributed into disbursement accounts to pay for expenditures at the brands.[31]

The record shows conflicting evidence regarding who had control over the prioritization of Master Account funds.  Master Account funds paid payroll first, and then the various vendors at the brands.[32]  On the occasions where payments from the Master Account could not sustain payments to all the brands' vendors, FBI Debtors made a company-wide decision to delay payments.[33]  In that case, "the brands would work out

---

[27] D.I. 67, A000472, 494, 506 (*Graham Tr.*, 18:8-19:7, 40:3-8, 52:3-17).

[28] *Id.* at A000485-86 (*Graham Tr.*, 31:20-32:15).

[29] D.I. 66, A000058-59 (*Cash Management Motion*); *see also* D.I. 74, A1-26 (*Dec. of Vance Johnson*).

[30] *Id.* at A000093, 104 (*Exh. A, Domestic Bank Accounts; Cash Management Diagram*).

[31] *Id.* at A000062-64 (*Cash Management Motion*).

[32] D.I. 67, A000488-89 (*Graham Tr.*, 34:20-35:2).

[33] *Id.* at A000506-08, (*Graham Tr.*, 52:3-54:9).

themselves how they wanted to try to lower the amount that they wanted paid."[34] Each brand, including Lane and Broyhill, would provide information prioritizing the debts their brands wished to pay from the Master Account funds.[35] A group of employees from corporate and the several brands, including Lane and Broyhill, would review those payments.[36] The finalized list of payments was approved by FBI Debtors and was at their discretion.[37]

Actual payments were managed by FBI Debtors' Treasury group during the Preference Period.[38] Once payments were approved, Treasury would transfer the funds from the commingled Master Account to the various disbursement accounts.[39] Treasury's role in processing payments was purely transactional, nevertheless the brands had no ability to control payment once the funds were in their disbursement accounts.[40] Employees in the accounts payable groups of each brand would merely look up each vendor that was on the approved list of payments, see what balanced was owed, and pay the balance they were instructed to pay from the appropriate disbursement account.[41] To

---

[34] D.I. 68, A000627 (*Isaac Tr.*, 25:20-24).

[35] *Id.* at A000626-27 (*Isaac Tr.*, 24:15-25:2).

[36] *Id*; D.I. 67, A000478-80 (*Graham Tr.*, 24:9-26:24).

[37] *Id.* at A000512 (*Graham Tr.*, 58:15-20).

[38] D.I. 66, A000501 (*Graham Tr.*, 47:14-24) ("Q. Did [Treasury] have any authority to determine which payments were made to each vendors? … A: They were—they just functionally managed the accounts").

[39] D.I. 67, A000495-96 (*Graham Tr.*, 41:25-42:12).

[40] *Id.* at A000512 (*Graham Tr.*, 58:10-14); D.I. 68, A000705 (*Isaac Tr.*, 103:21-104:7) ("Q: … Preinitiative, was corporate in St. Louis physically sending out the checks and sending out the wires and ACHs for each of the brands? A: … But we centralized all of the payment process at some point between 2007 and 2013 into corporate, for all the brands and for corporate. And corporate made all payments and the brands no longer had that ability.")

[41] *Id.* at A000627 (*Isaac Tr.*, 25:7-16).

the extent the corporate office decided to delay payments, accounts payable for each brand kept to the delayed schedule.[42]  In the case of Lane and Broyhill, vendor debts could be paid in one of three methods: ACH, check, or wire.  The type of payment used was determined by the vendor.[43]

### 3. The Transfers

The Liquidating Trustee's complaint seeks to avoid and recover eighteen disputed Transfers made to All American Poly.[44]  All Transfers occurred between June 12, 2013 and September 4, 2013, within the Preference Period.[45]

Thirteen of the Transfers were made by Debtor LFI Wind Down, Inc. (f/k/a Lane Furniture Industries, Inc.) ("Lane") and totaled $412,532.40 (collectively, the "Lane Transfers").  All Lane Transfers were made from a disbursement account owned by Lane, ten of them via check and three by wire.  The remaining five Transfers were made by Debtor BFI Wind Down, Inc. (f/k/a Broyhill Furniture Industries, Inc.) ("Broyhill") and totaled $141,616.96 (collectively, the "Broyhill Transfers").[46]  All Broyhill Transfers were made as ACH payments from a disbursement account owned by Broyhill.[47]

### i. Lane and Broyhill Pressure Payments

---

[42] D.I. 67, A000522-23 (*Graham Tr.*, 68:20-69:14).

[43] *Id.* at A000474, 508 (*Graham Tr.*, 20:16-17, 54:19-25).

[44] D.I. 1.

[45] *Id.* at Exh. A-B.

[46] *Id.*

[47] D.I. 68, A000739-40 (*Exh. B (Broyhill)*.

Plaintiff separately discusses the payment history behind the last seven Lane Transfers, including the three wire payments, worth $252,866.21 (the "Lane Pressure Payments"), as well as one Broyhill Transfer totaling $60,544.06 (the "Broyhill Pressure Payment").

For the period between July 3, 2013 and July 25, 2015, Lane made no payments to All American Poly. Instead, Lane issued four checks on four different dates credited to All American Poly worth $104,678.25, which were held at the Debtors' corporate office but not mailed.[48] Due to a unique check printing system for the Lane subsidiary, these checks were held at their corporate headquarters until such time that final payment was approved.[49] The delayed payments were justified as the Debtors' attempt to manage a reduced cash flow.[50]

On August 7, 2013, All American Poly threatened to place Lane's goods on hold unless previous debts were paid.[51] All American Poly provided supplies to Lane on August 13th, but made no subsequent deliveries until September 3rd.[52] On August 22nd,

---

[48] *Id.* at A000547 (*Graham Tr.*, 93:3-25).

[49] D.I. 70, pp. 122-24 (*Graham Tr.*, 60:20-62:23).

[50] *See* D.I. 68, A000625, 688 (*Isaac Tr.*, 23: 10-14, 86: 12-16); D.I. 67, A000514 (*Graham Tr.*, 60:24-61:5).

[51] *Id.* at A000290 (*E-mail from J. Sussman (AAP) to T. North and J. Eames (FBI)*) (August 7, 2013):

> You have many invoices way past due and others due as well[.] In the event I do not hear back from you with concrete info. We will be forced to place your account on hold. Something we have been reluctant to do. But, may have not have a choice, since our pleas for payment are being ignored.

[52] *Id.* at A000296 (*Defendant's Responses to Interrogatories*), 407 (*Sussman Tr.*, 96: 17-21) ("Q: … it looks like no goods were shipped between August 13th and September 3rd; is that correct? A: That's what it looks like."). Defendant failed to present rebutting evidence to demonstrate that goods were shipped in this period.

All American Poly demanded that Lane pay all outstanding debts and change the manner of payment going forward from check to wire.[53]  In an e-mail exchange, All American Poly referenced a possible "bankruptcy in the future" as a reason for why future transfers had to be paid by wire.[54]  Lane acquiesced by releasing the four checks previously made to All American Poly that same day via overnight Federal Express, and wiring the remaining balance of $51,977.00.[55]  All American Poly conditioned all subsequent delivery of goods on receipt of payment by wire.[56] Starting with the August 22nd payment and up to the Petition Date, All American Poly's exposure with Lane decreased from more than $250,000 to $34,455.88.[57]

All American Poly similarly conditioned the release of additional goods to Broyhill on the Broyhill Pressure Payment.  On September 3rd, All American Poly represented via email that future shipment of goods was contingent on Broyhill paying its current balance.[58]  Broyhill sent payment of $60,544.06 the next day via ACH, zeroing out All

---

[53] D.I. 68, A000667, 770 (*Isaac Tr.*, 65:14-25; *E-mail from J. Sussman (AAP) to J. Eames and T. North (FBI)*) (August 22, 2013).

[54] *Id.* at A000598 (*E-mail from J. Sussman (AAP) to J. Eames and T. North (FBI)) (August 22, 2013)*) ("A check will not due under the circumstances. We will need it all by wire per our banks constraint. In case of bankruptcy in the future").

[55] *Id.* at A000547, 98 (*Graham Tr.*, 93:18-25; *E-mail from J. Eames (FBI) to J. Sussman (AAP) (August 22, 2013)*).

[56] D.I. 67, A000451 (*E-mail from J. Sussman (AAP) to J. Eames (FBI) (August 30, 2013)*) ("I erred on the amount we need for next week in order to release more goods to your plants."); *id.* at A000453 (*E-mail from J. Sussman (AAP) to J. Eames (FBI) (September 9, 2013)*) ("We will need the balance due on account of $34,455.88, for continued shipments").

[57] D.I. 68, A000543, 52 (*Graham Tr.*, 89:18-22, 98:1-7).

[58] *Id.* at A000600 (*E-mail from J. Sussman (AAP) to D. Kaylor (FBI) (September 3, 2013)*) ("Any news as to when we will see payment on below? Shipment of product is contingent on that").

