# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | Case No. 13-12329 (CSS) |
| FBI WIND DOWN, INC. (f/k/a | ) | |
| Furniture Brands International, | ) | |
| Inc.), *et al.*, | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| FBI WIND DOWN, INC. | ) | |
| LIQUIDATING TRUST, by and through | ) | |
| Alan Halperin, as Liquidating Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No.: 15-51324 (CSS) |
| | ) | |
| CAREERS USA, INC. a/k/a | ) | |
| CAREERSUSA, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

**CAREERS USA, Inc**.
Jennifer O. Johnson
Careers USA, Inc., General Counsel
6501 Congress Avenue
Suite 200
Boca Raton, FL 33487

Timothy J. Weiler
716 North Tatnall Street
Wilmington, DE 19801

Counsel for Defendants,
Careers USA, Inc.,


**BLANK ROME LLP**
Michael B. Schaedle
Victoria Guilfoyle
Bryan J. Hall
1201 Market Street, Suite 800
Wilmington, DE 19801

**HAHN & HESSEN LLP**
Mark S. Indelicato
Jeffrey Zawadzki
499 Madison Avenue
New York, NY 10022

Co-Counsel for the Liquidating
Trust


Dated: April 17, 2020

Sontchi, C.J._____

# INTRODUCTION[1]

Before the Court are cross-motions for summary judgment.[2]  At issue is whether twenty-four transfers Furniture Brands International, Inc. and Thomasville Furniture Industries, Inc.[3] made to Careers USA, Inc. (collectively, the "Transfers" or the "Disputed Transfers") are preferential or constructively fraudulent under Bankruptcy Code Sections 547 and 548, respectively.[4]

In connection with the Disputed Transfers, Defendant seeks to deny Plaintiff's avoidance action (i) for failure to satisfy the required elements, and (ii) on account of the ordinary course of business, contemporaneous exchange for new value, and subsequent new value defenses.  Additionally, Defendant asserts the mere conduit defense to deny Plaintiff's recovery of the Disputed Transfers.

Plaintiff seeks (i) to avoid the Disputed Transfers under Sections 547 and 548, (ii) to deny all defenses, (iii) to recover the value of the Disputed Transfers under

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them *infra*.

[2] Del. Bankr. Adv. Pro. No. 15-51324, D.I. 68; Del. Bankr. Adv. Pro. No. 15-51324, D.I. 69.  All references to the Adversary Proceeding Docket will be cited hereinafter as "Adv. D.I." and will refer to this Adversary Proceeding unless otherwise stated.

[3] The *Second Amended Chapter 11 Plan of Liquidation of FBI Wind Down, Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* (the "Plan") substantively consolidated the Debtors into debtor groups.  The FBI Debtors are comprised of FBI Wind Down, Inc. (f/k/a Furniture Brands International, Inc.), FBO Wind Down, Inc. (f/k/a Furniture Brands Operations, Inc.), and FBRC Wind Down, Inc. (f/k/a Furniture brands Resource Company, Inc.).  The Thomasville Debtors are comprised of TFI Wind Down Inc. (f/k/a Thomasville Furniture Industries, Inc.), THF Wind Down, Inc. (f/k/a Thomasville Home Furnishings, Inc.), TR Wind Down, Inc. (f/k/a Thomasville Retail, Inc.) (f/k/a Classic Design Furnishings, Inc.).

For clarity, Furniture Brands International, Inc., and Thomasville Furniture Industries, Inc. are, together, (the "Transferring Debtors").

[4] Hereafter, "Section" refers to Bankruptcy Code Section unless otherwise stated.

Section 550,[5] (iv) to disallow and to object to Defendant's Claims, pursuant to Section 502(d) and Plan Sections 9.5 and 9.7, and (iv) to offset the Disputed Transfers against Defendant's Claims under Plan Section 8.9.

For the reasons set forth below, the Court will deny Defendant's Motion in its entirety and grant, in part, and deny, in part, Plaintiff's Cross-Motion.

Specifically, the Court holds the following on Defendant's Motion:

1.  Summary judgment is denied as to whether the Transfers were preferential under Section 547. Factual issues remain solely as to whether August 21, 2013, August 23, 2013, and August 30, 2013 Transfers were for or on account of antecedent debt.

2.  Summary judgment is denied as to the lack of fraudulent transfers under Section 548 as Defendant has not met its evidentiary burden.

3.  Summary judgment is denied regarding the ordinary course of business defense as Defendant has not met its evidentiary burden and a significant number of factual issues remain for trial.

4.  Summary judgement is denied regarding the contemporaneous exchange for new value defense. Defendant has failed to meet its evidentiary burden.

---

[5] Specifically, Plaintiff seeks to recover $167,121.26, plus interest (at the legal rate) from the date of the Transfers, together with the costs of the adversary action. If the Court does not grant its requested relief under its Section 547 action, Plaintiff only seeks partial summary judgment in connection with its Section 548 action. It seeks to establish that it did not receive reasonably equivalent value in return for the Transfers.

5. Summary judgment is denied regarding the subsequent new value defense. Defendant did not meet its evidentiary burden with respect to separation fees. There is a genuine dispute of material fact regarding the allocation of $10,656.97 of new value between the Transferring Debtors.

6. Summary judgment is denied regarding the mere conduit defense as CareersUSA established a reimbursement payment model with the Transferring Debtors in which Defendant exercised dominion and control over the Transfers.

The Court also holds the following on Plaintiff's Cross-Motion:

1. Summary judgment is granted, in part, and denied, in part, as to whether Transfers were preferential under Section 547. Summary judgment is granted for all Transfers excluding August 21, 2013, August 23, 2013, and August 30, 2013, for which summary judgment is denied. Factual issues remain solely with regard to whether these Transfers were made for or on account of an antecedent debt.

2. Partial summary judgment on Plaintiff's Section 548 fraudulent transfer claim is denied. Plaintiff requested partial summary judgment on the reasonably equivalent value element of fraudulent transfer if the Court found that any of the Disputed Transfers was not made on account of an antecedent debt under Section 547(b). The need for the Court to consider this issue is obviated by the Court's finding that all of the Disputed Transfers have been on account of

antecedent debt or have implicated factual questions regarding whether the Transfers were on account of an antecedent debt.

3. Summary judgment is granted, in part, and denied, in part, regarding the inapplicability of defenses.

    a. Summary judgment is denied with respect to the ordinary course of business defense as there are unresolved questions of fact.

    b. Summary judgement is granted, in part, and denied, in part regarding the contemporaneous exchange for new value defense. Summary judgement is granted with respect to all Disputed Transfers prior to August 15, 2013, as it is clear that these transfers were not intended to be, nor were they, in fact, contemporaneous exchanges. Summary judgment is denied with respect to all Transfers after August 15, 2013, as there are unresolved questions of fact.

    c. Summary judgment is denied regarding the subsequent new value defense. With respect to staffing services there is a genuine dispute of material fact regarding how $10,656.97 of new value is allocated between the Transferring Debtors; and it is unclear if Defendant will be able to prove its case with respect to separation fees.

4. Summary judgment is denied as to recovery under Section 550 since recovery is inappropriate when Section 547(b) and Section 548 avoidance actions have not been fully adjudicated.

5.  Summary judgment is denied regarding disallowance, objection, or setoff since relief is inappropriate when the Section 547(b) and Section 548 avoidance actions have not been fully adjudicated.

## JURISDICTION & VENUE

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A) and (O).  Venue is proper before the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. §§ 1408 and 1409.  The Court has the judicial authority to enter a final order.

## BACKGROUND

### I.    Procedural History

On September 9, 2013 (the "Petition Date"), FBI Wind Down, Inc. (f/k/a Furniture Brands International, Inc.) and each of its eighteen affiliates   (the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court" or the "Bankruptcy Court") for relief under Chapter 11 of the Bankruptcy Code.[6]  On November 25, 2013, CareersUSA filed a proof of claim (number 3045) against the Debtors, which asserts an unsecured, non-priority claim in the amount of $10,656.97 (the "Claim").  On July 9, 2014 the Debtors filed *Second Amended Joint Plan of Liquidation of FBI Wind Down, Inc., and Its Subsidiaries Under Chapter*

---

[6] Del. Bankr. 13-12329, D.I. 1.  The Debtors in these Chapter 11 cases are as follows: FBI Wind Down, Inc.; AT Wind Down, Inc.; BFI Wind Down, Inc.; BHF Wind Down, Inc; BR Wind Down, Inc.; BT Wind Down, Inc.; FBH Wind Down, Inc.; FBO Wind Down, Inc.; FBRC Wind Down, Inc.; HFI Wind Down, Inc.; HR Wind Down, Inc.; HT Wind Down, Inc; LFI Wind Down, Inc.; LHFR Wind Down, Inc.; LV Wind Down, Inc.; MSFI Wind Down, Inc., TFI Wind Down, Inc.; THF Wind Down, Inc.; and TR Wind Down, Inc.

11 of the Bankruptcy Code (the "Plan").[7]  On July 14, 2014, the Delaware Bankruptcy Court entered *Order Confirming Debtors' Second Amended Joint Plan of Liquidation of FBI Wind Down, Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* (the "Confirmation Order"), which entered effect on August 1, 2014 (the "Effective Date").[8] Pursuant to Plan Section 7.3, the Creditors' Committee, in consultation with the Debtors, appointed Alan D. Halperin Liquidating Trustee of the FBI Wind Down, Inc. Liquidating Trust (the "Trustee").  His duties include pursuing any existing or potential Causes of Action (as defined in the Plan) in connection with 11 U.S.C. §§ 547-50.[9]

In April 2015, the Trustee sent a written correspondence to Defendant demanding the return of transfers made by the FBI and Thomasville Debtors on or within 90 days before the Petition Date (the "Preference Period") to the Liquidating Trustee.[10]   The Defendant did not comply with this request.  Consequently, on September 8, 2015, the Trustee filed the *Complaint to Avoid and Recover Preferential Transfers and Object to Claims* (the "Complaint").[11]  On December 20, 2016, the CareersUSA filed *Defendant's Answer and Affirmative Defenses*.[12]   On January 31, 2017, the Bankruptcy Court entered an order assigning the adversary proceeding to Mediation, which did not resolve the dispute. [13]

---

[7] Del. Bankr. 13-12329, D.I. 1799.

[8] Del. Bankr. 13-12329, D.I. 1840 (Confirmation Order); Del. Bankr. 13-12329, D.I. 1920 (Notice of Effective Date).

[9] Del. Bankr. 13-12329, D.I. 1799.

[10] Adv. D.I. 1 at 5.

[11] Adv. D.I. 1.

[12] Adv. D.I. 44.

[13] Adv. D.I. 46.

On May 17, 2017, the Court entered a *Scheduling Order*, which required all dispositive motions to be filed and served by July 24, 2018 and for any deadline contained in the *Scheduling Order* to be extended only by the Court and only upon written motion for good cause shown.[14]  On July 25, 2018, after the Parties filed a July 24th stipulation, the Court entered *Order Approving Stipulation Extending Time to File Dispositive Motions*, which extended the deadline to file dispositive motions from July 24, 2018 to July 30, 2018.[15]

On July 30, 2018, the CareersUSA filed *Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law* (the "Motion").[16]  On August 13, 2018, the Trustee filed *Plaintiff's Cross-Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56* (the "Cross-Motion").[17]  On July 21, 2018, the Parties agreed to file on the subsequent day a stipulation that extended the deadline for (i) Defendant to file a reply brief in support of its summary judgment motion and answering brief in response to Plaintiff's Cross-Motion to September 4, 2018, and (ii) Plaintiff to file a reply brief in support of the Cross-Motion to September 11, 2018.[18]  The Court entered an order approving this stipulation (the "Briefing Order") on August 27, 2018.

---

[14] Adv. D.I. 55.

[15] Adv. D.I. 66 (Stipulation); Adv. D.I. 67 (Order Approving Stipulation).

[16] Adv. D.I. 68.

[17] Adv. D.I. 69.  The Cross Motion was filed along with the *Answering Brief in Response to Defendant's Motion for Summary Judgment and Opening Brief in Support of Plaintiff's Cross-Motion for Summary Judgment to Fed. R. Civ. P. 56*. (Adv. D.I. 70)., and the *Appendix to Answering Brief in Response to Defendant's Motion for Summary Judgment and Opening Brief in Support of Plaintiff's Cross-Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56*. (Adv. D.I. 71).

[18] Adv. D.I. 75.

On September 4, 2018 CareersUSA filed *Defendant's Reply Brief in Support of Defendant's Motion for Summary Judgment and Answering Brief in Response to Plaintiff's Cross-Motion for Summary Judgment*.[19]  In response, on September 11, 2018, the Trustee filed *Reply Brief in Support of Plaintiff's Cross-Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56*.[20]

Due to the Parties' unavailability, the Court heard oral argument on August 13, 2019.

## II.    Factual Background

The Debtors were a Missouri-based home furnishings company.  CareersUSA is a national staffing firm that provided prepetition temporary staffing services to several debtor entities in the underlying bankruptcy case.  Defendant provided these services pursuant to the Parties' Temporary Labor Services Agreement (the "Agreement").[21]

The Transferring Debtors made twenty-four transfers via check and wire to CareersUSA within the Preference Period (i.e. on or within 90 days of the Petition Date) that are the subject of the Parties' dispute.  The FBI Debtors and the Thomasville Debtors made thirteen and eleven transfers, respectively, during the Preference Period to Defendant in the aggregate amount of $167,121.26.

After the Petition Date, CareersUSA, an unsecured creditor, filed proof of claim number 3045 in the amount of $10,656.97 against Furniture Brands International, Inc.

---

[19] Adv. D.I. 77.

[20] Adv. D.I. 78.