American Poly's accounts payable with the subsidiary.[59]   All American Poly made no further shipment of goods after Broyhill's payment.[60]

## ANALYSIS

### A.  Legal Standard: Summary Judgment

Under FED. R. CIV. P. 56, made applicable here by FED. R. BANKR. P. 7056, summary judgment is appropriate when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[61]  The movant always bears the initial burden of demonstrating the absence of a genuine issue of material fact.[62]

When asserting whether "a fact cannot be or is genuinely disputed," a party "must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers or other materials." Alternatively, a party can show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[63]

At the summary judgment phase, the court does not "weigh the evidence and determine the truth of the matter;" rather, the court determines "whether there is a

---

[59] D.I. 66, A00043 (*Broyhill ACH Payments*).

[60] The invoice date for the last shipment of goods is August 16, 2013.  D.I. 67, A000300 (*Defendant's Responses to Interrogatories, Annex 1*).

[61] FED. R. CIV. P. 56(a).

[62] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[63] FED. R. CIV. P. 56(c)(1)(A)-(B).

genuine issue for trial."[64]  A material fact is one which "could alter the outcome" of the case.  The fact is genuine when it is "triable," i.e. when reasonable minds could disagree on the result.[65]  In deciding a motion for summary judgment, all factual inferences must be viewed in the light most favorable to the non-moving party.[66]  The court in its assessment "need only consider the cited materials" in its analysis, but may look elsewhere in the record.[67]

Once the movant presents sufficient support for the motion, the burden shifts to the non-moving party to show the continued existence of genuine issues of material fact.[68]  It does not suffice to assert the "mere existence of some alleged factual dispute between the parties," instead a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[69]  Likewise in a bench trial where the judge is the ultimate trier of fact, an issue is genuine if a reasonable factfinder could find for the nonmovant on the evidence.[70]  If there is a complete failure of proof concerning an essential element of the nonmoving party's case, FRCP 56(c) renders all other facts immaterial and mandates a ruling in favor of the movant.[71]

---

[64] *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

[65] *Id.* at 210 (citing *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 301 (3d Cir. 1995)).

[66] *Matsushita Electric Industrial Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

[67] FED. R. CIV. P. 56(c)(3).

[68] *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

[69] *Anderson*, 477 U.S. at 247-48.

[70] *Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 679 (3d Cir. 1993).

[71] *Celotex Corp.*, 477 U.S. at 317.

14

### B.    Avoidance of Preferential Transfers

Plaintiff seeks summary judgment alleging the Transfers qualify as avoidable preferences.[72]  In their Cross-Motion, Defendant asserts that neither Lane nor Broyhill Debtors have an interest in property in the Transfers.[73]

*1. Transfers as Property of the Debtor Pursuant to § 547(b)*

As a threshold matter, Defendant disputes whether the Transfers constitute an interest of the Lane and Broyhill Debtors in property.  As a condition precedent to the elements of § 547(b), any transfers that are not property of the debtors' estates are unavoidable.[74]  The burden is on the Liquidating Trustee to prove the interest and that it belongs in the Lane and Broyhill Debtors' estates.[75]

While the Bankruptcy Code does not specifically define the term, the Supreme Court has interpreted it to mean "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."[76]  As a result, the term is largely co-extensive with the § 541 definition of "property of the estate," including "all legal or equitable interests of the debtor in property as of the commencement of the case."[77]  Courts first look to state law to determine whether a legal

---

[72] D.I. 64.

[73] D.I. 62.

[74] *See Radnor Holdings Corp. v. PPT Consulting LLC* (*In re Radnor Holdings Corp.*), 2009 WL 2004226 (Bankr. D. Del. 2009).

[75] *Schubert v. Lucent* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 400-01(3d Cir. 2009) (citing *Metcalf v. Golden* (*In re Adbox, Inc.*), 488 F.3d 836, 842 (9th Cir 2007), and 11 U.S.C. § 547(g)).

[76] *Begier v. IRS*, 496 U.S. 53, 58 (1990).

[77] *Slobodian v. IRS* (*In re Net Pay Solutions, Inc.*), 822 F.3d 144, 154 (3d Cir. 2016) (citing *Begier v. IRS*) (internal quotations omitted).

and equitable interest exists, before applying bankruptcy law to determine an interest's inclusion in the estate.[78]  The crucial question in deciding whether to include property within the estate is to determine whether the transferred funds "diminished the resources from which the debtor's creditors could have sought payment."[79]

It is "well-settled case law" that any bank accounts under the legal title of the debtor, as well as any deposits in such accounts credited to the debtor, are presumptively considered property of the debtor's estate.[80]  If a trustee establishes that a transfer was made from a debtor-owned account over which the debtor normally exercises control, the trustee "makes a preliminary showing of an avoidable transfer 'of an interest of the debtor' under § 547(b)."[81]  This presumption holds even in cases where the account contains commingled funds.[82]  In reviewing whether the presumption should not apply to a specific case, courts have looked to evidence demonstrating other indicia of control.[83]  Control refers not merely to the physical means of exerting control, but the legal right to

---

[78] *Butner v. United States*, 440 U.S. 48, 55 (1979); *see also Majestic Star Casino v. Barden Development (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 751 (3d Cir. 2013) (citing *In re Brannon*, 476 F.3d 170, 176 (3d Cir. 2007)).

[79] *In re Southmark Corp.*, 49 F.3d 1111, 1117 (5th Cir. 1995).

[80] *In re Washington Mutual, Inc.*, 442 B.R. 314, 330 (Bankr. D. Del. 2011) (citing *Amdura Nat'l Distribution Co. v. Amdura Corp., Inc. (In re Amdura Corp.)*, 75 F.3d 1447, 1451 (10th Cir. 1996), also *In re Meadows*, 396 B.R. 485, 490 (6th Cir. BAP 2008), and five other compiled cases); *see also* 4 COLLIER ON BANKRUPTCY ¶ 541.09 (15th ed. 2009) ("deposits in the debtor's bank account become property of the estate under section 541(a)(1)").

[81] *In re Winstar Commc'ns, Inc.* 554 F.3d at 401 (citing *In re Adbox, Inc.* 488 F.3d at 842).

[82] *In re Southmark Corp.*, 49 F.3d at 1116-17; *see also In re Radnor Holdings Corp.*, 2009 WL 2004226 at *2.

[83] *In re Amdura Corp.* 75 F.3d at 1451 ("In this case the concentration account was not only held exclusively in [debtor-parent's] name, but [debtor-parent] also possessed all other legally cognizable indicia of ownership"); *see also In re Washington Mutual, Inc.* 442 B.R. at 330-31; *Millard Refrigerated Services, Inc. v. Landamerica 1031 Exchange Services, Inc. (In re LandAmerica Fin. Group, Inc.)*, 412 B.R. 800, 809-10 (Bankr. E.D. Va. 2009).

do so.[84]  Thus, the transferor's right to use funds to pay its own creditors or for an alternative purpose is dispositive over actual ownership.[85]

The same factors apply to cash management accounts, although additional attention must be paid to respect corporate formalities.[86]  Generally, parent and subsidiaries companies have no claim on the assets of the other, unless a party seeks to pierce the corporate veil or substantively consolidate two entities.[87]  In the case of a cash management account, with proper bookkeeping allocations, "the holder of all indicia of control is the holder of the interest."[88]  Courts have focused first on which party holds legal title over the account, and then whether the party has unfettered control to pay creditors at its own discretion.[89]  Crucially, however, a parent who only maintains ownership or corporate governance control over a subsidiary, but no legal title to a subsidiary's assets, does not have control of the subsidiary's assets.[90]

Neither party disputes that the disbursement accounts and associated deposited funds are an "interest in property" under state law.[91]  Both parties furthermore concede

---

[84] *Cassirere v. Herskowitz (In re Schick)*, 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999).

[85] *Id.* (citing *Newpower v. Boyd (In re Newpower)*, 229 B.R. 691, 701 (W.D. Mich. 1999)).

[86] *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 377 (Bankr. S.D.N.Y. 1998).

[87] *In re Regency Holdings (Cayman), Inc.*, 216 B.R at 373-77.

[88] *Enron Corp. v. Rexel Southern Electrical Supply (In re Enron Corp.)*, 2006 WL 2385194 (Bankr. S.D.N.Y. June 2, 2006).

[89] *In re Southmark Corp.* at 1116.

[90] *In re Regency Holdings (Cayman), Inc.* 216 B.R at 377-378 (noting the ability to remove directors, appoint officers, and by extension control the disposition of assets, is insufficient control for a preference action).

[91] State laws find the mere deposit of funds in an account to be an interest in property.  This principle is so apparent that one court called a challenge against such a claim "frivolous."  *Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. (Matter Of USA Diversified Products, Inc.)*, 100 F.3d 53, 55 (7th Cir. 1996); *see also Sarachek v. Chitrik (In re Agriprocessors, Inc.)*, 2011 WL 3033710 (N.D. Iowa 2011).

that Lane and Broyhill had legal title to the disbursement accounts from which the Transfers were made.  In conceding that the Transfers were deposited and transferred from a bank account in the name of Lane and Broyhill, the Liquidating Trustee has made a presumptive showing that the Transfers are property of the Lane and Broyhill Debtors' estates.

Defendant counters that Lane and Broyhill did not have an interest in the Transfers because "FBI Debtors … had ultimate control over the funds in the Master Account, and by extension, the funds in the bank accounts of the Lane and Broyhill Debtors."[92]   In support of this view, Defendant points to FBI Debtors' approval process, ability to delay payments, and control over actual disbursement.  The Defendant claims legal title to the disbursement accounts is irrelevant since only approved payments from the Master Account were transferred to the Lane and Broyhill disbursement accounts, and neither brand could alter the disbursement account payments to vendors once approved.