[21] Adv. D.I. 68, Exh. A.

Defendant's Motion seeks to deny Plaintiff's avoidance action (i) for failure to satisfy the required elements, and (ii) on account of the ordinary course of business, contemporaneous exchange for new value, and subsequent new value defenses. Additionally, Defendant asserts the mere conduit defense to deny Plaintiff's recovery of the Disputed Transfers.

Plaintiff's Cross-Motion seeks (i) to avoid the Disputed Transfers under Sections 547 and 548, (ii) to deny all defenses, (iii) to recover the value of the Disputed Transfers under Section 550, (iv) to disallow and object to Defendant's Claims, pursuant to Section 502(d) and Plan Sections 9.5 and 9.7, and (iv) to offset the Disputed Transfers against Defendant's Claims under Plan Section 8.9.

## ANALYSIS

### I.    Summary Judgment Standard

Summary judgment is a mechanism used to ascertain the existence of a genuine factual dispute between the parties that would necessitate a trial.  FED. R. Civ. P. 56, made applicable by FED. R. BANKR. P. 7056 is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[22]

---

[22] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted).

When seeking summary judgment, the movant bears the initial burden of "establishing the absence of a genuine issue of material fact."[23]  A genuine issue is not simply based on opposing opinions or unsupported assertions but rather on conflicting factual evidence over which "reasonable minds could disagree on the result."[24]  Furthermore, a fact is material if it could "alter the outcome of a case."[25]  In other words, the movant's goal is "to establish an absence of evidence to support the nonmoving party's case."[26]

If the movant meets this initial burden, the burden shifts to the nonmoving party to defeat summary judgment by producing "evidence in the record creating a genuine issue of material fact."[27]  To demonstrate a genuine issue of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[28] The nonmoving party must demonstrate "sufficient evidence (not mere allegations) upon which a reasonable trier of fact could return a verdict in favor of a nonmoving party."[29]  This evidence "cannot be conjectural or problematic; it must have

---

[23] *J. Aron & Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 504 B.R. 39, 51 (Bankr. D. Del. 2013) (*quoting Celotex*, 477 U.S. at 322).

[24] *The Liquidating Tr. v. Huffman (In re U.S. Wireless Corp.)*, 386 B.R. 556, 560 (Bankr. D. Del. 2008) (citations omitted).

[25] *Id.*

[26] *Id.* (*quoting Celotex*, 477 U.S. at 325).

[27] *In re W.R. Grace & Co.*, 403 B.R. 317, 319 (Bankr. D. Del. 2009).

[28] *Matushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[29] *Giuliano v. World Fuel Servs., Inc.* (*In re Evergreen Int'l. Aviation*), 2018 WL 4042662, at *2 (Bankr. D. Del. Aug. 22, 2018) (citations omitted).

substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial."[30]

When considering a motion for summary judgment, "the court does not weigh the evidence and determine the truth of the matter; rather, the court determines whether there is a genuine issue for trial."[31]  The Court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."[32] "If the opposition evidence is merely colorable or not significantly probative, summary judgment may be granted."[33]  However, where the record could lead reasonable minds to draw "conflicting inferences, summary judgment is improper, and the action must proceed to trial."[34]  Summary judgment is proper only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party.[35]

A cross-motion filing does not change the standards or analysis by which to grant or deny summary judgment to the moving party.  Each moving party still bears the initial burden of demonstrating the absence of a genuine issue of material fact.  "[T]he court must rule on each party's motion on an individual and separate basis, determining, for

---

[30] *The Liquidating Tr. v. Huffman*, 386 B.R. at 559-60 (*quoting Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)).

[31] *Argus Mgmt. Grp. v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del .2005) (*quoting Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986) (citations omitted)).

[32] *Saldana v. Kmart*, 260 F.3d 228, 231-32 (3d Cir.2001).

[33] *Whitlock v. Pepsi Am*s., No. C 08-24742 SI, 2009 WL 3415783, at *7 (N.D. Cal Oct. 21, 2009) (citations omitted).

[34] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (*quoting Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir.2000).

[35] *Id.*

each side, whether a judgment may be entered in accordance with the [summary judgment] standard."[36]  Although the filing of a cross motion may imply that the parties agree that no material issue of fact exists, "the court is not bound by this implicit agreement and is not required to enter a judgement for either party."[37]

## II.    Plaintiff Has Sustained His Burden Under the Section 547(b) Preference Action with the Exception of Three Transfers, Which Have Unresolved Questions of Fact.

The Trustee's avoidance powers are designed: (i) "to preserve the property includable within the bankruptcy estate . . . available for distribution to creditors . . . ,"(ii) to prevent a prepetition race to the debtor's assets, and (iii) to facilitate equality of distribution among similarly situated creditors.[38]  A Trustee can avoid a preferential transfer only if he proves each of the § 547(b) elements and the associated § 547(c) defenses are inapplicable.[39]  Plaintiff is required to meet this burden if the Court is to grant summary judgment in his favor.[40]  While the "trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section . . . the creditor . . . against whom recovery or avoidance is sought has the burden of proving the nonavoidability of

---

[36] *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citations omitted).

[37] *The Liquidating Tr.*, 386 B.R. at 560-61 (*quoting WorldCom, Inc. v. HE Global Asset Mgmt. Servs. (In re WorldCom, Inc.)*, 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006).

[38] *Begier v. IRS*, 496 U.S. 53, 58 (1990).

[39] *Union Bank v. Wolas*, 502 U.S. 151, 154 (1991) (*citing* 11 U.S.C. § 547(b)) (internal quotations omitted).

[40] *FBI Wind Down, Inc. v. Innovative Delivery Sys., Inc. (In re FBI Wind Down, Inc.)*, 581 B.R. 387 (Bankr. D. Del. 2018) (*citing Union Bank*, 502 U.S. at 154.).

a transfer under subsection (c) of this section."[41]  Both Parties must meet their respective

burdens by a preponderance of evidence.[42]

Section 547(b) requires the Trustee to establish the following six conditions to

avoid a preferential transfer:

> (b) Except as provided in subsections (c) and (i) of this section, trustee may avoid any transfer of an interest of the debtor in property
>
>> (1) to or for the benefit of a creditor;
>>
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>>
>> (3) made while the debtor was insolvent;
>>
>> (4) made—
>>
>>> (A) on or within 90 days before the date of the filing of the petition; or
>>>
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>>
>> (5) that enables such creditor to receive more than such creditor would receive if —
>>
>>> (A) the case were a case under chapter 7 of this title;
>>>
>>> (B) the transfer had not been made; and
>>>
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The subsections *infra* discuss each of the elements in turn.

> 1. *Interest of the Debtor Property –§ 547(b)*

---

[41] *See* 11 U.S.C. § 547(g).

[42] *In re First Jersey Sec., Inc*, 180 F. 3d 504, 512 (3d. Cir. 1999) ("The burden is on the transferee to satisfy each statutory element by a preponderance of the evidence."); *Pirinate Consulting Grp, LLC, v. Kadant Sols. Div., (In re New Page Corp.)*, 569 B.R. 593, 599 (D. Del. 2017) ("Trustee is required to establish each element by a preponderance of the evidence.").

Section 547(b) requires the Trustee to establish that the transfer involved an "interest of the Debtor in property."  While the Bankruptcy Code does not define this term, the Supreme Court has construed it to mean "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."[43]  The Supreme Court's definition of this term comports with the Bankruptcy Code's definition of "property of the estate," which the Bankruptcy Code defines as "all legal or equitable interests of the debtor in property as of the commencement of the case."[44]

"A transfer is preferential only if the property transferred belongs to the debtor" and "diminishes the fund to which other creditors can legally resort for the payment of their debts . . . ."[45]  "It is 'well-settled case law' that any bank accounts under the legal title of the debtor, as well as any deposits in such account credited to the debtor, are presumptively considered property of the debtor's estate."[46]

The Parties dispute whether the Transfers involved of an "interest of the Debtor in property."  Plaintiff asserts that both the FBI and Thomasville Debtors had an interest in their respective Transfers,[47] which Defendant denies in its Answer but does not address in any subsequent brief.[48]

---

[43] *Beiger*, 496 U.S. at 59.

[44] 11 U.S.C. § 541(a)(1).

[45] 5 *Collier on Bankruptcy*, ¶ 547.03[2] (Richard Levin & Henry Sommer eds. 16th ed. 2020).

[46] *Halperin v. Innovative Delivery Sys., Inc.*, 581 B.R. at 400 (citation omitted).

[47] Adv. D.I. 1 at 4-6; Adv. D.I. 70 at 19-20.

[48] Adv. D.I. 44 at 4, 8.

Plaintiff has met his burden under this element.  The FBI Debtors made thirteen transfers to CareersUSA totaling $135,208.78 from a Wells Fargo disbursement account (ending in x9463) held by Furniture Brands International, Inc.  Similarly, the Thomasville Debtors made eleven transfers to CareersUSA totaling $31,912.48 from a Wells Fargo disbursement account (ending in x9537) held by Thomasville Furniture Industries, Inc.  Consequently, the Court finds that all twenty-four disputed Transfers involved the transfer of a property interest of each Transferring Debtor to CareersUSA.

### 2.  *Transfer to or for the Benefit of a Creditor -§ 547(b)(1)*

Section 547(b)(1) requires the Disputed Transfers to have been made "to or for the benefit of a creditor."[49]  The Bankruptcy Code defines "creditor"  as an "entity that has a claim against the debtor, where a claim is a right to payment, and where a payment is a performance of an obligation by the delivery of money or some other valuable thing, accepted in partial or full discharge of the obligation."[50]  "This . . . element has been loosely construed by courts."[51]  Where a debtor's transferred funds reimburses Defendant for past payment to a third-party, Courts have held that this payment is sufficient to satisfy Section 547(b)(1).[52]

Plaintiff has met its burden.  It highlights ample evidence of the reimbursement relationship between the Transferring Debtors and Defendant in the sworn statement of

---

[49] 11 U.S.C. § 547(b)(1).

[50] *Halperin v. Innovative Delivery Sys., Inc.*, 581 B.R. at 401 (citations and quotations omitted).

[51] *Halperin v. Innovative Delivery Sys., Inc.*, 581 B.R. at 387 (*citing Argus Mgmt. Grp.*, 327 at 214).

[52] *Lenox Healthcare, Inc. v. Golden (In re Lenox Healthcare), Inc.*, 343 B.R. 96, 106 (Bank. D. Del. 2006) (*citing Fonda Grp, Inc. v. Marcus Travel (In re Fonda, Grp, Inc.)*, 108 B.R. 956, 959-60 (Bankr. D. N.J. 1989)).

the Mandy Wilson, Vice President of Operations for Careers USA, Inc.  Ms. Wilson makes

the following statements in her affidavit:[53]

- "Temporary associates are paid contingent upon client's approval of the individuals' time/hours . . . in advance of the client's payment to Careers."[54]

- "Careers paid weekly wages; FBI paid Careers to reimburse for such wages with minimal profit."[55]

- "[T]emporary associates are paid by Careers before Careers receives payment from its clients for the corresponding services."[56]

Although Defendant denies that it is a creditor in its brief, Plaintiff highlights

where Defendant admits it is a creditor in the context of the Disputed Transfers.  In a

series of responses to Plaintiff's First Request for Admission, Defendant states the

following:

- Request for Admission 1 Response: "CareersUSA states that payments during the entirety of the business relationship from February 2011 to December 2013, were made on behalf of the Debtor to Creditor's address . . ."[57]

- Request for Admission 3 Response: "CareersUSA was a creditor of the Debtor from approximately February 2011 to December 2013."[58]

Plaintiff also highlights instances where Defendant describes itself as a beneficiary

of the Disputed Transfers.  Defendant noted that "all payments made for the entire

relationship, from approximately February 2011 to December 2013, by the Debtor to

---

[53] Mandy Wilson is Vice President of Operations at Careers USA, Inc.  She has worked for Careers USA, Inc. for approximately thirteen years.  *See* D.I. 68, Exh. C., Wilson Aff.

[54] D.I. 68, Exh. C., Wilson Aff. ¶ 10.

[55] D.I. 68, Exh. C., Wilson Aff. ¶ 18.

[56] D.I. 68, Exh. C., Wilson Aff. ¶ 18.

[57] D.I. 71, Exh. A at 67.

[58] D.I. 71, Exh. A at 70.

CareersUSA[]. . . were for the . . . benefit of Debtor, governmental authorities, those employees provided to Debtor by CareersUSA . . . **and CareersUSA**."[59]  The Wilson Affidavit confirms Defendant is a beneficiary of the Debtors' transfers when she notes that the Debtors reimburse Defendant at a profit.[60]

Overall, Defendant offers no credible evidence that the Disputed Transfers were not to or for its benefit as a creditor.  Defendant's suggestion that it is merely a conduit for the Transferring Debtors' payments to third-parties is unpersuasive because the Debtors reimbursed Defendant for prior payments Defendant had made to third-parties.[61]

Based on the above, the Court finds that Plaintiff has satisfied this element of the preference action.

3.  *For or on Account of Antecedent Debt - § 547(b)(2)*

Section 547(b)(2) requires the Trustee to prove that the transfer was made "for or on account of an antecedent debt."  Like the previous term, the Bankruptcy Code does not define "antecedent debt."  Nevertheless, courts have held that a "debt is antecedent if it was incurred before the debtor made the allegedly preferential transfer.  A debtor incurs a debt 'on the date upon which the debtor first becomes legally bound to pay.'"[62]

---

[59] D.I. 71, Exh. A at 71, 78, 94 (emphasis added).

[60] Adv. D.I. 68, Exh. C, Wilson Aff. ¶ 44 ("FBI paid Careers to reimburse for such wages with minimal profit.").