Defendant demonstrates a dispute of material fact over whether FBI Debtors' other indicia of control is enough to shift the property interest away from Lane and Broyhill Debtors.  FBI Debtors exerted complete control over the physical payment process; neither Lane nor Broyhill had the ability to make payments to vendors directly during the Preference Period.  Moreover, the ultimate allotment to each brand from the Master Account was at the discretion of the corporate office, even if Lane and Broyhill mainly

---

[92] D.I. 70, p. 15.

had the ability to prioritize among their own accounts payable.[93]    Once in the disbursement accounts, neither brand was able to effectively alter the course of the approved payments.

There are reasons to view the Defendant's position cautiously.    Defendant's assertion that neither Lane nor Broyhill Debtors have an interest in the funds in the disbursement accounts, despite legal title, disregards the Debtors' corporate structure as preserved in the bankruptcy.    As the Defendant notes, the Plan only partially consolidated the Debtors, distinguishing between FBI, Lane, and Broyhill Debtors.[94] Defendant has not asked to pierce the corporate veil, nor substantively consolidate the Plan's groups.    To follow the Defendant's suggestion then and shift the interest to FBI Debtors may compromise the corporate separation between parent and subsidiary that the cash management system preserved.[95]    These formalities require attention.[96] Nevertheless, the Defendant's case is enough to pass over summary judgment, which only requires the Court from granting judgment where a dispute of material fact remains as to the issue presented.

Looking at the facts in the light most favorable to either the Plaintiff or Defendant as required in summary judgment, the level of control enjoyed by FBI Debtor over the

---

[93] Defendant attempts to argue that Treasury had the ultimate say in payments.  Although Treasury simply executed the payments, FBI Debtors did approve the list of payments from each brand.

[94] D.I. 70, pp. 7-8.

[95] Indeed, it seems the reason the Master Account funds would be divided into different disbursement accounts may be to concretely define the portion of those funds that each subsidiary had rights to disburse.

[96] "It is superstitious to put one's hopes in formalities, but arrogant to refuse to submit to them."  Blaise Pascal, *Pensees* 364 (A. J. Krailsheimer ed., 1995).

disbursement accounts leaves open the possibility of overcoming the presumption of interest held by the Lane and Broyhill Debtors.[97]   As a result, the Court finds that a dispute of material fact exists over whether the Transfers are an interest of the Lane and Broyhill Debtors.

*i. Earmarking*

Defendant next claims that the Transfers are not part of the Lane and Broyhill Debtors estates because the funds were "earmarked" for All American Poly.[98]   As long as the Liquidating Trustee has proven its initial burden of showing an interest of the debtor in property, the burden shifts to the Defendant to prove earmarking.[99]

"The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a transfer of an interest of the debtor in property."[100]   As a judicial exception to the general avoidance rules, earmarking is narrowly construed by courts.[101]   In a preference action, it generally applies when "a third party makes a loan to a debtor specifically to enable that debtor to satisfy the claim of a

---

[97] Corporate chose to pay payroll before vendors, to delay payments, and to approve final use of Master Account funds.  *See In re Schick* 234 B.R. at 343 (citing *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988)).

[98] Earmarking is not considered an affirmative defense, but a challenge to whether the transfers in question are part of the scope of the debtor's estate.  *See In re Winstar Commc'ns* 554 F.3d at 400.

[99] *Id.* at 401.

[100] *Id.* (citations and internal quotations omitted).

[101] *Campbell v. Hanover Insurance Co.* (*In re ESA Environmental Specialists, Inc.*), 709 F.3d 388, n. 5 (4th Cir. 2013) (internal citations omitted); 5 COLLIERS ON BANKRUPTCY, 547.03[2][a] (16th ed. 2011).

designated creditor."[102]  Whereas other courts have principally analyzed earmarking in terms of control,[103] the Third Circuit uses the three *Bohlens* requirements:

> (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt, (2) performance of that agreement according to its terms, and (3) the transaction viewed as a whole … does not result in any diminution of the [debtor's] estate.[104]

The above test requires a specific agreement between the debtor and new lender delineating the payment a particular debt, as well as the lack of any dispositive control by the debtor over the direction of the new funds.[105]  The Third Circuit has emphasized that an earmarking agreement must clearly note the restriction and direction of the new funds, mere knowledge that funds will be used for a specific purpose is not enough.[106]  If

---

[102] *Id.*

[103] *See Official Committee of Unsecured Creditors v. Columbia Forest Products, Inc. (In re Harwood P-G, Inc.)*, 2007 WL 1728653 at *4 (Bankr. W.D. Tex. June 12, 2007) (comparing the *Bohlen* test's focus on agreement with the Fifth Circuit's focus on whether "the property in question was ever in the control of the debtor").

[104] *In re Winstar Commc'ns* 554 F.3d at 400 (citing *McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 859 F.2d 561, 565 (8th Cir. 1988)) (internal quotations omitted).

[105] *AFD Fund v. Transmed Foods, Inc. (In re AmeriServe Food Distribution, Inc.)*, 315 B.R. 24, 30 (*quoting In re McLean Industries, Inc.*, 132 B.R. 247, 261 (Bankr.S.D.N.Y.1991), *reversed on other grounds* 30 F.3d 385 (2nd Cir.1994), *cert. denied sub nom.*, *U.S. Lines Reorganization Trust, Successor to U.S. Lines (S.A.), Inc. v. U.S.*, 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995)):

> This doctrine is almost exclusively applied where a third party loans money to a debtor for the very specific purpose of repaying a designated debt. The funds are sometimes transferred to the creditor whose obligation is being satisfied, but the court in *Coral Petroleum[,] Inc. [v. Banque Paribas-London*, 797 F.2d 1351 (5th Cir.1986)] observed that the doctrine may still apply where the debtor physically receives control of the funds but the debtor lacks dispositive control over the funds.

[106] *In re Winstar Commc'ns* 554 F.3d at 401-02 (citing *Cadle Co. v Mangan (In re Flanagan)*, 503 F.3d 171, 185 (2d Cir. 2007)).

the debtor lacks any dispositive control, the funds may be considered earmarked even if the debtor received actual possession of the funds.[107]

The Court should look at the 'big picture' in analyzing an earmarking case. The overarching question is "whether the debtor had the right to disburse the funds to whomever it wished, or whether the disbursement was limited to a particular old creditor or creditors under the agreement with the new creditor."[108] Thus a debtor with earmarked funds is only a conduit to the transfer, where only the creditor paid had a reasonable expectation of recovering the transfers.[109] Where other creditors have no rights to the transferred funds, the elements of § 547(b) prevent avoidance.[110]

Since FBI Debtors maintained dispositive control over the Transfers, Defendant asserts, the Transfers were earmarked. The Transfers could only be disbursed upon the approval of the corporate office. Lane and Broyhill were involved in the prioritization

---

[107] *Coral Petroleum, Inc. v. Banque Paribas-London*, 797, F.2d 1351, 1361 C.B.C.2d 1031 (5th Cir.), *reh'g denied*, 801 F.2d 398 (5th Cir. 1986).

[108] *In re AmeriServe Food Distribution, Inc.*, 315 B.R. at 30 (internal quotations omitted).

[109] *Cooper v. Centar Investments Ltd. (In re TriGem Am. Crop.)*, 431 B.R. 855, 864-65 (Bankr. C.D. Cal. 2010):

> If the debtor was only a conduit and its creditors would not otherwise have had any reasonable expectation of recovering this money, why should those creditors receive a windfall now? From the standpoint of debtor's creditors, in whose behalf the Trustee brings suit, there was no net diminution of expected recovery, which is and must be the touchstone of every avoidance action whether under §§ 547, 548 or 549.

[110] *In re TriGem Am. Corp.*, 431 B.R. at 865:

> Reduced to its essence, the earmarking defense merely holds for the unsurprising conclusion that where creditors would not otherwise have any reason or expectation to look to the assets transferred, there is no diminution of the net recovery on account of the earmarked funds and there can therefore be no avoidance.

only when the funds were in the Master Account.  As a result, it was only once the corporate office approved the use of Master Account funds for a particular creditor that funds were transferred into the disbursement accounts.  Neither Lane nor Broyhill had the ability to thereafter change the course of payment.

Although FBI Debtors' direction over the funds supports the overarching view that the disbursement of the Transfers was limited to a particular creditor, it does not show the necessary agreement on the direction of loan proceeds as required by the earmarking requirements.  Indeed, in the instant case, FBI Debtors did not proceed as a 'lender' nor create a 'new loan.'  A "key feature" of all earmarking analysis is the creation of a new loan by a third party.[111]  The Eighth Circuit has held as much in saying "a key component of the earmarking doctrine … is the creation of a new debt … that takes place of the old debt."[112]  The conclusion that a debt must be incurred because of the new transfer is inherent in the very definition of an earmark, as well as in the requirements accepted by the Third Circuit.[113]  Even the overarching inquiry of this Circuit requires the parties to show an agreement on the particular creditors to be paid.[114]  Nothing in the record demonstrates that the Transfers were loan proceeds to Lane or Broyhill.  No loan

[111] Barry E. Adler, *Accelerated Resolution of Financial Distress*, 76 Wash. U. L. Rev. 1169, 1181 (1998).