[61] A more fulsome explanation as to why the "mere conduit" defense fails can be found in the Section IV of this opinion.

[62] *Halperin v. Innovative Delivery Sys., Inc.*, 581 B.R. at 402.

Plaintiff argues that all of the Disputed Transfers were made after Defendant serviced the Thomasville and FBI Debtors.[63]  He principally relies on the following evidence to support this assertion:   (i) the Wilson Affidavit, which describes CareersUSA's general operating practice of billing clients after rendering service,[64] (ii) CareersUSA's partial payment schedule (the "Document Responses"),[65] (iii) Debtors' payment records (Debtors' records and Debtors' Bank Records),[66]  and the Edelschick Declaration.[67]

While Plaintiff admits he cannot produce invoices for $21,280.64 of FBI Debtors' $33,500 August 31, 2013 transfer,[68] he nevertheless contends that the following evidence supports that the entire $33,500 transfer was made on account of antecedent debt: (i) Debtors continued to be in arrears during the Preference Period and through the Petition Date, (ii) Defendant's August 15, 2013 threaten to remove its employees from working for the Debtors absent immediate payment of $93,810, (iv)  Defendant's proof of claim demonstrating a payment request for past services rendered, and (v) no Careers

---

[63] All payment dates in this section reference the "Transfer Clear Dates" alleged in the Complaint.  *See* Adv. D.I. 1, Exh. A (FBI); Adv. D.I. 1, Exh. B (Thomasville).

[64] Adv. D.I. 68, Exh. C, Wilson Aff. at 43-44.

[65] Adv. D.I. 71, Indelicato Decl., Exh. B at B000351-000356 (Defendant's Document Responses).

[66] Adv. D.I. 1, Exh. A (FBI); Adv. D.I. 1, Exh. B (Thomasville); Adv. D.I. 71, Graham Decl., Exhs. C-G at B000219-B000282 (omitted invoices); D.I. 71, Graham Decl., Exh. A at B000009-111 (FBI Transfers and Bank Statements); D.I. 71, Graham Decl., Exh. B at B000113-217 (Thomasville Transfers and Bank Statements).

[67] Adv. D.I. 71 (Edelschick Decl.) at B000001-004.

[68] Adv. D.I. 70 at 11 ("Plaintiff has been unable to identify $21,280.64 of invoices that were purportedly paid by the $33,500 August 30, 2013 wire transfer. . . . [T]he documents that Defendant produced to Plaintiff . . . only recognize the application of $5,042.40 of the $33,500 August 30, 2013 wire transfer . . .").

allegations that the Transferring Debtors made Transfers prior to Careers rendering services.[69]

Defendant offers no persuasive evidence to support that the Disputed Transfers were not made on account of antecedent debt.

Consequently, the Court finds that, with three exceptions—the FBI Debtors' August 21, 2013, August 23, 2013, and August 30, 2013 transfers—the record demonstrates that all of the Disputed Transfers were on account of an antecedent debt. The Court draws this conclusion based on the Parties' records, which indicate that, for nearly all Disputed Transfers, invoice dates precede payment dates (i.e. the clear dates). Although Defendant's Document Responses do not reflect the Thomasville's purported July 5, 2013 $1,228.50 transfer, the sum, date, and invoice number in relation to other invoices[70] verify the that Thomasville Debtors' bank (detailing a $1,228.50 payment on July 5, 2013) transfer was on account of an antecedent debt.[71]  Because Defendant's Document Responses also do not reflect the FBI Debtors' purported August 20, 2013 transfer, the Court used this same process to conclude that this transfer was also made on account of an antecedent debt.[72]

---

[69] Adv. D.I. 95 (Tr: 27:1-28:11).

[70] Invoice no. 1266108 ($756, dated April 7, 2013) and invoice no. 1266803 ($472.50, dated April 14, 2013)).

[71] Adv. D.I. 71, Graham Decl., Exh. C at B00219-220 (Omitted Thomasville Invoices); Adv. D.I. 71, Graham Decl., Exh. B at B000113-217 (Thomasville Transfers and Bank Statements); Adv. D.I. 71, Edelschick Decl. at B000002.

[72] Adv. D.I. 71, Graham Decl., Exh. D at B000222-240.

Plaintiff, however, has not met his burden with respect to the 2013 FBI Debtors' Transfers it alleges were made on August 21st, August 23rd, and August 30th.  For each of these transfers, the Court is presented with the same issue—Defendant's Document Responses do not reflect the Debtors' payment date.  Yet, for these transfers, the record is devoid of corroborating evidence to permit the Court to determine if these payments were on account of an antecedent debt.

With respect to the August 21, 2013 transfer, the record of invoices Plaintiff highlights as probative is incomplete and inconsistent with its representation.[73]  As a result, these invoices amount to approximately $382 less than the $7,992.54 the Debtor claims to have paid.  Because this $382 discrepancy could reflect an error or an overpayment, the record does not allow the Court to determine if this transfer was on account of antecedent debt.  Therefore, a genuine dispute of material fact remains.

Plaintiff also does not meet his burden with respect to the FBI Debtors' $12,000 August 23, wire transfer.  Here, the invoices in Exhibit F amount to $1,973.54 more than what Plaintiff has claimed to be associated with the $12,000 payment.[74]  Although it may be possible that the Debtors underpaid for services performed, it may also be possible that this $12,000 payment does not correspond with the invoices Plaintiff supplied.  Consequently, it remains possible that this payment was not made on account of antecedent debt.

---

[73] Invoice 1275470, which is listed on Exhibit A of the Complaint, is not present as it has represented in the Graham Declaration.  Invoice 1275467, which is listed on Exhibit A of the Complaint lists a balance that is $381.30 less than what Plaintiff lists on Exhibit A.

[74] Adv. D.I. 71, Graham Decl, Exh. F at B000255-271.

Lastly, Plaintiff does not meet his burden with respect to the FBI Debtors' purported August 30, 2013 $33,500 transfer.  While the Debtors' bank records reveal that the Debtors made a $33,500 transfer on August 30, 2013, the record of associated invoices amounts to only $7,249.02, which renders the Court unable to determine if any of the $33,500 transfer was made on account of antecedent debt.

In summary, the Court finds that, with three exceptions, all the Disputed Transfers were on account of an antecedent debt.  The record is insufficient to conclude whether the FBI Debtors transfers on August 21st, August 23rd, and August 30th of 2013 were made after CareersUSA rendered service.

### 4.  Insolvency - § 547(b)(3)

Section 547(b)(3) requires the Trustee to show the debtor to be insolvent at the time of the disputed transfer.  Section 547(f) provides that a "debtor is presumed to have been insolvent on and during the ninety days immediately preceding . . ." the Petition Date.[75] "If the Defendant fails to present evidence to rebut the presumption, Plaintiff is entitled to rely on the presumption to establish that it was insolvent."[76]

This element has been met, and the Transferring Debtors, pursuant to 547(f), are presumed to have been insolvent at the time of the Disputed Transfers.  Defendant has made only conclusory statements challenging the Debtors' insolvency at the time of the

---

[75] 11 U.S.C. 547(f).

[76] *Halperin v. Innovative Delivery Sys., Inc.*, 581 B.R. at 404 (*citing Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 540 (Bankr. D. Del. 2002) (quotations omitted).

Transfers.   Thus, Defendant has failed to present evidence to rebut the insolvency presumption.[77]

### 5. Within the Preference Period - § 547(b)(4)

Section 547(b)(4)(A) requires the Trustee to show that the disputed transfers to non-insiders occurred within the voidable Preference Period, i.e. "on or within 90 days before the date of the filing of the petition."[78]   The Preference Period in this case is from June 11, 2013 to September 9, 2013.   Plaintiff argues that all twenty-four Disputed Transfers occurred on or within ninety days of the Petition Date.[79]   Defendant, however, alleges that FBI Debtor transfers on June 13, 2013, June 5, 2013, and June 6, 2013 fall outside of the ninety-day Preference Period.[80]

In the context of Section 547(b) the controlling date of transfer depends on the payment method.   The Supreme Court has held that a check transfer is deemed to occur when the payor's bank honors a check (i.e. the clear date) rather than when the check is issued, received, or sent.[81]   A wire transfer occurs "when the receiving bank receives the credit message" as the debtor's transfer instructions and bank execution of these instructions typically occur on the same day (i.e. the clear date).[82]   For the purposes of Section 547(b), these dates control check and wire transfers because they represent when

---

[77] *See* Adv. D.I. 44 at 8-9; D.I. 68 at 18; Adv. D.I. 77 at 11.

[78] 11 U.S.C. § 547(b)(4)(A).

[79] Adv. D.I. 70 at 23.

[80] Adv. D.I. 68 at 18; Adv. D.I. 77 at 10-11.

[81] *Barnhill v. Johnson*, 503 U.S. 393 (1992).

[82] *In re Pioneer Commercial Funding Corp.*, 140 B.R. 951, 956-57 (Bankr. S.D.N.Y. 1992).

the issued property is no longer under the control of the debtor.  These controlling dates "le[ave] the debtor in the position that it would have occupied if it had withdrawn cash from its account and handed it over to the [defendant]."[83]  Until these controlling dates, intervening events—caused by the debtor, the bank, or third-parties—can preclude the completion of transfer to the payee.[84]

By this framework, the Court finds that all the Disputed Transfers occurred within the Preference Period.  Plaintiff has met his burden under this element of the avoidance action.

| Account Holder: Furniture Brands International, Inc. Bank: Wells Fargo Account Number: x9463 | | | |
|---|---|---|---|
| Payment Type | Transfer No. | Clear Date | Amount |
| Check | 51026 | 6/13/2013 | 105.60 |
| Check | 51040 | 6/13/2013 | $4,304.36 |
| Check | 51077 | 6/21/2013 | $4,322.05 |
| Check | 51393 | 7/12/2013 | $4,233.50 |
| Check | 51411 | 7/19/2013 | $3,408.35 |
| Check | 51469 | 7/26/2013 | $4,868.05 |
| Wire | 000475 | 8/16/2013 | $26,164.78 |
| Wire | 000489 | 8/20/2013 | $12,673.35 |
| Wire | 000492 | 8/21/2013 | $7,992.54 |

---

[83] *Barnhill*, 503 U.S. at 400.

[84] *Id.* at 399.

| Wire | 000498 | 8/23/2013 | $12,000 |
| Wire | 000557 | 8/30/2013 | $33,500 |
| Wire | 000588 | 9/05/2013 | $10,863.80 |
| Wire | 000588 | 9/06/2013 | $10,772.40 |

| **Account Holder:** Thomasville Furniture Industries, Inc. **Bank:** Wells Fargo **Account Number:** x9537 | | | |
|---|---|---|---|
| Payment Type | Transfer No. | Clear Date | Amount |
| Check | 1086209 | 6/25/2013 | $3,111.50 |
| Check | 1086777 | 7/05/2013 | $1,183.56 |
| Check | 1086811 | 7/05/2013 | $1,434.01 |
| Check | 1086814 | 7/05/2013 | $420.24 |
| Check | 1086815 | 7/05/2013 | $1,228.50 |
| Check | 1086820 | 7/08/2013 | $756 |
| Check | 1087078 | 7/12/2013 | $2,340.49 |
| Check | 1087535 | 7/25/13 | $3,377.09 |
| Wire | 001897 | 8/21/13 | $17,191.25 |
| Check | 1088134 | 9/3/2013 | $586.70 |
| Check | 1088135 | 9/3/2013 | $283.14 |

6.   *Greater Recovery than in Chapter 7 - § 547(b)(5)*

Section 547(b)(5)(A) requires the Trustee to establish that the creditor received more than it "would have received under chapter 7 distribution provisions of the Code if the transfer had not been made."[85]  Generally, "nearly all transfers to an unsecured creditor will satisfy this test unless the debtor's estate is solvent in chapter 7."[86]

The Supreme Court has held that whether a particular transfer is preferential should be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results."[87]  Thus, as long as the distribution in bankruptcy is less than one-hundred percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have receive in liquidation had the payment not been made.  Thus, the relevant inquiry for this Court is whether CareersUSA would have received a 100 percent payout in a Chapter 7 liquidation.  If so, no preference can be recovered; if not, the requirements of Section 547(b)(5) are met.

Plaintiff argues that it paid 100 percent of the distribution in connection with the invoices listed in Exhibits A and B of the Complaint.[88]  Consequently, it argues that "both the FBI Transfers and Thomasville Transfers enabled Defendant to receive more than it

---

[85] 5 *Collier on Bankruptcy*, ¶ 547.03[7] (Richard Levin & Henry Sommer eds. 16th ed. 2020).

[86] *Halperin v. Innovative Delivery Sys, Inc.*, 581 B.R. at 405.

[87] *Palmer Clay Prods Co. v. Brown*, 297 U.S.  227, 229 (1936).

[88] Adv. D.I. 70 at 24-25. *See* D.I. 1, Exh. A, Exh. B.

would receive if the FBI and Thomasville bankruptcy cases were under chapter 7 of the Bankruptcy Code and the FBI Transfers and the Thomasville Transfers had not been made."[89]    Defendant denies this assertion in its answer, but it does not address Section 547(b)(5) in any subsequent brief.[90]

"Because [CareersUSA] received 100 [percent] of what it was owed for each of the Transfers, the Court need only find that [the unsecured Defendant] would have received less than 100 [percent] of these claims in a chapter 7 liquidation."[91]    In performing this analysis, bankruptcy courts generally "take judicial notice of the documents in a case" and the Debtors' bankruptcy case as a whole.[92]

Under the Chapter 11 liquidation plan, after paying the secured, administrative, and priority creditors, FBI Debtors' unsecured creditors can expect a 2.6% to 6.7% recovery while Thomasville Debtors unsecured creditors can expect a the 3.1% to 7.2% recovery.[93]    These unsecured creditor recoveries include a Global Settlement that provides for a (i) $6 million PBGC cash contribution[94]  and (ii) an asset sale negotiations that increased the final purchase price by nearly $60 million.[95]  These value maximizing

---

[89] Adv. D.I. 70 at 24.