[112] *Frankum v. Heartland Community Bank (In re Frankum)*, 453 B.R. 352, n. 15 (Bankr. E.D. Ark. 2011) (citing *In re Bohlens Enterprises, Ltd.*, F.2d 561 at 565; also citing *In re Interior Wood Products Co.*, 986 F.2d 228, 232 (8th Cir. 1993); and citing *In re Libby Intern., Inc.*, 240 B.R. 375, 377 (Bankr. W.D. Mo. 1999)).

[113] Reviewing the factors once again, the Third Circuit requires "(1) the existence of an agreement between the *new lender* and the debtor …" *In re Winstar Commc'ns* 554 F.3d at 400 (emphasis added).

[114] Looking back at the overarching question presented in *In re Ameriserve*, the court focuses on "whether the debtor had the right to disburse the funds to whomever it wished, or whether the disbursement was limited to a particular old creditor or creditors under the *agreement with the new creditor*."  *In re AmeriServe Food Distribution, Inc.*, 315 B.R. at 30 (emphasis added) (internal quotations omitted).

documentation existed of any kind, and the Defendant's brief openly admits there is "no 'new lender'" in this case.[115]   The absence of a new unsecured debt to replace the now-paid antecedent debt disrupts the inherent assumption that other creditors are not harmed by an earmarked transfer.[116]

The Defendant has consequentially not sustained its burden of proving the necessary elements to apply earmarking doctrine.   The interest of the Lane and Broyhill Debtors in the Transfers remains in dispute.

2.   *Remaining § 547(b) Elements for Avoidable Preference*

A trustee can only avoid a preferential transfer if it satisfies all elements under § 547(b), the exclusion of even one element prevents the avoidance.   The Supreme Court has authorized trustees to avoid "any transfer of the debtor in property *if* five conditions are satisfied and *unless* one of seven exceptions defined in subsection (c) is applicable."[117]   The remaining conditions, set forth in § 547(b), are as follows:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
    (1)   to or for the benefit of a creditor;
    (2)   for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3)   made while the debtor was insolvent;
    (4)   made—
        (A) on or within 90 days before the date of the filing of the petition; or
        (B)  between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

---

[115] D.I. 70, p. 10.

[116] It is argued that the classical example of an earmarked preference produces no reduction in net recovery since one unsecured creditor is changed for another unsecured creditor, a transaction akin to a novation.  5 COLLIERS ON BANKRUPTCY at 547; *In re ESA Environmental Specialists, Inc.*, 709 F.3d at n. 7.

[117] *Union Bank v. Wolas* 502 U.S. 151, 154 (1991) (italics in original) (citing 11 U.S.C. § 547(b))(internal quotations omitted).

      (5) that enables such creditor to receive more than such creditor would receive if —
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.[118]

While neither party contests the elements of § 547(b) not discussed *supra*, the Liquidating Trustee maintains the burden of proving each element.[119]

First, § 547(b)(1) requires that a transfer be "to or for the benefit of a creditor." This requirement has been loosely construed by the courts.[120] Under § 101(10), a "creditor" is any "entity that has a claim against the debtor",[121] where a "claim" is a "right to payment,"[122] and a "payment" is a "performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation."[123]

Second, § 547(b)(2) requires a transfer be "for or on account of an antecedent debt." A debt is antecedent if it was incurred before the debtor made the allegedly preferential transfer.[124] A debtor incurs a debt "on the date upon which the debtor first becomes legally bound to pay."[125]

---

[118] *Id.* § 547(b).

[119] *Id.* § 547(g).

[120] *In re CVEO Corp.*, 327 B.R. 210, 214 (Bankr. D. Del. 2005).

[121] 11 U.S.C. §101(10).

[122] *Id.*

[123] *In re Bake-Line Grp., LLC*, 359 B.R. 566, 577 (Bankr. D. Del. 2007) (quoting BLACK'S LAW DICTIONARY 1165 (8th ed. 2004)).

[124] *Peltz v. New Age Consulting Servs., Inc.*, 279 B.R. 99, 102 (Bankr. D. Del. 2002).

[125] *Id; accord In re CVEO Corp.*, 327 B.R. at 214.

Third, a debtor must be insolvent when the transfers are made.  Under § 547(f), a debtor is presumed insolvent within the ninety days immediately preceding the Petition Date.[126]  Fourth, a preferential transfer must occur within the voidable preference period: at least on or within ninety days of the Petition Date, extending as far back as within one year of the Petition Date for insiders.

Lastly, an avoidable preference must enable a creditor to receive more than if the transfer had not been made, and if the creditor received payment of such debt to the extent provided by the provisions of Title 11.  The determination is made based on "the actual effect of the payment as determined when bankruptcy results,"[127] or whether All American Poly would have received a 100% payout in a Chapter 7 liquidation.[128]  If so, no preference can be avoided; if not, the requirements of § 547(b)(5) are met.[129]  As a general matter, nearly all transfers to an unsecured creditor will satisfy this test unless the debtor's estate is solvent in Chapter 7.[130]

The Liquidating Trustee has satisfied all the remaining elements of a preferential transfer.  The Transfers were made in payment of accounts payable to All American Poly for goods previously provided to Lane and Broyhill.  The debt owed All American Poly

---

[126] See also Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.), 18 F.3d 217, n.4 (3d Cir. 1994); see also Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.), 281 B.R. 535, 540 (Bankr. D. Del. 2002) (noting the burden of bringing forward evidence to rebut this presumption is on the party against whom the preference action is directed towards).

[127] Palmer Clay Products Co. v. Brown, 297 U.S. 227, 229 (1936).

[128] See In re Vaso Active Pharm., Inc., 500 B.R. 384, 394 (Bankr. D. Del. 2013) (quoting In re Lewis W. Shurtleff, Inc., 778 F.2d 1416, 1421 (9th Cir. 1985)).

[129] See In re AmeriServe, 315 B.R. at 32.

[130] George M. Treister et al., Fundamentals of Bankruptcy Law §4.03(c)(1)(G) (6th ed. 2006).

was accordingly reduced.  The reduction in debt demonstrates that the Transfers were made to the creditor's benefit in satisfaction of § 547(b)(1).  Furthermore, since the goods were provided prior to the payment, the Transfers were in payment of an antecedent debt.  As the Defendant has not provided evidence challenging the presumption of insolvency, the Debtors are presumed insolvent in the ninety days prior to the Petition Date.  The Transfers were all made within ninety days of the Petition Date. All American Poly further concedes that the Transfers were more than the amount they would have otherwise received under a Chapter 7 liquidation, evidenced by the 8.7% or less recovery rate of the Lane and Broyhill Debtors' other unsecured creditors.[131]

*** 

A dispute of material fact exists as to whether the Transfers were property of the Lane and Broyhill Debtors' estates.  Nevertheless, the Court will grant, in part, the Plaintiff's Motion as to all other § 547(b) elements, but will deny, in part, the Plaintiff's Motion as to the element of an interest of the debtors in property.[132]  For the same reasons, the Cross-Motion is denied as to the claim that there is no interest of the debtors in property.

### C.  Affirmative Defenses Under § 547(c)

The Defendant asserts two affirmative defenses under § 547(c): an ordinary course of business and subsequent new value defense.  Once the Plaintiff has made a *prima facie*

---

[131] D.I. 20, p. 254.

[132] *See Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 527 B.R. 178, 183 (Bankr. D. Del. 2015) (granting a summary judgment motion, in part, and denying, in part).

showing that the Transfers are preferential, the burden shifts to the Defendant to establish any exception under § 547(c) by a preponderance of the evidence.[133]  Plaintiff argues that Defendant can assert no affirmative defenses under § 547(c).  The Cross-Motion contends that both the ordinary course of business and subsequent new value exceptions of § 547(c) apply to the Transfers.  Each defense is analyzed below.

### D.  Ordinary Course of Business Defense

A transfer fulfilling the requirements of § 547(b) may still be unavoidable if it qualifies for a § 547(c) exception.  In a motion for summary judgment, the party seeking nonavoidance maintains the burden, whereas the plaintiff must only point to the absence of such proof to make its case.[134]

Defendant argues that all the Transfers are exempt from avoidance because they were done in the ordinary course of business.  Although Plaintiff originally contended that all the Transfers were outside the ordinary course exception, they seem to have retracted that position in later briefing.  At the very least, Plaintiff contends that the Lane and Broyhill Pressure Payments were made outside the ordinary course.[135]

---

[133] 11 U.S.C. §§ 547 (g); *see Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 240 (Bankr. D. Del. 2010) (citing *United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999)); *see also Burtch v. Prudential Real Estate & Relocation Servs. (In re AE Liquidation, Inc.)*, Case No. 10-55543, 2013 WL 3778141, at *3 (Bankr. D. Del. 2013), *aff'd*, 2015 U.S. Dist. LEXIS 120464 (D. Del. 2015).

[134] *Id.* (citing *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990)).

[135] Plaintiff's reply brief to Plaintiff's Motion, as well as its answer brief to the Cross-Motion, both ask this Court to enter judgment only up to the total amount of the Lane and Broyhill Pressure Payments, not the total amount of the Transfers as suggested in the opening brief to Plaintiff's Motion.  Although Plaintiff never openly concedes the point regarding the other Transfers, they fail to contend with it.  *See* D.I. 65, p. 35; D.I. 75, p. 18; D.I. 71, p. 18; *see also, supra*, n. 3.