[90] Adv. D.I. 44 at 6.

[91] *Burtch v. Prudential Real Estate and Relation Servs., Inc. and Prudential Relocation, Inc., (In re AE Liquidation, Inc.)*, No. 10-55543, 2013 WL 3778141, *3 (Bankr. D. Del. July 17, 2013).

[92] *In re AmeriServe Food Distrib., Inc.*, 315 B.R. 24, 32-33 (Bankr. D. Del. 2004).

[93] Del. Bankr. 13-12329, D.I. 1799 at 63.

[94] Del. Bankr. 13-12329, D.I. 1802 at 11.

[95] Del. Bankr. 13-12329, D.I. 1812 at 2.  *See In re AmeriServe*, 315 at 33 (*citing Tire Kings of Am., Inc. v. Hoffman Tire Co. (In re Tire Kings of Am., Inc.)*, 164 B.R. 40 (Bankr. M.D. Pa. 1993) (finding that Section 547(b)(5) was satisfied when debtors assets as of the petition date were less than liabilities)).

features of the chapter 11 process generated a meaningful distribution to unsecured creditors that would likely be unavailable in a chapter 7 liquidation scenario. A chapter 7 liquidation "would result in substantial diminution in value to be realized by holders of Claims as compared to distributions contemplated under the Plan."[96] Furthermore, as of the Petition Date, the Debtors reported that their assets totaled approximately $547 million and liabilities totaled $550 million. Courts have found that when a debtor's total assets are less than its total liabilities, this discrepancy is sufficient to conclude that Section 547(b)(5) is satisfied.[97]

Based on the above evidence, the Court finds that the Transfers that Defendant received during the Preference Period were more than the amount they would have otherwise received under a chapter 7 liquidation. Inasmuch as the record shows that CareersUSA, as an unsecured creditor, would receive less than one hundred percent of its claim in the event of a chapter 7 liquidation, the requirements of Section 547(b)(5) have been satisfied.

* * *

The Court finds that, Plaintiff, having carried its burden under the Section 547(b) for all Transfers except those on August 21, 2013, August 23, 2013, and August 30, 2013, has made prima facie showing that the Disputed Transfers were preferential. Accordingly, the Court will deny Defendant's Motion. Additionally, the Court will grant,

---

[96] Del. Bankr. 13-12329, D.I. at 105 (Disclosure Statement).

[97] Adv. D.I. 16 at 9.

in part, and deny in part, Plaintiff's Cross-Motion.  Specifically, the Court will grant Plaintiff summary judgment for all Transfers excluding August 21, 2013, August 23, 2013, and August 30, 2013, for which summary judgment is denied.  With respect to these three Transfers, factual issues remain solely with regard to whether they were made for or on account of an antecedent debt.

### III.    Cross-Motions Concerning Section 548 Fraudulent Transfer Will Be Denied.

In connection with Section 548, Defendant argues that the Disputed Transfers are not fraudulent transfers, and that Plaintiff has not established any of the requisite elements under Section 548.  Defendant does not highlight any persuasive evidence to support its request for relief except a not fully executed Temporary Labor Services Agreement.  Without additional evidence, the Court cannot rely on the agreement as it cannot verify the terms to which the Parties bound themselves.

While it is true that, when seeking summary judgment, the movant bears the initial burden of "establishing the absence of a genuine issue of material fact," this burden does not free the movant of the charge of supporting its request for relief with evidence.[98] Merely stating statutory elements and repeating conclusory statements is insufficient. Defendant has not met its burden.

Plaintiff argues, in the alternative, that if the Court finds that any of the Disputed Transfers was not made on account of an antecedent debt under Section 547, then Plaintiff, pursuant to Section 548(a)(1)(B)(i), is entitled to partial summary judgment on

---

[98] *J. Aron & Co.*, 504 B.R. at 51 (*quoting Celotex*, 477 U.S. at 322).

the grounds that it did not receive reasonably equivalent value in return for the Disputed Transfers.[99]

The Court need not consider this issue as it has found the Disputed Transfers to have been on account of an antecedent debt or to have implicated factual questions, which will be resolved at trial.

Accordingly, for the reason stated above, the Court will deny the Cross-Motion as it concerns Section 548.

## IV.    Defenses

"Once the plaintiff has made a prima facie showing that a transfer constitutes a preference under Section 547(b), the burden shifts to the defendant to establish a defense" to bar recovery.[100]  Defendant has the burden of proving a defense by a preponderance of evidence.[101]

Defendant argues that Plaintiff's Cross-Motion and Opening Brief should not be considered because they are untimely.   Additionally, pursuant to Section 547(c), Defendant seeks to deny the avoidance action on account of the ordinary course of business, contemporaneous exchange for new value, and subsequent new value defenses. Furthermore, the Defendant seeks to deny recovery of the Disputed Transfers on account of the mere conduit defense.

---

[99] Adv. D.I. 70 at 12.

[100] *In re NWL Holdings, Inc. (Giuliano v. RPG Mgmt., Inc.)*, No. 10-53535, 2013 WL 2436667, at *5 (Bankr. D. Del. June 4, 2013).

[101] *See* 11 U.S.C. § 547(g) ("for the purposes of this section . . . the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.")

## A. The Court Will Consider the Cross-Motion and Opening Brief

On May 17, 2017, the Court entered *Scheduling Order*, which required all dispositive motions to be filed and served by July 24, 2018 and for any deadline of extensions contained in the *Scheduling Order* to be extended only by the Court and only upon written motion for good cause shown.[102]  On July 25, 2018, the Court entered *Order Approving Stipulation Extending Time to File Dispositive Motions*, which extended the deadline to file dispositive motions from July 24, 2018 to July 30, 2018.[103]  On August 13, 2018, after the court-ordered deadline expired, Plaintiff filed the Cross-Motion.[104]

Defendant argues that the Court should not consider Plaintiff's Cross-Motion and Opening Brief.  It contends that the Cross-Motion is (i) untimely, as it was filed August 13, 2018, fourteen days after the July 30, 2018 dispositive motion deadline, (ii) unauthorized, as it was filed after the expiration of the deadline without it or the Court's consent, and (iii) "extreme[ly] prejudice[ial]" to the Defendant, as it allegedly violates the *Scheduling Order* and the Parties' *Stipulation to Extend Time to File Dispositive Motions*.[105]  Defendant also contends that Plaintiff's filing of the Cross-Motion in conjunction with its Answering Brief "circumvents the rules and established, agreed-upon deadlines in this Adversary Proceeding."[106]

---

[102] Adv. D.I. 55.

[103] Adv. D.I. 66 (Stipulation); Adv. D.I. 67 (Stipulation Order).

[104] Adv. D.I. 69.

[105] Adv. D.I. 77 at 7; Adv. D.I. 55 (Scheduling Order); Adv. D.I. 67 (Dispositive Motion Stipulation Order).

[106] Adv. D.I. 77 at 5-6.

Plaintiff maintains that the Court should consider its Cross-Motion.  He asserts he has filed the Cross-Motion in the interest of judicial economy to narrow the issues for trial as he is now required to respond to Defendant's summary judgment motion regarding Plaintiff's prima facie case in addition to its affirmative defenses.[107]   Additionally, Plaintiff alleges that one day after Defendant's deadline to file its reply brief, he consented to, at Defendant's request, a stipulation  that provided additional time for Defendant to file a reply brief in support of its summary judgement and answering brief in response to the Cross-Motion.  Having obtained said extension, Plaintiff argues that Defendant's assertion that this Court's consideration of the Cross-Motion would be prejudicial is without basis.[108]  Furthermore, Plaintiff argues that the Court has the authority to grant summary judgment in favor of a non-movant.[109]

The Court's *Scheduling Order* provides that "all dispositive motions . . . shall be subject to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware."  Plaintiff's filing of the Response Brief, complied with Local Rule 7.1.2 as it was filed within fourteen days of the filing of Defendant's Motion.  The Delaware Bankruptcy Court has found, in similar

---

[107] Adv. D.I. 70 at 8 n.1.

[108] Adv. D.I. 78 at 6.

[109] Adv. D.I. 70 at 8 n.1.

circumstances, that "the filing of response to motion for summary judgment and cross

motion for summary judgment is appropriate."[110]

Additionally, the "suggestion that the Scheduling Order acts as a bar to a motion

for summary judgment is mistaken, as the Court always retains discretion to modify the

Scheduling Order."[111]

Furthermore, the "weight of authority [permits] . . . summary judgment . . . [to be]

rendered in favor of the opposing party even though the opponent has made no formal

cross-motion under Rule 56."[112]   The prevailing concern of courts entering summary

judgment for a non-moving party in the absence of a cross-motion  is whether the losing

party had adequate notice and an opportunity to respond.[113]

These concerns are assuaged by the facts of this proceeding.  Defendant was given

notice of Plaintiff's Cross-Motion when it was filed on August 13, 2018.  At this time,

instead of opposing this Court's consideration of the Cross-Motion, Defendant entered

---

[110] *Argus Mgmt Grp.*, 327 B.R. at 213 (Bankr. D. Del 2005) (finding that a cross-motion for summary judgment filed after the dispositive motion deadline was not barred where it was filed with a timely response to the summary judgment motion.) (citation omitted).

[111] *Burtch v. Masiz (In re Vasco Active Pharmaceuticals, Inc.)*, 500 B.R. 384, 400 (Bankr. D. Del. 2013) (quotation marks and citations omitted).

[112] 10A *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure* § 2720.1 (4th ed. 2020); *See also* Fed. R. Civ. P. 54(c) ("Every other final judgement should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable rime to respond, the court may: (1) grant summary judgment for a nonmovant . . . (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."); *Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc.*, 510 F. Supp. 2d 356, 362 (D. Del. 2007) ("Where one party has invoked the power of the court to render summary judgment against an adversary, Fed. R. Civ. P. 54(c) and 56, when read together, give the court the power to render a summary judgment for the adversary if it is clear that the case warrants that result, even though the adversary has not filed a cross-motion for summary judgment.").

[113] 10A *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure* § 2720.1 (4th ed. 2020).

into a stipulation with Plaintiff, one day after the deadline to file its answering brief, to extend its answering brief deadline.  Defendant subsequently filed its reply brief on September 4, 2018.[114]

Defendant's current position is inconsistent with the apparent understanding of the Parties' stipulation, which presumed the Court's consideration of the Cross-Motion. Logically, it would not make sense for the Parties to extend the answering brief deadline to a motion that the Court had no intention of hearing.  Clearly, Defendant's position has changed; however, the time to have raised concerns about the timeliness of Plaintiff's Cross-Motion and opening brief would have been prior to entering into a stipulation that requested entry of an order that implicitly recognized the Court's consideration of the Cross-Motion and Opening Brief.  Having had notice of the Cross-Motion, Defendant seized its opportunity to respond to the Cross-Motion in *Defendant's Reply Brief in Support of Defendant's Motion for Summary Judgment and Answering Brief in Response to Plaintiff's Cross-Motion for Summary Judgment*.[115]

For the reasons stated above, and specifically because the Parties have had notice and a "fair opportunity to address the issue adjudged," the Court, amends the Scheduling Order accordingly, to allow Plaintiff's Cross-Motion and Opening Brief to move forward.[116]  This decision promotes judicial economy, the policy goal of summary judgment.

---

[114] Adv. D.I. 77.

[115] Adv. D.I. 77 at 4-7.

[116] *Maravilla v. United States.*, 867 F. Supp. 1363, 1380 (N.D. Ind. 1994).

### B. The Court Will Deny the Ordinary Course of Business Defense Cross-Motions

The "ordinary course of business" defense balances debtor and creditor interests, in order to "induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy."[117]  Under Section 542(c)(2), a trustee may not avoid a transfer if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business of the debtor and transferee [(the "Subjective Test"], or (B) made according to ordinary business terms [(the "Objective Test")]."[118]

The Parties dispute the applicability of the ordinary course of business defense to all of the Disputed Transfers.[119]  However, in the alternative, Plaintiff argues that "even if Defendant were to establish an ordinary course of business between itself and each [of the Transferring Debtors], at a minimum, in 2013, a series of July and August FBI Debtor transfers totaling $113,966.87 (the "FBI Pressure Payments"), and an August Thomasville Debtor transfer of $17,191.25 (the "Thomasville Pressure Payment") cannot be protected under an ordinary course defense."[120]

---

[117] *Forman v. Moran Towing Corp. (In re Thames, LLC)*, 547 B.R. 99 (Bankr. D. Del. 2016) (*quoting Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 219 (3d Cir. 1994)).

[118] 11 USC § 547(c)(2)(A)-(B).

[119] Adv. D.I. 70 at 31.

[120] "FBI Pressure Payments" refers to the following transfers: (i) August 16, 2013 wire transfer of $26,164.78, (ii) August 20, 2013 wire transfer of $12,673.35, (iii) August 21, 2013 wire transfer of $7,992.54, (iv) August 23, 2013 wire transfer of $12,000,  (v) August 30, 2013 wire transfer of $33,500, (vi) September 5, 2013 wire transfer of $10,863.80, and (vii) September 6, 2013 wire transfer of $10,772.40.