The "ordinary course of business" defense is structured to balance the interests of the debtor and creditor, in order to "induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy."[136]  Pursuant to § 547(c)(2), a trustee may not avoid a transfer "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and [where] such transfer was (a) made in the ordinary course of business of the debtor and transferee, *or* (b) made according to ordinary business terms."[137]  In order to successfully apply the ordinary course of business exception, the creditor must prove by a preponderance of the evidence that the transaction between creditor and debtor meets two of the three subparts of § 547(c)(2).[138]

### 1.  Debt Incurred in the Ordinary Course of Business

A transfer befitting the ordinary course of business exception must go toward paying a debt incurred by the debtor in the ordinary course of business of both parties.[139]

---

[136] *Forman v. Moran Towing Corp. (In re AES Thames, LLC)*, 547 B.R. 99 (Bankr. D. Del. 2016) (quoting *In re Molded Acoustical Products, Inc.*, 18 F.3d at 219).

[137] *Sass v. Vector Consulting, Inc. (In re Am. Home Mortgage Holdings, Inc.)*, 476 B.R. 124, 135 (Bankr. D. Del. 2012) (internal quotations omitted) (emphasis added) (citing 11 U.S.C. § 547(c)(2)(A)-(B)).

[138] *Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 2010 Bankr. LEXIS 890 at *8 (Bankr. D. Del. 2010).

[139] 11 U.S.C. §§ 547 (c) (found in the introductory language).

Courts examine the underlying debt for "the normality of such occurrences in each party's business operations generally."[140]

The Liquidating Trustee does not dispute the Defendant's support for the first prong of § 547(c). All American Poly is in the business of producing custom plastic products, including film sheeting, stretch wraps, liners, and bags. Both Lane and Broyhill had a business relationship with All American Poly prior to the Preference Period whereby the brands were provided such products for their furniture supply businesses. As a result, the Court finds the first prong of the test satisfied.

### 2. Ordinary Course Between the Parties

The Motions do not contend the Transfers were made according to "ordinary business terms," rather it is argued the Transfers were in the ordinary course of business between the parties. After finding that the alleged payments were for a debt incurred in the ordinary course of business, courts "look for certain hallmarks to determine whether the transfers were not in the ordinary course of business."[141] A determination whether a creditor has met its burden under § 547(c)(2)(A) is a subjective test that "contemplated the normal payment practice between the parties."[142]

Courts have found no one factor determinative in this analysis.[143] Instead, a multitude of factors have been considered, including: (1) the length of time the parties

---

[140] *Speco Corp. v. Canton Drop Forge (In re Speco Corp.)*, 218 B.R. 390 (Bankr. S.D. Ohio 1998); *cf. In re Archway Cookies*, 435 B.R. at 241 (finding the first prong of § 547(c)(2) satisfied where debtor purchased goods made by the creditor for use in their industry, and where a two year business relationship existed).

[141] *In re Am. Home Mortgage Holdings, Inc.*, 476 B.R. at 135.

[142] *Id.*

[143] *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 306 (Bankr. D. Del. 2010).

engaged in the type of dealings at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating condition.[144]

### i. Length of Relationship

In situations where the parties have a long history of dealings, those dealings are the focus.[145]  A court must first look at "the length of the business relationship between [Lane and Broyhill] Debtors and Defendant to determine if their relationship was of recent origin, as opposed to being cemented long before the onset of insolvency."[146]  As even first-time transactions between a creditor and debtor can establish a § 547(c)(2)(A) defense, this Court "must do the best it can with the evidence before it as to the parties'

---

[144] *In re Am. Home Mortg.*, 476 B.R. at 135-36 (citing *In re Archway Cookies*, 435 B.R. at 242); *In re Hechinger Inv. Co of Delaware, Inc.*, 320 B.R. 541, 548-49 (Bankr. D. Del. 2004)).

[145] *Forklift Liquidating Trustee v. Custom Tool & Mfg. Co.* (*In re Forklift LP Corp.*), 340 B.R. 735, 739 (D. Del. 2006) (citing *Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*, 321 B.R. 388, 392 (Bankr. D. Del. 2005)).

[146] *In re Archway Cookies* 435 B.R. at 243 (internal quotations omitted); *see In re Molded Acoustical Products, Inc.*, 18 F.3d at 225:

> Therefore, when the relationship in question has been cemented long before the onset of insolvency-up through and including the preference period-we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straitened [*sic*] debtor a fighting chance of sidestepping bankruptcy and continuing in business. Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often help a business tend off an unwelcome voyage into the labyrinths of a bankruptcy.

relationship."[147]  The subjective test reviews those "transactions between the debtor and the defendant,"[148] and not "what transactions would have been ordinary for either party with *other* debtors or creditors."[149]

In comparison to cases extending over fifteen or sixteen months,[150] courts are less willing to establish an ordinary course of dealings where the parties' prior business relationship was a year or less.[151]  Relevant here is the case *In re Sierra Concrete Design*, where this Court determined that two parties whose relationship before the Preference Period (the "Historical Period") consisted fully of "17 checks covering approximately 68 invoices over an 11 month period" was insufficient evidence to meet the defendant's burden.[152]

Defendant contends that it is "beyond question" the "Defendant did business with the Debtors for a number of years."[153]  During their business relations, All American Poly supplied custom plastic products to the furniture supply business of Lane and Broyhill. As evidence, Defendant attaches two separate payment histories for its business history

---

[147] *Stanziale v. Southern Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*, 518 B.R. 269, 282 (Bankr. D. Del. 2014).

[148] *In re Archway Cookies*, 435 B.R. at 244.

[149] *Wood v. Stratos Product Development, LLC (In re Ahaza Sys., Inc.)*, 482 F.3d 1118, 1124 (9th Cir. 2007) (internal quotations omitted).

[150] *See Troisio v. E.B. Eddy Forest Prods. Ltd. (In re Global Tissue, L.L.C.)*, 302 B.R. 808, 814 (D. Del. 2003) (affirming the bankruptcy court's holding that the parties' relationship of approximately 15 months was sufficient to establish ordinary course of dealings); *but see Sacred Heart Hosp. v. E.B. O'Reilly Servicing Corp. (In re Sacred Heart Hosp.)*, 200 B.R. 114, 117 (Bankr. E.D. Pa. 1996) (holding a 16-month relationship between the parties insufficient to establish ordinary course of dealings).

[151] *In re U.S. Interactive, Inc.*, 321 B.R. at 393 (holding that the year-long relationship did "not create the kind of significant relationship of which *Molded Acoustical* speaks").

[152] *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302 (Bankr. D. Del. 2012).

[153] D.I. 70, p. 17.

with Broyhill and Lane.[154]   Lane's business with All American Poly in the Historical Period comprised approximately 86 payments covering 179 invoices stretching back more than 2 years, while Broyhill's business in the same period only extended to 20 payments covering 81 invoices made over approximately 8 months.

The Liquidating Trustee does not challenge whether the length of dealing is sufficient to show a prior business relationship.  The evidence further shows that the Defendant's relationship with Lane was likely sufficiently long to show an ordinary course of dealings.  However, the Broyhill payment history reflects a separate line of credit, which conducted its affairs in a different manner from that of Lane.[155]  As a result, Broyhill's payment history must be considered separately.

The Court thus finds Lane's prior relationship of sufficient length to establish an ordinary course of dealings.  However, due to Broyhill's shorter relationship with All American Poly as evidenced in the record, particularly given the similarities to the facts in *Sierra*, the Court finds the Broyhill relationship insufficient to also establish an ordinary course of dealings.

### ii. Similarity of Transactions

Second, the Court must compare the Transfers in the Preference Period to those "made during the prior course of the parties' relationship to determine if the transactions were sufficiently similar."[156]   The Defendant must prove the transactions in the

---

[154] *Id.* at Exh. B-C.

[155] D.I. 68, A000558 (*Graham Tr.*, 104:11-13).

[156] *In re Stone & Webster, Inc.*, 547 B.R. 588, 600 (Bankr. D. Del. 2016) (quoting *In re AE Liquidation*, Case No. 10-55543 at *5; *see also In re Archway Cookies*, 435 B.R. at 243.

Preference Period materially complied with the Historical Period behavior of the parties.[157]  This analysis is done even for the Broyhill Transfers, despite a more limited course of dealings than Lane.[158]

In determining the ordinary course of dealings between parties, "[c]ourts place particular importance on the timing of payments."[159]  Payments made in the Preference Period are deemed in the ordinary course of business when made within the range of the Historical Period.[160]  Courts have found small deviations in payment timings to be not so significant as to defeat the ordinariness of such payments.[161]  In contrast, greater deviations in payment timing can defeat the ordinariness of payments.[162]

The Defendant argues that during the Historical Period, Broyhill and Lane Debtors paid All American Poly's invoices in the range of 6 to 132 days of the invoice date.  In this model, the Preference Period invoices were paid between 20 and 134 days of the invoice

---

[157] *In re Sierra Concrete Design, Inc.*, Case No. 08-12029, 2015 WL 4381571, *8 (Bankr. D. Del. 2015).