*1. Debt Incurred in the Ordinary Course of Business*

A transfer befitting the ordinary course of business exception must go toward paying a debt incurred by the debtor in the ordinary course of business of both parties.[121] Courts examine the underlying debt for "the normality of such occurrences in each party's business operations generally."[122] "If the transaction from which the debt arose was not ordinary for the debtor or the transferee, then the defense will fail."[123]

Defendant argues that the Debt was incurred in the ordinary course of business of the Parties.[124] Plaintiff does not dispute this element.

The Court finds this first prong is satisfied. The Transferring Debtors are a home furnishings company and the Defendant is a national staffing firm. The record indicates the Debtors hired Defendant for the provision of temporary staffing in order to execute their home furnishing business. The alleged debt was incurred in the context of the routine operations of both Transferring Debtors and Defendant.

After it is clear that the debt was incurred in the ordinary course of business, the disjunctive nature of Section 547(c)(2) permits a party to establish an ordinary course of business defense by meeting either the Section 547(c)(2)(A) (Subjective) or the Section 547(c)(2)(B) (Objective) standard. The Court will address each prong in turn.

---

[121] 11 U.S.C. § 574(c)(2).

[122] *Halperin v. All Am. Poly Corp. (In re FBI Wind Down, Inc.)*, 581 B.R. 116, 138 (Bankr. D. Del. 2018) (*citing Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R. 390 (Bankr. S.D. Ohio 1998) (citations omitted)).

[123] 5 *Collier on Bankruptcy*, ¶ 547.04[2][a][i] (Richard Levin & Henry Sommer eds. 16th ed. 2020).

[124] Adv. D.I. 68 at 3-4.

*2. Subjective Standard – 547(c)(2)(A)*

After finding that the payments were for a debt incurred in the ordinary course of business, courts "look for certain hallmarks to determine whether the transfers were not in the ordinary course of business."[125]  A determination whether a creditor has met its burden under Section 547(c)(2)(A) is a subjective test that "contemplate[s] the normal payment practice between the parties."[126]

Courts have found no one factor determinative in this analysis.[127]  Instead, they have considered a multitude of factors including: (1) the length of time the parties engaged in the type of dealings at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating condition.[128]

*a. Length of Relationship*

The Court must first review the "length of the business relationship between Debtors and Defendant to determine if their relationship was "of recent origin," as

---

[125] *Sass v. Vector Consulting, Inc. (In re Am. Home Mortg. Holdings, Inc.)*, 476 B.R. 124, 135 (Bankr. D. Del. 2012).

[126] *Sass v. Vector Consulting, Inc.*, 476 B.R. at 135.

[127] *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463. B.R. 302, 306 (Bankr. D. Del. 2012).

[128] *Sass v. Vector Consulting, Inc.*, 476 B.R. at 135-36 (*citing Burtch v. Detroit Forming, Inc., (In re Archway Cookies)*, 435 B.R. 234, 242 (Bankr. D. Del. 2010).

opposed to being "cemented long before the onset of insolvency."[129] "Bankruptcy policy, as evidence by the very existence of Section 547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often help businesses fend off an unwelcome voyage into the labyrinths of a bankruptcy."[130]

Defendant argues that the Parties engaged in the type of dealing at issue—payment for staffing services rendered—for approximately three years.[131] The Parties do not dispute this element.

The Court finds that the business relationship between the Debtors and Defendant was of sufficient length to establish an ordinary course of dealing between the Parties. The record indicates the Parties' relationship was established over a multiyear period of at least 2.6 years during which there were hundreds of transactions of said type between the Parties.[132] Based on the length of their business relationship and the numerous transactions between the Parties, the Court finds Defendant has carried its burden.

### b. Similarity of Transactions

Second, the Court must compare the Transfers in the Preference Period to those "made during the prior course of the parties' relationship to determine if the transactions were sufficiently similar."[133] Defendant must prove the transaction in the Preference

---

[129] *Halperin v. All Am. Poly Corp.*, 581 B.R. at 138 (*citing Burtch v. Detroit Forming, Inc.*, 435 B.R. at 243.).

[130] *Fiber Lite Corp.*, 18 F. 3d at 225.

[131] Adv. D.I. 68 at 5.

[132] Adv. D.I. 71, Indelicato Decl., Exh. B at B000334-000356 (Defendant's Document Responses); Adv. D.I. 71, Indelicato Decl., Exh. I at B000651 (Letter from B. Dranoff (CUSA) to L. Adams (FBI)).

[133] *Halperin v. All Am. Poly Corp.*, 581 B.R. at 138 (*citing In re Stone & Webster, Inc.*, 547 B.R. 588, 600 (Bankr. D. Del. 2016) (citations omitted).

Period materially complied with the historical period behavior of the parties. In determining the ordinary course of dealings between parties, payments made in the Preference Period are deemed in the ordinary course of business when they are similar in amount and made within a similar period of time as those in the historical period (i.e. outside of the Preference Period).[134] "[W]hen analyzing the timing of payment, the receipt date by the creditor is controlling, and not the date the Preference Period Checks clear. . . ."[135] Courts have found small deviations in payment timings to be not so significant as to defeat the ordinariness of such payments.[136] However, greater deviations in payment timing can defeat the ordinariness of payments.[137] It is, therefore, the transferee's responsibility to:

> establish a baseline of dealing' so that the court may compare the transfers made during the preference period with the parties' prior course of dealings. This baseline of dealing must be fixed at least in part during a time in which debtor's day-to-day operations were ordinary in the layman's sense of

---

[134] *Bros. Gourmet Coffees v. Armenia Coffee Corp. (In re Bros. Gourmet Coffees, Inc.)*, 271 B.R. 456 (Bankr. D. Del. 2002); *Sass v. Vector Consulting, Inc.*, 476 at 138.

[135] *Sass v. Vector Consulting, Inc*, 476 B.R. at 137-38 (*citing Barnhill*, 503 at 401-402 (recognizing that Courts of Appeals have unanimously agreed in concluding that a "date of delivery" rule should apply to check payments for the purposes of § 547(c)).

[136] *See, e.g., Burtch v. Detroit Forming, Inc.*, 435 B.R. at 234 (holding that a 4.9-day difference in payment timing between the pre- and post-Preference Period was not material); *Fieldbrook Farms, Inc. v. Fabricon Prods., Inc. (In re Ice Cream Liquidation, Inc.)*, Adv. Pro. No. 03-3175, 2005 WL 976935 (Bankr. D. Conn. 2005) (holding that a five-day discrepancy between average days outstanding during the pre-preference period versus during the preference period did not make the payments out of the ordinary course of business).

[137] *Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, No. 06-10894, 2009 WL 2004226, *6, 2009 (Bankr. D. Del. July 9, 2009) (holding that the average number of days to payment nearly doubled between the historical period and the preference period, which based on the facts of the that particular case, made the payments outside the ordinary course of dealings between the plaintiff and the defendant).

the work. Preferably, the material period should extend back
to the time before the debtor became financially distressed.[138]

Defendant argues that "the subject transfers were typically in the same or similar amounts as was usually paid by FBI to CareersUSA" and were consistent with "the usual and customary time frame for payments from FBI to CareersUSA."[139]  In support of its argument it references (i) Plaintiff's Complaint Exhibits A and B, which provide "transfer clear dates" and "invoice dates" of the Disputed Transfers, (ii) the Temporary Labor Services Agreement allegedly entered into by and between the Parties,[140]  and (iii) the Lassman Affidavit.

Defendant principally relies on two assertions in the Lassman Affidavit to establish the baseline dealings for comparison.  In addition to providing a frequency of distribution of the payment timing of the Disputed transfers, [141] the affidavit states in relevant part:

- "[O]n average, there were approximately fifty-six days between invoice date and the transfer clear date."[142]

- "Per the exhibits attached to Plaintiff's Complaint . . . nearly ninety percent of CareersUSA's invoices were paid by FBI within the same time timeframe, i.e. payment was consistently made between twenty-four and seventy-four days."[143]

---

[138] 5 Collier on Bankruptcy, ¶ 547.04[2][a][ii] (Richard Levin & Henry Sommer eds. 16th ed. 2020).

[139] Adv. D.I. 68 at 5, 7.

[140] Adv. D.I. 68 at 8 ("Each of the transfers in question was made by FBI to CareersUSA according to the ordinary, express business terms set forth in the Temporary Labor Services Agreement by and between CareersUSA and the entity formerly known as Furniture Brands International, Inc."  Defendant alleges that the agreement expressly provides for payment to be made by FBI within sixty days after receipt of the invoices.).

[141] Adv. D.I. 68 at 7 (citing Adv. D.I. 68, Exh B, Lassman Aff. ¶ 9).

[142] Adv. D.I. 68 at 7 (citing Adv. D.I. 68, Exh. B, Lassman Aff.  ¶ 8).

[143] Adv. D.I. 68 at 7 (citing Adv. D.I. 68, Exh B, Lassman Aff. ¶ 9).

Plaintiff maintains that Defendant has not met its burden under this element. With regard to payment amounts, he argues that Defendant's failure to produce a detailed pre-Preference Period payment history prevents this Court from determining whether any of the Disputed Transfers are subject to the ordinary course of business defense with respect to both amount and timing of payment.[144]  He adds that the Court's analysis is further stifled by incomplete data in connection with the Disputed Transfers.  In support of this argument he highlights that Defendant provided an incomplete payment history for the July 5, 2013, August 21, 2013, August 23, 2013, and August 30, 2013 Transfers.[145]  With respect to payment timing, Defendant argues that Defendant's fifty-six day range is misleading as it does not consider that Thomasville and FBI are separate business entities with separate payment histories.[146]

With regard to the Transferring Debtors' Pressure Payments specifically, Plaintiff highlights that after Defendant's August 15, 2013 demand letter, payment amount and timing requirements were materially changed.  Plaintiff underscores what he alleges was an unprecedented demand for lump sum payments, citing the (i) Thomasville Debtors' August 21, 2013 transfer ($17,191.25) and  the FBI Debtors' August 23, 2013 ($12,000) and August 30, ($33,500) transfers, and (ii) the five-day period during which the FBI Debtors wired three transfers in the aggregate amount of $46,830.67.[147]  He points out that the

---

[144] Adv. D.I. 70 at 14.

[145] Adv. D.I. 70 at 14.n5 (citing Adv. D.I. 71, Indelicato Decl., Exh. B at B000334-000356 (Defendant's Document Responses).

[146] Adv. D.I. 70 at 31.

[147] Adv. D.I. 70 at 33.

August 15, 2013 demand letter also reduced the FBI and Thomasville Debtors credit terms from 60 days to 10 days.[148]

The Court finds that Defendant does not carry its burden under this element of the defense. Defendant's evidence fails to establish a baseline of dealing to which the Court can compare the Disputed Transfers to determine if they are subject to the ordinary course of business defense. The Lassman Affidavit, which serves as the foundation of Defendant's defense, uses the incorrect controlling date to calculate the timing of payment. For the purpose of Section 547(c) "the receipt date by the creditor is controlling, and not the date the Preference Period Checks 'clear' as Defendant [suggests] . . . ."[149]

Additionally, for the purposes of establishing a pre-preference historical record, the Court cannot rely on a Temporary Labor Services Agreement, which has been signed by only one party. Without a copy of the Temporary Labor Services Agreement that has been executed by both Parties, the Court, without more evidence, cannot verify the specific debtor entities that agreed to be bound, the terms to which these parties bound themselves, and the duration for which they bound themselves.[150] In the absence of pre-Preference Period historical data, Defendant's ordinary course of business defense fails.

Notwithstanding the creditors defense, the record is insufficient for the Court to draw any inferences in connection with this element. Plaintiff is correct that Defendant

---

[148] Adv. D.I. 70 at 32-33.

[149] *Sass v. Vector Consulting, Inc*, 476 B.R. at 137-38 (Bankr. D. Del. 2012).

[150] Adv. D.I. 71, Indelicato Decl., Exh. I at B000651 (August 15, 2013 Letter from B. Dranoff (CUSA) to L. Adams (FBI)).

improperly combines the payment histories of the FBI and Thomasville Debtors, when they should be analyzed separately.[151]  The record does not allow the Court to identify which Debtor made a transfer outside of the twenty-four Disputed Transfers.  Without this ability, the Court cannot evaluate which of the Disputed Transfers are subject to the ordinary course of business defense.

For the reasons stated above, Defendant fails to meet this element.

### c.  Manner Tendered

Next a court considers changes in the actual payment method between pre-Preference Period payments and the Disputed Transfers.[152]  Simple changes to payment method alone do "not take a payment out of the ordinary course."[153]  Yet, more significant changes can make transfers outside the ordinary course, as was the case where a debtor retained checks and selectively sent them to creditors despite a prior practice of mailing checks as they were printed.[154]  Any changes in the manner tendered insisted upon by the creditor are weighed against the ordinary course of business.

Defendant argues that the Disputed Transfers "were made in the same manner as previous payments from FBI to CareersUSA."[155]  The only evidence Defendant provides in support of this argument is the Wilson Affidavit, which describes how "it is not

---

[151] *Halperin v. All Am. Poly Corp.*, 581 B.R. at 141.

[152] *Burtch v. Prudential*, 2013 WL, at *7 (*citing Sass v. Vector Consulting, Inc.*, 476 B.R. at 139).

[153] *Id.* (Bankr. D. Del. July 17, 2013) (*citing Logan Square. E. v. Peco Energy Co. (In re Logan Square E.)*, 254 B.R. 850, 856 (Bankr. E.D. Pa. 2000).

[154] *See Ames Merch. Corp. v. Revere Mills Inc. (In re Ames Dep't Stores, Inc.)*, No. 03-08325, 2010 WL 2403104, at *28 (Bankr. S.D.N.Y. 2010).