[158] *In re Conex Holdings, LLC*, 518 B.R. at 282 (requiring the Court to review the payments that are in the record between the parties for a § 547(c)(2)(A), and not requiring additional industry terms).

[159] *Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, Case No. 06-10894, 2009 Bankr. LEXIS 1815, *14 (Bankr. D. Del. July 9, 2009).

[160] *See Brothers Gourmet Coffees v. Armenia Coffee Corp. (In re Brothers Gourmet Coffees, Inc.)*, 271 B.R. 456 (Bankr. D. Del 2002).

[161] *See, e.g., In re Archway Cookies*, 435 B.R. at 243 (holding that a 4.9 day difference in payment timing between the pre- and post-Preference Period was not material); *Ice Cream Liquidation, Inc. v. Fabricon Products, Inc. (In re Ice Cream Liquidation, Inc.)*, Adv. Pro. No. 03-3175, 2005 Bankr. LEXIS 704, 2005 WL 976935 (Bankr. D. Conn. 2005) (holding that a five day discrepancy between average days outstanding during the pre-preference period versus during the preference period did not make the payments out of the ordinary course of business).

[162] *See, Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, Case No. 06-10894, 2009 Bankr. LEXIS 1815, at *15 (Bankr. D. Del. July 9, 2009) (holding that the average number of days to payment nearly doubled between the historical period and the preference period, which based on the facts of that particular case, made the payments outside the ordinary course of dealings between the plaintiff and defendant).

date, with only one transfer of $1,462.50 falling outside the range.[163]  Defendant further notes that the Historical Period payments were paid an average of 46.24 days from the invoice date, and within the Preference Period were paid 55.54 days from the invoice date.  A difference of fewer than 10 days.[164]

The Liquidating Trustee argues that the Defendant improperly combines the payment histories of these two brands, when they should be viewed separately.  As already addressed *supra*, the Liquidating Trustee's position is appropriate here since each brand had a separate relationship with All American Poly.  Indeed, the Defendant seems to support this view in their own records by providing each subsidiary's payment history in a separate Annex.[165]

Looking at each brand, Broyhill made its Historical Period payments within 28 and 104 days of the invoice date, within an average of 42.7 days.  In comparison, the Broyhill Transfers were made within a range of 20 to 52 day and an average of 35.6 days from the invoice date, and the Broyhill Pressure Payment covered invoices that were paid 20 and 22 days from the invoice dates.[166]  The Lane pre-Preference Period range was 6 to 132 days from the invoice date, with an average of 47.9 days.  In comparison, the Lane Transfers were made within a range of 29 to 134 days, and within an average of 59.8

---

[163] D.I. 70, p. 23.

[164] *Id.*

[165] D.I. 67, A000298-307 (*Annex 1-2: Broyhill Transactions, Lane Transactions*).

[166] D.I. 65, pp. 33-34; D.I. 70, App. B.

days.[167]  This does not include the "open account" payments Lane historically made that were keyed on specific invoices after payment.

The Liquidating Trustee does not contest that the majority of the Transfers fall within an acceptable range of the Historical Period.  Plaintiff only contends that the Broyhill Pressure Payment is outside the ordinary course because it paid invoices earlier than previous payments.  The difference in the payment range between the Broyhill Pressure Payment and the pre-Preference Period Broyhill range is less than 10%, which does not represent a significant change in the payment timing.[168]

The Court finds the Transfers were within a similar range of timing when compared to the Historical Period.

### iii. Manner Tendered

Next, a court need consider changes in the actual payment method between pre-Preference Period payments and the Transfers.[169]  Simple changes to payment method alone do "not take a payment out of the ordinary course."[170]  Yet more significant changes can make transfers outside the ordinary course, as was the case where a debtor retained checks and selectively sent them to creditors despite a prior practice of mailing checks as

---

[167] *Id.* at App. C.

[168] *Burtch v. Texstars, Inc. (In re AE Liquidation, Inc.)*, Case No. 10-55502, 2013 WL 5488476, at *4 (Bankr. D. Del. October 2013) (holding a 10-15% quicker payment time as compared from the range of days is not significant).

[169] *In re AE Liquidation, Inc.*, 10-55543 at *7 (citing *In re Am. Home Mortg.*, 476 B.R. at 139).

[170] *Id.* (citing *Logan Square E. v. Peco Energy Co. (In re Logan Square E.)*, 254 B.R. 850, 856 (Bankr. E.D. Pa. 2000)).

they were printed.[171]  Any changes in the manner tendered insisted upon by the creditor

are weighed against the ordinary course of business.[172]

    The Liquidating Trustee contends that the Lane Pressure Payments made by wire

and through checks mailed overnight were tendered in a manner different from the

ordinary course.   Defendant argues, rather, that both check and electronic payment

methods were available to All American Poly, and both payment forms were used by the

Lane and Broyhill Debtors together.

    The record indicates that overnight delivery of the held checks was an atypical

form of payment from Lane that weighs against the ordinary course.[173]  In fact, the very

act of Lane holding checks for prolonged periods of time at their corporate office in delay

of their payment terms was outside the ordinary course of business for the parties.[174]  The

Lane Pressure Payments made on August 22, 2013, including the wire payments and the

four checks sent via Federal Express, were sent only after an email from All American

Poly rejecting normal delivery of the checks and requiring wire transfers in the future.

The change in mailing, as well as the move to wires as insisted by the Defendant, both

support the view that the Lane Pressure Payments were made in a different manner than

in the ordinary course.  Furthermore, as described *supra*, it is inappropriate to view the

---

[171] *See Ames Merch. Corp. v. Revere Mills Inc. (In re Ames Dep't Stores, Inc.)*, No. 03-08325, 2010 WL 2403104, at *28 (Bankr. S.D.N.Y. 2010).

[172] *See, e.g., Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods. (In re Hechinger Inv. Co. of Del., Inc.)*, 489 F.3d 568, 578 (3d. Cir. 2007); *In re AE Liquidation, Inc.*, 10-55543 at *7.

[173] D.I. 68, A000535 (*Graham Tr.*, 81:13-17); *see Yaquita v. Arrow Fin. Servs. (In re Brook Mays Music Co.)*, 418 B.R. 623, 629 (Bankr. N.D. Tex. 2009) (holding use of overnight Federal Express as a factor against the ordinary course).

[174] *See* D.I. 67, A000303 (*Lane Historical Period Transactions*).

Lane and Broyhill payments together.  The one prior wire payment Lane made in its more than ninety payments to All American Poly does not make the insisted future wire payments ordinary.[175]

All other Transfers in the Preference Period fit the payment methods historically used by Lane and Broyhill.  All Transfers outside the Lane Pressure Payments were made as checks from Lane and ACH payments from Broyhill.  Consequently, the Court finds the manner unusual only as to the Lane Pressure Payments.

<em>iv. Unusual Collection Activity</em>

Unusual collection activity in the Preference Period can similarly defeat an ordinary course defense.[176]  Unusual actions constitute "unusual behavior designed to improve the lot of one creditor at the expense of the others."[177]  "Telephone calls and other communications may be considered unusual if they resemble a calculated response to a deteriorating creditor-debtor relationship."[178]

Defendant contends that All American Poly exerted collection pressure on Lane and Broyhill prior to the Preference Period, and thus the collection activity did not change in the Preference Period.  However, as the Liquidating Trustee points out, All American Poly's Historical Period requests for information from Lane on when it could expect

---

[175] *In re AE Liquidation, Inc.*, Case No. 10-55502 at *5 (citing *In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d at 578) (noting that one-off terms and arrangements do not necessarily reflect the "baseline relationship" between the parties).

[176] *Id.* (citing *Montgomery Ward, LLC v. OTC Int'l, Ltd. (In re Montgomery Ward, LLC)*, 348 B.R. 662, 678 (Bankr. D. Del. 2006)).

[177] *Molded Acoustical*, 18 F.3d at 225.

[178] *In re AE Liquidation, Inc.*, 10-55543 at *7 (citing *Am. Home Mortg.*, 476 B.R. at 139).

payment are not the same as its Preference Period communications threatening an account hold.[179] Similarly, the Defendant failed to present evidence that shows Historical Period communications with Broyhill threatening an account hold similar to the September 3, 2013 email.[180]

The Court, in sum, finds that Transfers made after these pressuring Preference Period communications, i.e. the Lane and Broyhill Pressure Payments, were under unusual collection activity.

*iv. Attempts to Gain Advantage of Debtor's Condition*

A creditor can take advantage of a debtor's financial condition by taking on additional collateral, assessing late fees, or through pressuring the debtor for payments.[181] Such conduct includes "unacceptable debtor favoritism, as well as manifest selective preference period payments to designated creditors by troubled debtors."[182] Furthermore, a creditor's awareness of a debtor's financial condition can support a finding that the creditor attempted to collect a debt ahead of other creditors.[183]    Such attempts to collect from the debtor are more likely to be outside the ordinary course when

---

[179] D.I. 75, p. 12-13.

[180] D.I. 68, A000600 (*E-mail from J. Sussman to D. Kaylor (September 3, 2013)*).

[181] *Am. Home. Mortg.*, 476 B.R. at 140.

[182] *Camelot Music, Inc. v. MHW Advertising & Public Relations Inc. (In re CM Holdings, Inc.)*, 264 B.R. 141, 154 (Bankr. D. Del. 2000).