[155] Adv. D.I. 68 at 5.

uncommon for the clients to pay by credit card, ACH, wire or check and vary their payment methods throughout the relationship."[156]

Plaintiff contends that before the August 15, 2013 it was not customary for the Debtors to pay by wire.  Historically, the Debtors represent that they paid exclusively by check, which they mailed by the United States Postal Service, on credit terms of approximately sixty days, in non-lump sum payments, after they received an invoice.[157] Plaintiff offers one of the Debtors' internal 2012 emails describing Defendant as a "check vendor."[158]

Plaintiff argues that on August 15, 2013 all of these customary practices changed when the Debtors received a letter from Careers that demanded immediate wire payment for the outstanding balance of $93,810.15 on reduced credit terms.[159]  Furthermore, they allege that after the August 15, 2013 letter, all subsequent payments were wired to Defendant, in frequent lump sum payments sometimes without invoices.[160]  Through a series of lump sum payments from the Transferring Debtors, Plaintiff asserts that Defendant reduced "its exposure from approximately $93,810.15 . . . on August 15, 2013 to approximately $10,656.97 on the Petition Date."[161]

---

[156] Adv. D.I. 68, Exh. C, Wilson Aff. ¶ 17.

[157] Adv. D.I. 70 at 39, 43.

[158] Adv. D.I. 71, Indelicato Decl., Exh. N at B000675 (Email A. Beckley (FBI) to R. Isaac (FBI) (10/4/12).

[159] Adv. D.I. 71, Indelicato Decl., Exh. I at B000651 (Letter from B. Dranoff (CUSA) to L. Adams (FBI)).

[160] Adv. D.I. 71, Graham Decl., Exh I at B000286 (Isaac Lump Sum Credit Memo) ("We were waiting on the invoices to even pay the $12k today."); Adv. D.I. 70 at 40 ("Prior to the $12,000 August 23 Wire and the $33,500 August 30 Wire, FBI had not paid Defendant with lump sum payments.  The August 23 and 30 Wires were the first lump sum payments that the Defendant received from FBI.").

[161] Adv. D.I. 70 at 42-43.

Defendant does not meet its burden.  While Defendant provides an affidavit that speaks to the behavior of its clients generally, it does not address the specific payment circumstances of the Disputed Transactions.  Consequently, there is no persuasive evidence to support Defendant's argument.

Nevertheless, there are various factual questions that do not permit the Court to draw an inference in Plaintiff's favor.  For example, it is unclear if the lump sum payments that Plaintiff alleges were made without invoices were made because Careers did not provide them or because the Debtors had misplaced them.[162]  It is also unclear if some or all of payment methods and terms changed because the Temporary Labor Services Agreement between the Parties had expired.

### d.  Unusual Collection Activity

Unusual collection activity in the Preference Period can similarly defeat an ordinary course defense.[163]  Unusual actions constitute "unusual behavior designed to improve the lot of one creditor at the expense of the others. . ."[164]  Telephone calls and other communications may be considered unusual if they resemble a calculated response to a deteriorating creditor-debtor relationship.[165]

---

[162] Adv. D.I. 71, Indelicato Decl., Exh. K at B000661-63 (Letter from B. Dranoff (CUSA) to R. Johnson (FBI)) ("So that you are aware, invoices are mailed every Friday to Shawn Oberreiter in HR, as requested.  In an effort to maintain this business relationship, CareersUSA's Executive Vice President, Jennifer Johnson has requested to speak with you directly.").

[163] *Burtch v. Texstars, Inc. (In re AE Liquidation, Inc.)*, No. 10-55502, 2013 WL 5488476, at *5 (Bankr. D. Del. Oct. 2, 2013) (*citing* Montgomery Ward, LLC v. OTC Int'l Ltd. *(In re Montgomery Ward, LLC)*, 348 B.R. 662, 678 (Bankr. D. Del. 2006).

[164] *Fiber Lite Corp. v. Molded Acoustical Prods., Inc.*, 18 F.3d at 225.

[165] *Burtch v. Prudential*, 2013 WL, at *3 (*citing Sass v. Vector Consulting, Inc.*, 476 B.R. at 139).

Defendant has met its burden in connection with this element.  Defendant argues that "there was no unusual action taken by either the debtor or creditor to collect or pay on the debt."[166]  In support of this argument Defendant offers the Lassman Affidavit, which asserts that the collection efforts during the Preference Period "were customary for this account and the industry."[167]  Ms. Lassman states that CareersUSA would typically (i) "contact FBI's accounts payable department to ensure that payments would be forthcoming,"[168] (ii) "advise that absent payment, that they would have to halt provision of temporary employees,"[169] (iii) "enlist the assistance of Careers' in-house legal department" if collection efforts did not attain the desired results."[170]

Plaintiff asserts that beginning with Defendant's $93,810.15 demand letter on August 15, 2013, CareersUSA engaged in unusual and coercive collection activities that departed from their pre-Preference Period activities.  Defendant's unusual collection activities allegedly included: (i) a noticeable shift in attitude,[171] (ii) "threats to terminate its provision of temporary employees" absent immediate wire payment of all outstanding debt,[172] (iii) severely shorter credit terms, (iii) use of in house legal counsel (which

---

[166] Adv. D.I. 68 at 5.

[167] Adv. D.I. 68 at 9.

[168] Adv. D.I. 68 at 9 (*citing* Adv. D.I. Exh. B, Lassman Aff. ¶ 5); *See also* Adv. D.I. 68, Exh. C, Wilson Aff. ¶ 6.

[169] Adv. D.I. 68 at 9 (*citing* Adv. D.I. Exh. B, Lassman Aff. ¶ 6); *See also*, Adv. D.I. 68, Exh. C, Wilson Aff. ¶ 7.

[170] Adv. D.I. 68 at 9 (*citing* Adv. D.I. Exh. B, Lassman Aff ¶ 12).

[171] Adv. D.I. 70 at 35-36 (comparing communications from pre-Preference Period to Preference Period).

[172] Adv. D.I. 70 at 14-15, 32, 41 (*citing* Adv. D.I. 71, Indelicato Decl., Exh. I at B000651 (Letter from B. Dranoff (CUSA) to L. Adams (FBI)).

Plaintiff asserts only assisted on one occasion prior to Preference Period),[173] and (iv) escalation of debt payment from FBI's accounts payable department to a Senior Vice President and Defendant's Executive Vice President and General Counsel.[174]  As a result of Defendant's purported unusual collection activity, Plaintiff asserts that Defendant was able to pressure the FBI Debtors to transfer approximately $113,966.87 within 2.5 weeks (August 16 to September 6, 2013) and for the Thomasville Debtors to transfer approximately $17,191.25 on August 21, 2013.

There is a genuine dispute of material fact with respect to this element.  It is unclear if Defendant were engaged in unusual collection activities or simply following up with a creditor who owed it nearly $100,000 in the context of Defendant's reimbursement business model and the expiration of a Temporary Labor Services Agreement.  At this juncture, the Court cannot draw a singular inference in favor of either litigant.

### e.  Attempts to Gain Advantage of Debtor's Condition

A creditor can take advantage of a debtor's financial condition by taking on additional collateral, assessing late fees, or through pressuring the debtor for payments.[175]  Such conduct includes "unacceptable debtor favoritism, as well as manifest

---

[173] Adv. D.I. 71, Indelicato Decl., Exh. I at B000651 (Letter from B. Dranoff (CUSA) to L. Adams (FBI); Adv. D.I. 71, Indelicato Decl., Exh. J at B000659 (B. Dranoff Email (CUSA) to R. Johnson (FBI)); Adv. D.I. 71, Indelicato Decl., Exh. K at B000661-63 (B. Dranoff Email (CUSA) to R. Johnson (FBI)).

[174] Adv. D.I. 71, Indelicato Decl., Exh. J at B000659 (B. Dranoff Email (CUSA) to R. Johnson (FBI)); Adv. D.I. 71, Indelicato Decl., Exh. K at B000661-63 (B. Dranoff Email (CUSA) to R. Johnson (FBI)).

[175] *Sass v. Vector Consulting, Inc.*, 476 B.R. at 140.

selective preference period payments to designated creditors by troubled debtors."[176] Furthermore, a creditor's awareness of a debtor's financial condition can support a finding that the creditor attempted to collect a debt ahead of other creditors.[177] Such attempts to collect from the debtor are more likely to be outside the ordinary course when the credit terms in the Preference Period are out of character with the long-term relationship of the parties.

Defendant argues that it did nothing to gain an advantage in light of FBI's deteriorating financial condition as it was unaware of the Transferring Debtors' financial condition during the Preference Period.

Defendant does not carry its burden for this element.  Defendant's assertion that he was not aware of the financial condition of the Transferring Debtors is flatly contradicted by evidence in the record.  On at least two occasions, it is clear that Defendant was aware of the Debtors' deteriorating financial condition.  This awareness was first exhibited in its August 15, 2013 letter to the FBI Debtors in which Defendant demands immediate, lump sum, wire payment of approximately $93,810.15.[178]  In this letter Defendant notes, "it is paramount that Furniture Brands' account be brought current immediately, especially in consideration of Furniture Brands' strained payment history with CareersUSA, as well as **Furniture Brands' current, worrisome financial**

---

[176] *Camelot Music, Inc. v. MHW Advert. & Pub. Relations Inc. (In re CM Holdings, Inc.)*, 264 B.R. 141, 154 (Bankr. D. Del. 2000).

[177] *Id* at 154.

[178] Adv. D.I. 71, Indelicato Decl., Exh. I at B000651 (Letter from B. Dranoff (CUSA) to L. Adams (FBI).

**status**."[179]  Eight days later, Defendant asserts the following in an email to the Debtors: "[I]n conjunction with **the company's troubling financial status**, CareersUSA's management has determined that it cannot continue with this level of exposure."[180]  The Defendant's more aggressive payment terms in conjunction with an awareness of the Debtors' financial condition are probative.

While this Court has acknowledged that a Defendant's awareness of the deteriorating financial condition and changed payment terms can support a finding that a creditor attempted to gain advantage over  the debtor and other creditors, in this case, questions of fact remain that preclude the Court from determining if Defendant will be able to satisfy this element at trial.

While it is clear Defendant did not meet its burden under this element, it is unclear if, beginning on August 15, 2013 Defendant acted based on an awareness of the Debtors' condition to gain advantage or acted based on a motivation to take a more aggressive position in connection with a client who owed it nearly $100,000 and whose contract had expired.  Without more context about collection activity, similarity of transactions, manner tendered, and the Temporary Labor Services Agreement, the Court cannot conclude Defendant acted on an awareness of the Debtors' financial condition to gain advantage.

---

[179] Adv. D.I. 71, Indelicato Decl., Exh. I at B000651 (Letter from B. Dranoff (CUSA) to L. Adams (FBI)) (emphasis added).

[180] Adv. D.I. 71, Indelicato Decl., Exh. J at B000659 (B. Dranoff Email (CUSA) to R. Johnson (FBI)) (emphasis added).

Defendant has not met its burden under Section 547(c)(2)(A).  Its failure to present sufficient evidence and unresolved factual issues related to similarity of transactions, manner tendered, unusual collection activity, and attempts to gain advantage of the debtor's condition preclude the Court from finding in its favor.

### 3. Objective Standard - § 547(c)(2)(B)

To satisfy the requirements of 547(c)(2)(B), Defendant must demonstrate that the disputed payments were made in the ordinary course of business in the creditor's industry.[181]

As the Third Circuit has held, transfers may be avoided only if they are "so idiosyncratic as to fall outside that broad range" of practices customary in the creditors industry.[182]  This Court and others within the Third Circuit have frequently characterized "ordinary business terms" as embracing a "broad range" of credit practices that are "in harmony with the range of terms prevailing as some relevant industry norms."[183]  "Only dealings that are so unique as to fall outside this broad range should be considered extraordinary and beyond the scope of § 547(c)(2)([B]) . . . . Even departures from that industry's norm which are not so flagrant as to be 'unusual' lie within the protection afforded by § 547(c)(2)([B])."[184]

---

[181] *Sass v. Vector Consulting, Inc.*, 476 B.R. at 140 (citation omitted).

[182] *See e.g., Argus Mgmt. Grp.*, 320 B.R. at 263 (Bankr. D. Del. 2005).

[183] *See e.g., Forklift Liquidating Tr. v. Custom Tool & Mfg. Co. (In re Forklift LP Corp.)*, 340 B.R. 735, 739 (Bankr. D. Del. 2006) (quoting *Fiber Lite Corp. v. Molded Acoustical Prods., Inc.*, 18 F.3d at 226).

[184] *Sass v. Vector Consulting, Inc.*, 476 B.R. at 140 (*citing Bohm v. Golden Knitting Mills, Inc. (In re Forman Enters, Inc.)*, 293 B.R. 8484, 859, 860 (Bankr. E.D. Pa. 2003).

Because Congress did not intend to upset commercial dealings with distressed parties, the "ordinary business terms" test of Section 547(c)(2)(B) is necessarily a broad one, and the evidentiary standard is not formidable.  This Court has held, "the creditor is not required to prove rigorous definitions of either the industry or the credit standards within that industry.  The creditor must simply establish a 'range of terms' on which 'firms similar in some general way to the creditor' deal."[185]

The Section 547(c)(2)(B) standard may be broad, but it nonetheless demands substance.  "Courts have rejected evidence of an industry standard where it is too general."[186]  While expert testimony is not necessarily required, a defendant must provide admissible non-hearsay testimony related to industry credit payment, and general business terms in order to support its position.[187]  "[C]ourts look for objective definitive evidence supported by specific data to meet the burden of proof."[188]  This evidence serves as a benchmark against which the Court can evaluate Defendant's practices.  "Where a defendant presents only the party's practices and gives no general industry standards for comparison, it has not met its burden under Section 547(c)(2)(B).[189]"

---

[185] *Sass v. Vector Consulting, Inc.*, 476 B.R. at 141.