[183] *Id.*

the credit terms in the Preference Period are out of character with the long-term relationship of the parties.[184]

The Liquidating Trustee argues that All American Poly took advantage of the Debtors' financial position by pressuring Lane and Broyhill to make payments as a result of knowledge over a possible bankruptcy filing. Payments from Lane and Broyhill to All American Poly were made despite both brands not paying all of its creditors, and delaying payments beyond normal terms.[185] In support of this view is an email from All American Poly asking for a change in payment method due to a possible "bankruptcy in the future." Defendant does not contest that pressure was used in exacting payments from Lane and Broyhill, instead they claim that such pressure was consistent with prior practice between the parties. Defendant also asserts that it is possible that the collection pressure asserted by All American Poly had no effect on the decision of Lane and Broyhill to make payments, particularly given FBI Debtors involvement in decision-making.

All American Poly threatened account holds against both Lane and Broyhill. In the emails threatening hold, All American Poly directly referenced the possibility of bankruptcy as a reason to insist on the change in payment method. The testimony of FBI Debtor employees also supports the finding that keeping plants open, continuing shipment of goods, and avoiding account holds were central concerns in deciding which

---

[184] *See In re AE Liquidation, Inc.*, 10-55543 at *9 (noting that significantly changed credit terms during the Preference Period showed a "zealous creditor's attempt to collect on a debt and does not constitute the ordinary course of business"); *cf. In re Archway Cookies*, 435 B.R. at 244 (holding transfers still in the ordinary course of business despite refusal to ship goods until account was current because payment terms were similar to those in the Historical Period).

[185] D.I. 68, A000555-56 (*Graham Tr.*, 101:20-102:6).

vendors were paid.  The pressure caused by the hold threat, coupled with All American Poly's knowledge of a possible bankruptcy filing and Debtors' attempt to react to hold threats, evidences an advantage sought by All American Poly.

As a result, the Court finds an attempt to gain advantage of the Debtors' financial condition for the Lane and Broyhill Pressure Payments.

***

The Lane Pressure Payments show unusual collection practices, payment methods, and advantage taken by the Defendant, but with similar payment timings when compared to the Historical Period.  In comparison, although the Broyhill Pressure Payment was predicated on the threat of an account hold, the transaction was within a similar timeframe to the Historical Period and done by the same method used in the parties previous transactions.  The nature of the Broyhill Pressure Payment weighs in favor of the ordinary course defense, despite the hold.[186]  The remaining Transfers presented no unusual features.

The Court concludes that a dispute of material fact exists as to whether the Lane Pressure Payments were in the ordinary course.  However, the Court further finds that the Broyhill Pressure Payment and all other remaining Transfers were in the ordinary course.  The Cross-Motion is granted, in part, regarding the ordinary course of business defense for all Transfers, with the exception of the Lane Pressure Payments where

---

[186] *See In re Archway Cookies*, 435 B.R. at 244-45 (holding that a refusal to ship goods, despite being tactics "that § 547 [were] created to solve," was not enough to make payments outside the ordinary course when other elements were within the Historic Period terms).

summary judgment is denied.  Given the above, Plaintiff's Motion requesting summary judgment on the inapplicability of any § 547(c) defense is denied.

### E.    Subsequent New Value Defense

Defendant next argues that the Liquidating Trustee may not avoid the Transfers since, pursuant to § 547(c)(4), the Transfers were given for subsequent new value.

A trustee may not avoid a transfer made "to or for the benefit of a creditor" who gives "new value to or for the benefit of the debtor … on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."[187]  "New value" is defined as "money or money's worth in goods, services or new credit … that is neither void nor voidable by the debtor or the trustee under any applicable law."[188]  This exception "is intended to encourage creditors to work with companies on the verge of insolvency … [and] to ameliorate the unfairness of allowing the trustee to avoid all transfers made by the debtor to a creditor during the preference period without giving any corresponding credit for advances of new value."[189]  As long as "the new value augments the estate in the same proportion as the value of the transfer," the estate, and consequently other creditors, are not harmed.[190]

This Court has previously held that a successful subsequent new value defense requires "two elements: (1) after receiving the preferential transfer, the creditor must

---

[187] *In re Proliance Int'l, Inc.*, 514 B.R. at 430 (quoting 11 U.S.C.  § 547(c)(4)(B)).

[188] *Id*. § 547(a).

[189] *In re Proliance Int'l, Inc.*, 514 B.R. at 430 (quoting *Friedman's Inc. v. Roth Staffing Co. (In re Friedman's Inc.)*, Case No. 09-10161, 2011 WL 5975283 at *2 (Bankr. D. Del. 2011)).

[190] *Id*.

have advanced 'new value' to the debtor on an unsecured basis; and (2) the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition."[191]  This rule has been dubbed the "subsequent advance approach" and has been employed by this Court on multiple occasions.[192]  Under this approach, the Defendant's pressure exposure would be determined by "(i) the value of transfer … less (ii) the value of the services provided (i.e. new value provided); plus (iii) the value of [additional] transfer[s]."[193]

Defendant argues that any avoidance of Transfers by the Liquidating Trustee should be reduced by $35,455.88 for providing new goods to Lane during the Preference Period.[194]  The new value analysis shows five additional invoices for products provided to Lane.  Two invoices totaling $18,763.88 date to before the Lane Pressure Payments, and three invoices totaling $16,692.00 date to after the Lane Pressure Payments.  These invoices correspond to the Claim, which Defendant has filed under the Plan.[195]  The Liquidating Trustee has made no arguments in response.[196]

Defendant's subsequent new value defense must, nevertheless, contend with the Court's ruling on the ordinary course of business exception.  Since the Court finds that the ordinary course of business exception applies to all Transfers outside the Lane

---

[191] *Id*. (quoting *In re Sierra Concrete Design, Inc.*, 463 B.R. at 307-08) (internal quotations omitted).

[192] *See id*.

[193] *Id*. (citing at *In re Vaso Active Pharm., Inc.*, 500 B.R. at 396-97).

[194] D.I. 70, 26; *see id*. at App. D, *Subsequent New Value Analysis*.

[195] *Id*.

[196] Plaintiff merely raises the assertion that the Defendant will be unable to provide evidence for a § 547(c) exemption, but they fail to contend with the new value analysis provided by the Defendant.

Pressure Payments, the Defendant cannot demonstrate on this record that there were avoidable preferential transfers incurred *before* the first two invoices. Consequently, these two invoices cannot be used to offset recovery.

Furthermore, a dispute of material fact remains regarding whether the Lane Pressure Payments are, in fact, preferential. To the extent the Lane Pressure Payments later prove to be preferential transfers, then the last three invoices constitute the service of goods after preferential transfers were given, and recovery should be offset by subsequent new value of $16,692.00.

Given the above, the Court grants the Cross-Motion's request for summary judgment on the subsequent new value defense, in part, up to the amount of $16,692.00, and denies summary judgment, in part, as to the remaining amount.

### F.  Recovery Pursuant to § 550

Section 550 provides that "to the extent that a transfer is avoided under section 544, . . . 547, [or] 548 . . . of this title, the trustee may recover . . . the property transferred . . . from the initial transferee of such transfer or the entity for whose benefit such transfer was made."[197]

As stated above, a material dispute remains as to whether the Transfers are in fact preferential. The Court denies summary judgment on § 550 grounds because the condition precedent to recovery has not been met.

_____

[197] 11 U.S.C. § 550(a)(1).

## G. Disallowance of Claim Pursuant to § 502(d), and Objection and Setoff Pursuant to the Plan

Plaintiff's Motion seeks summary judgment for disallowance of the Transfers under § 502(d), and objection and setoff of the Transfers under the Plan.

### 1. Disallowance under § 502(d)

A claim may be disallowed under § 502(d) if there is a judicial determination of a claimant having "received preferential transfer pursuant to § 547 or property recoverable pursuant to § 550."[198]  If a debtor or trustee has not yet received a judicial determination, the party cannot "avail itself of the benefits of section 502(d)."[199]

In denying, in part, the Plaintiff's request for summary judgment on its preference claims, the Court has left the Plaintiff without evidence of a sufficient judgment on the Transfers deserving of relief under § 502(d).  The Court denies the Plaintiff's Motion regarding disallowance of the Defendant's Claim under the Plan since the underlying preference action is unresolved.

### 2. Objection and Setoff under the Plan

Under Section 9.7 of the Plan, "any Claims held by Persons from which property is recoverable under section … 550 … of the Bankruptcy Code or by a Person that is a transferee of a transfer avoidable under section … 547 … of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code" until the

---

[198] *Cohen v. TIC Financial Systems (In re Ampace Corp.)*, 279 B.R. 145, 162-63 (Bankr. D. Del. 2002).

[199] *Giuliano v. Mitsubishi Digital Electronics America, Inc. (In re Ultimate Acquisition Partners, LP)*, 2012 WL 1556098, *3 (Bankr. D. Del. May 1, 2012) (citing *In re Lids Corp.*, 260 B.R. at 684) (internal quotations omitted).

settlement of the case and or entry of a "Final Order with respect thereto."[200]  A "Claim" is defined as "any right to payment from the Debtors … whether or not such right is reduced to judgment … disputed … or asserted."[201]  "Person" means, in relevant part, "an individual," and "Final Order" means "an order or judgment of a court …and has not been reversed, vacated, or stayed [without further possibility of appeal]."[202]

Defendant argues that the Transfers should be offset against the Claim under the Plan, in accordance with the language above.  However, by the language of the Plan, any form of offset or objection to the Claim can only come with a "Final Order."  However, since the Court denies, in part, summary judgment on the Plaintiff's preference action, then under the definition of the term in the Plan, a Final Order has not occurred that can lead to any disallowance or offset of the Claim.  The Court will consequently reject the Plaintiff's Motion for such relief.