[186] *Stanziale v. S. Steel Supply, L.L.C. (In re Conex Holdings, LLC)*, 518 B.R. 269, 286 (Bankr. D. Del. 2014) (citation omitted).

[187] *Hechinger Liquidation Tr. v. Robert Lee Rager* (*In re Hechinger Investment Co. of Del., Inc.)*, 298 B.R. 240 (Bankr. D. Del. 2003).

[188] *Stanziale v. S. Steel Supply, L.L.C.*, 518 B.R. at 286 (citation omitted).

[189] *Argus Mgmt. Grp.*, 327 B.R. at 219 (*citing Camelot Music, Inc. v. MHW*, 264 B.R. at 141 (Bankr. D. Del. 2000)).

Here, Defendant asserts that it has satisfied Section 547(c)(2)(B) because all of CareersUSA's disputed collection practices (e.g. contact with the Debtor's accounts payable department, threat of service termination absent payment, and use of in-house legal personnel in connection with the Transfers) were customary throughout the staffing industry. To support the assertion that its collection practices were aligned with industry standards Defendant references the Wilson Affidavit, which states that the disputed collection efforts were "customary for countless clients of Careers and are generally common throughout the industry."[190]

Defendant has not met its burden under Section 547(c)(2)(B) for any of the Disputed Transfers. Its failure to present "objective definitive evidence supported by specific data to meet [its] burden of proof" precludes the Court from finding in its favor on this element.

Therefore, the Court will deny Defendant's Motion on the ordinary course of business defense with respect to all Disputed Transfers.

In conclusion, the Court will deny the ordinary course defense cross-motions. The Court will deny the Motion regarding the ordinary course of business defense both because Defendant has not met its burden and because there are numerous unresolved issues of fact in connection with the elements of this defense. These unresolved issues pertain to the similarity of transactions, manner tendered, attempts to gain advantage of the debtor's condition, and unusual collection activity. Given these unresolved factual

---

[190] Adv. D.I. 68, Exh. C, Lassman Aff. ¶22.

issues, the Court will also deny the Cross-Motion in connection with the ordinary course of business defense.

### C. The Court Will Deny the Motion and Grant, in Part, and Deny, in Part, the Cross-Motion Regarding the Contemporaneous Exchange for New Value Defense

Defendant also asserts a contemporaneous exchange of new value defense under Section 547(c)(1).

This defense "protects transactions that were meant to be cash transactions, but which unavoidably involved a brief extension of credit."[191]  The defense is "intended to encourage creditors to continue to deal with troubled debtors by preventing trustees from avoiding payments that were clearly intended to support a new transaction instead of an antecedent debt."[192]

To gain a contemporaneous exchange of new value defense, Defendant must prove "(1) it extended new value to the debtors; (2) the parties intended the disputed transfers to be contemporaneous exchanges; and (3) the exchanges were, in fact, substantially contemporaneous"[193]

### 1. Extension of New Value to the Debtors

Defendant argues, by reference to the Wilson Affidavit, that CareersUSA extended new value to the Debtors in the form of its weekly and daily "staffing services rendered

---

[191] *Halperin, Inc. v. Innovative Delivery Sys., Inc.*, 581 B.R. at 413 (citations omitted).

[192] *Myers Controlled Power, LLC v. Gold (In re Truland Grp., Inc.)*, 604 B.R. 258 (E.D. Va. 2019) (citation omitted).

[193] *Halperin, Inc. v. Innovative Delivery Sys., Inc.*, 581 B.R. at 387 (citations omitted).

by newly provided staffing associates."[194]    It adds that the Wilson Affidavit is further

supported by the Lassman Affidavit's "review and analysis of the exhibits attached to the

Complaint including the specific dollar amounts of those transfers/payments made by

the Debtors to Careers during the preference period in exchange for the new value . . .

provided by Careers to the Debtors."[195]

Defendant responds that "Defendant has failed to establish the extent of the

purported new value with respect to the affected Transfers."[196]

The Court finds that Defendant has not met its burden under this element.  The

Court agrees with Plaintiff and with "what now appears to be the unanimous view . . .

that a defendant asserting the contemporaneous new value defense under

Section 547(c)(1) must prove the amount of the value of any 'new value' provided to the

Debtor [with specificity], and has no Section 547(c)(1) defense beyond the amount of such

value."[197]  Defendant does not meet this requirement.

      2.   *The Parties' Intention for the Disputed Transfers to be Contemporaneous;*
           *Determination as to Whether the Exchanges Were, in Fact, Substantially*
           *Contemporaneous*

Defendant argues that the Parties intended a contemporaneous exchange based

on (i) Defendant's knowledge that their exchange was always intended be

---

[194] Adv. D.I. 77 at 19 (citing D.I. 68, Exh. C, Wilson Aff. ¶ 14)

[195] Adv. D.I. 77 at 19-20.

[196] Adv. D.I. 70 at 44.

[197] *Dery v. Karafa (In re Dearborn Bancorp. Inc.)*, 583 B.R. 395, 416 (Bankr. E.D. Mich. 2018); *See Creditors Comm. v. Spada (In re Spada)*, 903 F. 2d 971, 975 (3d Cir. 1990) ("[N]ew value is defined as money . . . goods, services, or credit.  This language necessarily requires a specific dollar valuation of the new value—the money's worth—that the debtor received in the exchange."); *See also Burtch v. Masiz*, 500 B.R. at 397 (quotation marks and citations omitted).

contemporaneous in nature, and (ii) unspecified "wire transfer payments(s) (of which he cites August 30, 2013 as the only example) issued by FBI to CareersUSA substantially contemporaneously with the provision of staffing services . . . ."[198]

Plaintiff argues that Defendant has not established the contemporaneous intent of the Parties.  It highlights that the "Defendant admits the payment terms under the Parties' Temporary Labor Services Agreement  'were sixty days from receipt of invoice' . . . and that "even after threatening to terminate its staffing services  clear intent of the parties, Defendant still maintained credit terms with the Debtors, albeit shorted to ten days and again to seven days."[199]  It adds that Defendant cannot establish that any of the exchanges were, in fact, contemporaneous based on: (i) Defendant's description of a billing process whereby temporary workers would render service to the Debtor and CareersUSA would pay temporary employees in advance of the Debtors' payment to Defendant, and (ii) Defendant's admission that most transfers were paid within  twenty-four to seventy-four days of the invoice date.[200]

The Court finds that Defendant does not carry its burden with respect to this element.  Defendant provides no compelling evidence that the Parties ever intended the payments to be contemporaneous or that they were in fact contemporaneous exchanges. The "mere statement that there was no intent for the exchange to be substantially

---

[198] Adv. D.I. 68 at 12.

[199] Adv. D.I. 70 at 45.

[200] Adv. D.I. 70 at 45.

contemporaneous is insufficient . . ."[201]  Defendant's conclusory statements yield no evidentiary value.

Courts have found "the existence of a delay between the creation of a debt and its payment is a hallmark of a credit relationship, which is, by definition a relationship in which the creditor entrusts the debtor with goods [or services] without present payment."[202]  The Third Circuit and others have held that where there is no delay between "when a debt arises and payment of the obligation" the Section 547(c)(1) defense is not implicated because of the absence of an antecedent debt.[203]  The defense is available, however, for a narrow band of transactions involving antecedent debt "that were meant to be cash transactions, but which unavoidably involved a brief extension of credit."[204]  Consequently, the existence of a credit relationship between the parties is probative but, not by itself, outcome determinative.

For example, in *In re Payless* the Third  Circuit concluded that the exchange was contemporaneous when "the debtor generally paid the creditor [mostly within five days] for specific shipments some time after the goods were shipped, but before or at the time that the shipments arrived at the debtor's facility."[205]  In another case, this Court held that the payments made eight and eleven days after delivery of goods were substantially contemporaneous given the complexities inherent in generating the required paperwork

---

[201] *Burtch v. Conn. Cmty. Bank (In re J. Silver Clothing, Inc.)*, 453 B.R. 518, 527 (Bankr. D. Del. 2011).

[202] 34 *Baxter Dunaway, Law of Distressed Real Estate § 34:66 (2019).*

[203] *Hechinger Inv. Co. of Del., Inc. v. Universal*, 489 F. 3d at 574.

[204] *Halperin v. Innovative Delivery Sys.*, 581 B.R. at 413 (citation omitted).

[205] *Hechinger Inv. Co. of Del., Inc. v. Universal*, 489 F. 3d at 575.

for the transaction.[206]  These two cases are distinguishable from *FBI Wind Down, Inc. v. Innovative Delivery Systems, Inc*, where this Court found that there was no contemporaneous exchange where payments were made 11 to 417 days after the completion of service.  These examples demonstrate the flexibility of the standard.

Here, the record shows that for all payments up to an including August 15, there is no dispute of material fact that there was no intent and no evidence that the exchange between the Parties was contemporaneous.  While the Court does not have access to a fully executed Temporary Labor Services Agreement, both Parties reference a 60-day credit term governing their transactions.[207]  Nowhere do the Parties party dispute that this payment term applied to both the Thomasville and the FBI Debtors.

Even if the Court were to accept Defendant's flawed course of dealing data–90 percent of CareersUSA's invoices were paid within 24 to 74-days and a 56-day average payment timeframe–these numbers do not distinguish the case before the Court from *FBI Wind Down, Inc. v. Innovative Delivery Systems, Inc.*  Here, Defendant's payment period numbers are well within the 11 to 417 day range this Court established was sufficient to

---

[206] *Burtch v. Revchem Composites*, 2015 WL, at *302.

[207] Adv. D.I. 68 at 8 ("The Temporary Labor Services Agreement by and between FBI and Careers . . . expressly provides for payment to be made by FBI within sixty days after receipt of CareersUSA's invoices.") (Defendant's Brief); Adv. D.I. 68, Exh. C, Wilson Aff. ¶ 16 ("FBI regularly and customarily issued payment to Careers within the allotted 60-day timeframe, including but not limited to a wired payment from FBI to Careers on August 30, 2013 for staffing services rendered in July and August of 2013.") (Defendant's Brief); Adv. D.I. 70 at 39 ("Defendant reduced FBI's terms from sixty days to ten days and then to seven.") (Plaintiff's Brief); Adv. D.I. 70 at 41 (Defendant demanded "severely shortened credit terms from sixty days to just ten days.") (Plaintiff's Brief).

deny the contemporaneous exchange of new value defense in.[208]  Like in *FBI Wind Down, Inc. v. Innovative Delivery Systems, Inc*, the Disputed Transfers in this case were made in satisfaction of the past completion of services.

As previously stated, on August 15, 2013, after what appeared to be a relationship governed by longstanding deal terms, Defendant sent a letter to the Debtors that fundamentally changed the relationship between the Parties.[209]  In this letter, Defendant informed the Debtors: (i) that the Temporary Labor Services Agreement which governed previous transactions had expired, (ii) that it had changed the credit terms from sixty days to ten days (Defendant later reduced the FBI Debtors' credit terms to seven days), and (iii) that it demanded a lump sum payment for the outstanding balance.  Following this letter, Plaintiff made a series of transfers about which the Court does not have sufficient knowledge to make a determination in connection with this defense.  Because the record is insufficient, the Court is unable to draw any inferences as to the intent of the parties or the nature of these transactions themselves.  While a fact-intensive analysis would reveal the intent and nature of these transactions, this analysis is inappropriate at the summary judgment stage.

For the reasons stated above, the contemporaneous exchange for new value defense in unavailable to Defendant.

---

[208] *Sass v. Vector Consulting, Inc.*, 476 B.R. at 138 (*citing Barnhill*, 503 U.S. at 401-402) (recognizing that Courts of Appeals have unanimously agreed that a "date of delivery" rule should apply to check payments for the purposes of § 547(c)).

[209] Adv. D.I. 71, Indelicato Decl., Exh. I at B000651 (Letter from B. Dranoff (CUSA) to L. Adams (FBI)).

In conclusion, the Court will deny the Motion for this defense with respect to all Disputed Transfers as Defendant has not met its evidentiary burden.  Additionally, the Court will grant, in part, and deny, in part, the Cross-Motion regarding this this defense. Specifically, the Court will grant summary judgment to Plaintiff with respect to all Disputed Transfers before August 15, 2013, as it is clear that these transfers were not intended to be, nor were they in fact, contemporaneous exchanges.  Because it is unclear whether the remaining Disputed Transfers were substantially contemporaneous, the Court will deny Plaintiff's summary judgment motion with respect to all Disputed Transfers after August 15, 2013.

### D.  The Court Will Deny the Motion and Grant, in Part, and Deny, in Part, the Cross-Motion Regarding the Subsequent New Value Defense

The Section 547(c)(4) new value defense "allows a creditor to retain an otherwise voidable preference if the creditor gave the debtor new value after the preferential transfer."[210]  New value is defined as "money or money's worth in goods, services or new credit . . . that is neither void nor voidable by the debtor or the trustee under applicable law."[211]  This defense "is intended to encourage creditors to work with companies on the verge of insolvency . . . [and] to ameliorate the unfairness of allowing the trustee to avoid all transfers made by the debtor to a creditor during the preference period without giving any corresponding credit for advances of new value."[212]  As long as "the new value

---

[210] *In re NWL Holdings, Inc.*, 2013 WL, at *8 (citations omitted).

[211] 11 U.S.C. § 547(a)(2).