**H.    § 548 Fraudulent Transfers**

Lastly, the Cross-Motion asserts the Transfers are not fraudulent because (1) the Lane and Broyhill Debtors were not the interest holders of the Transfers, and (2) the Transfers were made in exchange for reasonably equivalent value.  The burden remains on the Defendant as the movant to prove their Cross-Motion.

---

[200] D.I. 66, A000236 (*Plan*).

[201] *Id*. at A000198.

[202] *Id*. at A000202.

Pursuant to § 548, a trustee may avoid fraudulent transfers that improperly deplete a debtor's assets or dilute claims against those assets.[203]   A constructive fraudulent transfer must "show: (i) a transfer [from the debtor] within the applicable time period; (ii) [debtor's] insolvency; and (iii) a lack of reasonably equivalent value (or fair consideration)."[204]   The term "reasonably equivalent value" is not defined in the Bankruptcy Code, but the Third Circuit has held that "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"[205]   Any determination of reasonably equivalent value must be fact-driven and viewed through the "totality of the circumstances, taking into account the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arm's length."[206]

This Court follows a two-step approach, first looking to whether "based on the circumstances that existed at the time of the transfer [or obligation] it was 'legitimate and reasonable' to expect some value accruing to the debtor."[207]   "Second, if the court finds that the debtor received any value, the court must engage in a fact-driven comparison between such value and the transfer or obligation sought to be avoided to determine

---

[203] 5 COLLIER ON BANKRUPTCY, 548.01.

[204] *Charys Liquidating Trust v. McMahan Securities Co., L.P. (In re Charys Holding Co., Inc.)*, 443 B.R. 628, 636 (Bankr. D. Del. 2010).

[205] *Id.* (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007)) (internal quotations omitted).

[206] *Id.* (quoting *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002)) (internal quotations omitted).

[207] *Official Committee of Unsecured Creditors v. CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.)*, Adv. Case No. 08-51903, 2011 WL 4345204, at *8 (Bankr. D. Del 2011).

'whether the debtor got roughly the value it gave.'"[208]    "The purpose of the [fraudulent conveyance] laws is estate preservation; thus, the question whether the debtor received reasonable value must be determined from the standpoint of the creditors."[209]

Relevantly, the Bankruptcy Code does provide a definition for "value" for the purposes of § 548, including "property, in satisfaction of or securing of a present or *antecedent debt of the debtor* …"[210]  An antecedent debt will be considered value even where payment is on a contingent obligation.[211]  But transfers made for the benefit of third parties do not constitute reasonably equivalent value, such as when a debtor-subsidiary makes a transfer resulting in consideration for the parent corporation.[212]

The Third Circuit in *In re R.M.L., Inc.* also acknowledged that the determination of reasonably equivalent value "is exacerbated in cases where ... the debtor exchanges cash for intangibles, such as services or the opportunity to obtain economic value in the future, the value of which is difficult, if not impossible, to ascertain."[213]  The ability to borrow funds must be considered as value that needs to be assessed in a reasonably equivalent

---

[208] *Id.*

[209] *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991).

[210] 11 U.S.C. § 548(d)(2)(A) (emphasis added); *see Burtch . Opus, LLC (In re Opus East, LLC et al.)*, 528 B.R. 30, 83(Bankr. D. Del. 2015).

[211] *See Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest.)*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) (payment on guaranty is value).

[212] *Murray v. Prescott, Ball & Turben, Inc. (In re Chicago, Missouri & Western Ry. Co.)*, 124 B.R. 769, 772-73 (Bankr. N.D. Ill. 1991).

[213] *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 148 (3d Cir. 1996); *see also EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 641-42 (Bankr. D. Del. 2006).

value analyses, even if it complicates the valuation.[214]  Nevertheless, even these "indirect benefits" must be "measured and then compared to the obligations that the bankrupt incurred" in order to successfully argue that reasonably equivalent value was given.[215]

Defendant's first claim, that the Plaintiff's fraudulent transfer claims list the incorrect party because the Lane and Broyhill Debtors did not have an interest in the Transfers, is a question of material fact.  This question is the same as discussed previously in the context of the § 547 avoidable preference elements.

Defendant next contends that All American Poly provided reasonably equivalent value for the Transfers.  In their opening brief, Defendant originally contends that payment of Lane and Broyhill's "antecedent debt" would be enough to support reasonably equivalent value.  However, this argument relies on whether the Lane and Broyhill Debtors have an interest in the Transfers.  If, for instance, the interest in the Transfers lay with a third party, say the debtor parent, then the benefit of the Transfers to the interest holder would be minimal and not of reasonably equivalent value.  The Transfers would have simply paid the debt of a third party, i.e. Lane and Broyhill, not the debt of the debtor with the interest.  As a result, a dispute of material fact exists regarding the antecedent debt of the debtor.

---

[214] *L.J. Liff & Associates, Ltd. v. Collegeville/Imagineering, L.P. (In re Collegeville/Imagineering, L.P.)*, Case No. 95-1619, 1999 WL 33220041, at *8 (D. Del. October 5, 1999) (citing *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647-48 (3d Cir. 1991)).

[215] *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 213 (3d Cir. 2006) (citing *Mellon Bank, N.A.*, 945 F.2d at 648) (internal quotations omitted).

Defendant's reply to their Cross-Motion amends the initial argument and further contends that All American Poly provided reasonably equivalent value to the Debtors as a whole by increasing their ability to borrow funds through the asset-based lending facility entered into by the Debtors on September 25, 2012.  In support, the Defendant cites to the declaration of Vance Johnston, former CFO of Furniture Brands International, Inc., dated as of September 9, 2013.[216]  Under Local Rule 7007-2(b)(ii), a "party filing the opening brief shall not reserve material for the reply brief that should have been included in a full and fair opening brief."[217]  Per the Local Rules, Plaintiff has not had a fair chance to contend with this new argument regarding the asset-based lending facility, and should not be harmed for not having done so.

Regardless, the Defendant's argument falters as it makes no attempt to actually compare the value given, the Transfers, to the value received, the alleged increase in the borrowing base.  Without a comparison, a key element of the analysis is missing and a dispute of material fact remains on the issue of reasonably equivalent value.

The Court accordingly denies the Cross-Motion's request for summary judgment on the Defendant's claim that the Transfers are not fraudulent.

### 1.    *Plaintiff's Fraudulent Transfer Argument*

The reply brief to Plaintiff's Motion attempts a further § 548 fraudulent transfer argument.[218]  Plaintiff's reply contends that summary judgment may be granted because

---

[216] D.I. 74, App. A, *Dec. of Vance Johnston in Supp. of Chapter 11 Petition and First-Day Motions*.

[217] Del. Bankr. L.R. 7007-2(b)(ii).

[218] Plaintiff asserts that if the interest in the Transfers is not with the Lane and Broyhill Debtors, then the Transfers will be avoidable as fraudulent transfers, since the transferring debtor that did have the interest

the initial complaint makes a fraudulent transfer claim, despite the opening brief making no arguments for summary judgment on the grounds of fraudulent transfer.[219]  Local Rule 7007-2(b)(ii) is clear.  Because Plaintiff failed to raise the § 548 claims in their opening brief and Defendant has not had an opportunity to review all elements of the alleged § 548 claim, the Plaintiffs may not raise the issue now.[220]

## CONCLUSION

For the reasons and to the extent set forth above, both Motions are granted, in part, and denied, in part.

Summary judgment is entered for Plaintiff's Motion as to the § 547(b) preference elements, provided that summary judgment is not entered solely to the issues of whether the Transfers were an interest of the Lane and Broyhill Debtors in property.  Plaintiff's Motion is furthermore denied as to the inapplicability of any §547(c) defenses, and the disallowance or setoff.

The Cross-Motion's request for summary judgment is also granted, in part, as to the ordinary course of business defense for all Transfers excluding the Lane Pressure Payments, for which a dispute of material fact remains and summary judgment is denied. Summary judgment is also granted, in part, regarding subsequent new value up to $16,692.00, but is denied as to the remaining contested amount.  Summary judgment on

---

would have paid for services given to Lane or Broyhill without providing reasonably equivalent value. This argument is also made in Plaintiff's answer to the Cross-Motion. *See* D.I. 71, p. 11; D.I. 75, p. 6.

[219] In addition to this argument being noncompliant with Delaware Bankruptcy Local Rules, the argument is unwarranted at this stage given a lack of appropriate pleadings, since no transferring debtor has been listed other than Lane or Broyhill Debtors.

[220] Del. Bankr. L.R. 7007-2(b)(ii).

the Cross-Motion is denied on the claimed nonexistence of an interest of the Lane and Broyhill Debtors in property under § 547(b), and on the claimed lack of fraudulent transfer for less than reasonably equivalent value.

An order will be issued.