[212] *Halperin v. Innovative Delivery Sys., Inc.*, 581 B.R. at 387 (citations omitted).

augments the estate in the same proportion as the value of the transfer, the estate, and consequently other creditors, are not harmed."[213]

This Court has previously held that a successful subsequent new value defense requires "two elements: (1) after receiving the preferential transfer, the creditor must have advanced 'new value' to the debtor on an unsecured basis; and (2) the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition."[214]  This rule has been dubbed the "subsequent advance approach" and has been employed by this Court on multiple occasions.[215]  Under this approach, the Defendant's exposure would be determined by "(i) the value of transfer . . . less (ii) the value of the services provided (i.e. new value provided)' plus (iii) the value of [additional] transfer[s]."[216]

Defendant alleges, by reference to the Wilson Affidavit, that it provided unsecured new value to or for the benefit of the FBI Debtors in the form of staffing services.  It references invoices attached to its November 11, 2013 proof of claim to argue that it has provided $10,656.97 of new value for its staffing services.  It also argues that it provided $125,923.20 of new value in the form of separation fees for the Debtors' improper conversion of its temporary associates in breach of the Parties' Temporary Labor Services Agreement.

---

[213] *Id*. at 412 (citation omitted).

[214] *Halperin v. Innovative Delivery Sys., Inc.*, 581 B.R. at 412 (citation omitted).

[215] *Id.* (citations omitted).

[216] *Id.* (citations omitted).

Defendant has demonstrated through its unpaid invoices, dated one day before the Petition Date, that it provided unsecured new value to the Transferring Debtors after the alleged preferential transfers were made. The Parties agree that Defendant is entitled to a subsequent value defense in the amount of $10,656.97, resulting from invoices open as of the Petition Date. However, the Parties disagree about the how this new value should be allocated to specific Debtors. Defendant states in its brief and in its proof of claim that all $10,656.97 of new value was provided to the FBI Debtors while Plaintiff contends that $6,541.76 and $4,115.21 should be applied to the FBI preferences and Thomasville preferences respectively.[217] The Court holds that a material dispute exists, as to the entity to which new value has been given.

Defendant does not meet its evidentiary burden with respect to the purported separation fees. Defendant offers no evidence to show "what was done . . . , by whom it was done, when and where it was done, and whether there was any value or benefit to the debtor."[218] Absent additional evidence, the Court cannot rely on a copy of the Temporary Labor Services Agreement, which was not fully executed.

For the reasons set forth above, the Court will deny the Motion and deny Plaintiff's Cross-Motion as to this defense. With respect to separation fees, it is unclear if Defendant will be able to prove its case at trial; there is also a dispute of material fact concerning

---

[217] Adv. D.I. 70 at 46.

[218] *Carn v. Audientis LLC (In re SpecAlloy Corp.)*, 582 B.R. 801, 803 (Bankr. M.D. Ala. 2018).

how Defendant's $10,656.97 staffing services new value is allocated between the Transferring Debtors.

## V.    The Court Will Deny the Motion Regarding the Mere Conduit Defense

Defendant states that throughout its business relationship with the Debtors, "all payments made by the debtor to Careers . . . were for the benefit of the debtor, governmental authorities, those employees provided to the debtor by Careers, subcontractors of CareersUSA, and Careers' subcontractor's employees provided to the debtor."[219] Despite providing a detailed list of beneficiaries of the Debtors' payments, Defendant does not list itself as one of them.  By representing its business relationship with the Debtors in this manner, Defendant effectively invokes the "mere conduit" defense.

Section 550(a) permits a trustee to recover transfers avoided under Sections 547, 548, and 549 from "the initial transferee of such transfers[s] or [from] the entity for whose benefit such transfer[s were] made[.]"[220]  Courts have held that a defense is available for "parties who act as a mere conduit in receiving a transfer solely for another and not for their own benefit."[221]  A conduit "facilitates the passing of property to someone else" and

---

[219] Adv. D.I. 68 at 17.

[220] 11 U.S.C. § 550; *See e.g. Argus Mgmt. Grp. v. GAB Robins, Inc., (In re CVEO Corp.)*, 327 B.R. 210 (Bankr. D. Del. 2005).

[221] *Argus Mgmt. Grp.*, 327 B.R. at 216.

is not a "transferee" from whom the trustee (to the extent that a transfer is avoided under 547 and 548 (among others))  could recover transferred property under Section 550.[222]

The Third Circuit has adopted the "dominion and control test" to distinguish whether a party is a transferee within the meaning of Section 550 or a mere conduit.  To be a "mere conduit" a defendant must "establish that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use." [223]  The goal of the test is to determine whether a defendant's transfer to a third-party represents the fulfillment of an obligation to guide the transfer of the debtor's funds or the defendant's fulfillment of its own separate debt obligation using its own funds.

Courts often examine the sequence of payments between the litigants and the third-party to answer this question.  Where the debtor reimburses the defendant for the defendant's advance payment to a third-party, the defendant is "[is] not under any obligation to use the transfers for the benefit of the claimants" and is not a "mere conduit."[224]  "Courts have made it clear, one cannot be a creditor and receive a payment to satisfy a debt—this is the hallmark of a preferential transfer."[225]  This principle remains

---

[222] *Meininger v. TMG Staffing Serv., Inc. (In re Cypress Rests. of Ga, Inc.)*, 332 B.R. 60, 64 (Bankr. M.D. Fla. 2005) (citations omitted); *See also In re Whitacre Sunbelt, Inc.*, 200 B.R. 422 (Bankr. N.D. Ga. 1996) ("The terms 'initial transferee' and 'intermediate or mediate transferee' are not defined in the Bankruptcy Code.  The courts have developed an exception to the liability of the initial transferee by holding that a party is not liable as the initial transferee if it is a conduit . . .").

[223] *Forman v. P&M Brick LLC*, 2016 WL, at *4 (quotations and citations omitted).

[224] *Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 104 (Bank. D. Del. 2006).

[225] *Id*. at 105 (*citing Meininger v. TMR Staffing*, 332 B.R. at 65 ("Because [the defendant] is a creditor, [the defendant] cannot be a mere conduit.")).

true even where a debtor imposes an obligation on the defendant to pass along funds to

a third-party.[226]   A true conduit's obligation, however, [to pay a third-party] does not

arise until the debtor pa[ys] the conduit . . ."[227]

In the Wilson Affidavit, the Vice President of Operations and thirteen-year

employee of Defendant describes CareersUSA's business model as follows:

> As for the payment process, with respect to the business
> relationship between Careers and FBI and/or otherwise,
> temporary associates' hours are entered PerfectTIME®,
> Careers' proprietary time and attendance solution; ii) entered
> time is submitted to the client for the client's review and
> approval; **iii) temporary associates are paid contingent upon
> client's approval of the individuals' time/hours, based on a
> pay rate determined by the client, and in  advance of the
> client's payment to Careers**; iv) client pays (or should pay)
> Careers in accordance with the terms of the parties'
> contractual agreement.
>
> . . .
>
> Careers paid weekly wages; **FBI paid Careers to reimburse
> for such wages with minimal profit**.
>
> . . .
>
> [T]his is a regular and customary practice of Careers in the
> ordinary course of its business or financial affairs with FBI, as
> well as with other clients of Careers, because temporary
> associates are paid by Careers because Careers receive
> payment from its clients for the corresponding services.[228]

---

[226] *Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*, 458 B.R. 155 (Bankr. D. Del 2011) (holding that even where a debtor imposed an obligation on the defendant to pass along the vast majority of funds at issue, where the debtor had reimbursed the defendant for a payment the defendant made to a third-party, the defendant exercised "dominion and control" over funds for it to be a "transferee" under Section 550.).

[227] *Golden v. The Guardian*, 343 B.R. at 104 (*citing Meininger v. TMR Staffing*, 332 B.R. at 65).

[228] Adv. D.I. 68, Exh. C, Wilson Aff. at 42-44 (emphasis added).

The Wilson Affidavit sets forth a reimbursement payment model with the Debtors specifically, and with all its clients.  As a result, the Court finds that CareersUSA exercised dominion and control over the transfer, and is, therefore, not a mere conduit for the Debtor.

The Court will deny the Motion regarding this defense.

## VI.   The Court Will Deny the Cross-Motion Regarding Recovery Under Section 550

Plaintiff also seeks relief pursuant to Section 550.  Section 550 provides that "to the extent that a transfer is avoided under section 544, 547, [or] 547 . . . of this title, the trustee may recover . . . the property transferred . . . from the initial transferee of such transfer or the entity for whose benefit  such transfer was made."[229]   As stated above, Plaintiff's Section 547(b) and Section 548 actions have not been fully adjudicated.  Because the condition precedent to recovery has not been met, the Court denies the Motion regarding Section 550.

## VII.   The Court Will Deny the Cross-Motion Regarding Disallowance of Claims, Objection, and Setoff

Plaintiff's Motion seeks summary judgment for disallowance of the Disputed Transfers under Section 502(d), and objection and setoff of the Disputed Transfers under Section 8.9 of the Plan.

### 1.  Disallowance under § 502(d)

A claim may be disallowed under Section 502(d) if there is a judicial determination of a claimant having "received preferential transfer pursuant to Section 547 or property

---

[229] 11 U.S.C. § 550.

recoverable pursuant to Section 550."[230]  "502(d) is triggered only after a judgment has

been entered requiring the turnover of property to the estate. "[231]  Because the Court has

not made a judicial determination as to any of the Disputed Transfers, Plaintiff remains

unable to produce the requisite evidence for 502(d) relief.  Consequently, the Court denies

the Motion as to disallowance.

> 2. *Objection under the Plan*

Defendant argues, pursuant to Plan Sections 8.9, 9.5, and 9.7, that the Disputed

Transfers should be offset against the Claim under the Plan.

Plan Section 8.9 states in relevant part:

> The Liquidating Trustee may, but shall not be required to, set off against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant; provided, however, neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Liquidating Trust of any such claim they may have against such claimant.[232]
>
> . . .

Plan Section 9.5 states in relevant part:

> Notwithstanding any other provision hereof, if any portion of a Claim is Disputed, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.[233]

---

[230] *Halperin v. Innovative Delivery Sys., Inc*, 581 B.R. 387, 414 (Bankr. D. Del. 2018) (*citing Cohen v. TIC Fin. Sys. (In re Ampace Corp.)*, 279 B.R. 145, 162-63 (Bankr. D. Del. 2002).

[231] *DHP Holdings II Corp. v. Peter Skop Indus., Inc. (In re DHP Holdings II Corp.)*, 435 B.R. 264, 272-273 (Bank. D. Del. 2010).

[232] Del. Bankr. 13-12329, D.I. 1799 at 37.

[233] Del. Bankr. 13-12329, D.I. 1799 at 41.

. . .

Plan Section 9.7 States in relevant part:

> Any Claims held by Persons from which property is recoverable under section . . . 550 . . . of the Bankruptcy Code or by a Person that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Persons may not receive any Distributions on account of their Claims until such time as such Causes of Action against such Persons have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by such Person have been turned over or paid to the Liquidating Trust.[234]

By the language of the Plan, any form of offset or objection to the Claim can only come with a "Final Order."  Because the Court has not fully adjudicated any Disputed Transfer in connection with Plaintiff's Section 547(b) action, a Final Order will not have occurred that can lead to any disallowance of the Claim.  The prematurity of Plaintiff's request requires the Court to deny the relief requested in the Motion.

Because the Court has not fully adjudicated the avoidance action, the Court will deny the Cross-Motion regarding disallowance of claims, objection, and setoff.

## CONCLUSION

In sum, the Court will deny Defendant's Motion and grant, in part, and deny, in part, Plaintiff's Cross-Motion.

The Court will deny the Motion and grant, in part, and deny in part, the Cross-Motion regarding the Section 547(b) preference action.  Plaintiff has made a prima facie

---

[234] Del. Bankr. 13-12329, D.I. 1799 at 41.

showing that the all prepetition Transfers were preferential except those on August 21, 23, and 30, 2013.  With respect to the August 21, 23, and 30, 2013 Transfers, factual issues remain solely with regard to whether they were made for or on account of an antecedent debt.

The Court will deny the Section 548 Fraudulent Transfer Cross-Motions.  Because the Court has found the Disputed Transfers to have been on account of an antecedent debt or to have implicated factual questions concerning the same, the Court need not address the reasonably equivalent value issue at this time.  Defendant does not meet its evidentiary burden in connection with its request for relief.

The Court will deny the Cross Motion as to the ordinary course of business defense.  Defendant has not met its burden, and there are numerous unresolved issues of fact that pertain to the similarity of transactions, manner tendered, attempts to gain advantage of the debtor's condition, and unusual collection activity, and the Temporary Labor Services Agreement.

The Court will deny the Motion and grant, in part, and deny, in part, the Cross-Motion regarding the contemporaneous exchange for new value defense. Defendant has not met its evidentiary burden.  It is clear that all Disputed Transfers before August 15, 2013 were not intended to be, nor were in fact, contemporaneous exchanges for new value.  Nevertheless, issues of fact preclude the Court from determining whether all Disputed Transfers after this date were intended to be, or were in fact, contemporaneous exchanges for new value.

The Court will deny the Cross-Motion regarding the Subsequent New Value Defense.    Defendant does not meet its evidentiary burden with respect to the "separation fees" new value defense.  It is unclear if Defendant will be able to meet its burden with respect to separation fees.  There is, however, a genuine dispute of material fact concerning how Defendant's $10,656.97 staffing services new value is allocated between the Transferring Debtors.

The Court will deny the Motion regarding the mere conduit defense.  The record demonstrates that CareersUSA established a reimbursement payment model with the Debtors in which Defendant exercised dominion and control over the transfer.

The Court will deny the Cross-Motion regarding Section 550 as Plaintiff's Section 547 and Section 548 avoidance actions have not been fully adjudicated.

Finally, the Court will deny the Cross-Motion regarding disallowance of claims, objection, and setoff because the Court has not fully adjudicated the avoidance action. An order will be issued.